**WEILAND, GOLDEN, SMILEY, WANG EKVALL & STROK, LLP**
Evan D. Smiley, State Bar No. 161812
esmiley@wgllp.com
Hutchison B. Meltzer, State Bar No. 217166
hmeltzer@wgllp.com
Robert S. Marticello, State Bar No. 244256
rmarticello@wgllp.com
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
Telephone: 714-966-1000
Facsimile: 714-966-1002

Attorneys for Alfred H. Siegel, Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

In re

LBREP/L-Sun Cal Master I, LLC, et al.,

Debtor.

______ Affects LBREP/L-SunCal Master I, LLC, Only

______ Affects LBREP/L-SunCal McAllister Ranch, LLC, Only

______ Affects LBREP/L-SunCal McSweeny Farms, LLC, Only

______ Affects LBREP/L-SunCal Summerwind Ranch, LLC, Only

__X__ Affects All Debtors.

Case No. 8:08-bk-15588-ES

Chapter 11 Case

(Jointly Administered with Case Nos. 8:08-bk-15637-ES; 8:08-bk-15639-ES; and 8:08-bk-15640-ES)

**MOTION TO APPROVE COMPROMISE BETWEEN TRUSTEE, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND LEHMAN COMMERCIAL PAPER INC., AS ADMINISTRATIVE AGENT FOR FIRST LIEN LENDERS; AND MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF ALFRED H. SIEGEL IN SUPPORT**

**DATE:** **November 3, 2009**
**TIME:** **10:30 a.m.**
**PLACE:** **Courtroom 5A, 411 W. Fourth St., Santa Ana, CA 92701**

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

# TABLE OF CONTENTS

Page

I. INTRODUCTION .... 1
II. BACKGROUND .... 2
A. General Background .... 2
B. Significant Post-Petition Events .... 3
1. The LCPI Stay Relief Motions .... 3
2. Trustee's Use Of Cash Collateral .... 3
C. Pre-Petition Events Giving Rise to Claims Against LCPI .... 4
1. The First And Second Lien Credit Agreement .... 5
2. The Third Lien Credit Agreement .... 6
3. The Debtors' Alleged Defaults Under The Lien Credit Agreements .... 6
III. PROPOSED SETTLEMENT .... 7
IV. LEGAL ANALYSIS .... 11
A. The Probability Of Success In The Litigation .... 12
B. The Difficulties To Be Encountered In The Matter Of Collection .... 14
C. The Complexity, Expense, Inconvenience, and Delay .... 14
D. The Paramount Interests Of Creditors .... 15
V. CONCLUSION .... 17
DECLARATION OF ALFRED H. SIEGEL .... 18

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

## TABLE OF AUTHORITIES

Page(s)

### CASES

*In re A & C Props.*, 784 F.2d 1377 (9th Cir. 1986) .......... 12

*In re America West Airlines, Inc.*, 214 B.R. 382 (Bankr. D. Ariz. 1997) .......... 12

*In re Hermitage Inn, Inc.*, 66 B.R. 71 (Bankr. D. Colo. 1986) .......... 12

*In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415 (B.A.P. 9th Cir. 2003) .......... 12

*In re Schmitt*, 215 B.R. 417 (B.A.P. 9th Cir. 1997) .......... 12

*In re World Health Alternatives, Inc.*, 344 B.R. 291 (Bankr. D. Del. 2006) .......... 12

### STATUTES

11 U.S.C. § 363(c) .......... 3, 4

11 U.S.C. § 363(f) .......... 16

11 U.S.C. § 1123(a)(5)(D) .......... 8

### RULES

Federal Rule of Bankruptcy Procedure 9019(a) .......... 11, 12

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE:**

Alfred H. Siegel ("Trustee"), the chapter 11 trustee of the jointly administered estates of LBREP/L-SunCal Master I, LLC (the "Parent Debtor"), and LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC (collectively, the "Subsidiary Debtors," and together with the Parent Debtor, the "Debtors"), submits this Motion (the "Motion") to Approve Compromise Between Trustee, the Official Committee of Unsecured Creditors (the "Committee"), and Lehman Commercial Paper Inc., as First Lien Administrative Agent for the First Lien Lenders ("LCPI").[1] In support of the Motion, Trustee submits the following memorandum of points and authorities, and the Declaration of Alfred H. Siegel (the "Siegel Declaration").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

By this Motion, Trustee seeks approval of a term sheet (the "Term Sheet") globally resolving the disputes existing between Trustee, the Committee, and LCPI. Approval of the Term Sheet will settle the estates' claims against LCPI and resolve LCPI's stay relief proceeding, thereby saving the estates significant administrative expense and eliminating the risk associated with litigation. Under the Term Sheet, the estates will immediately receive $6.5 million in cash to administer these cases, preserve estate property, and pursue other litigation, and the potential to recover significant funds in the future for distribution to unsecured trade creditors. Moreover, by resolving the disputes between Trustee and LCPI, the Term Sheet will clear the way for Trustee to propose a chapter 11 plan with the support of LCPI, and to expeditiously pursue confirmation of the same. Trustee believes that the proposed settlement is in the best interests of the bankruptcy

[1] Unless the context clearly requires otherwise, LCPI means and refers to LCPI only in its capacity as administrative agent.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

estates. Accordingly, Trustee requests that the Court enter an order approving the Term Sheet.

## II. BACKGROUND

### A. General Background

On or about September 10 and 11, 2008 (the "Petition Dates"), involuntary petitions under chapter 11 of the Bankruptcy Code were filed against the Debtors. The Debtors' bankruptcy cases are being jointly administered pursuant to an order of this Court entered on November 13, 2008. On or about October 29, 2008, the Court entered an order approving Alfred H. Siegel's appointment as the chapter 11 trustee.

The Parent Debtor is a holding company, established to the fund the real estate development projects owned by each of its four operating subsidiaries, *i.e.*, the Subsidiary Debtors and LBREP/L-SunCal Patterson Ranch, LLC. Ninety percent (90%) of the Parent Debtor is owned by LBREP Lakeside SC Master I, LLC ("Lehman Lakeside"), which is an affiliate of Lehman Bros. Real Estate Partners, LP ("LBREP").[2] The remaining equity interests in the Parent Debtor are owned by SCC Ranch Ventures, LLC, which is an affiliate of SCC Acquisitions, Inc. d/b/a SunCal Companies. Lehman Lakeside is the managing member of the Parent Debtor.

The Parent Debtor's primary asset, other than cash, is its interests in its operating subsidiaries. The Parent Debtor is the sole equity member of the Subsidary Debtors, each of which, in turn, owns a real estate development project bearing the same name (collectively, the "Properties"). The Parent Debtor also has cash in accounts with a current aggregate balance of approximately $16 million, which funds were formerly held in a "Development Account" established under the LCPI loan documents. As discussed in further detail below, LCPI asserts a first priority lien against the Properties and the Parent

---

[2] Both LCPI and LBREP are affiliates of Lehman Brothers Holding, Inc. ("LBHI"). LCPI and LBHI are debtors in possession in jointly administered chapter 11 cases (Lead Case No. 08-13555) pending before the United States Bankruptcy Court for the Southern District of New York. Lehman Lakeside is not a debtor.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Debtor's cash for the full amount of the loans to the Parent Debtor. Trustee estimates that there is approximately $60 million in non-lien lender debt based upon the Debtors schedules and claims filed in the cases.

**B. Significant Post-Petition Events**

**1. The LCPI Stay Relief Motions**

On October 2, 2008, LCPI filed four motions for relief from the automatic stay, one in each individual case (the "LCPI Stay Relief Motions"), which were originally scheduled for hearing on October 28, 2008. The Court continued the hearing to November 20, 2008, to allow Trustee an opportunity to analyze the motions and prepare a response, if necessary, thereto. Both Trustee and the Committee opposed the LCPI Stay Relief Motions, in part, because the amount and validity of LCPI's security interests were in dispute. Following a hearing on October 28, 2008, the Court set the LCPI Stay Relief Motions for an evidentiary hearing on February 6, 2009 (the "Evidentiary Hearing"). The Court also set certain related deadlines to designate experts, file expert reports, and file trial briefs. To prepare for the Evidentiary Hearing, Trustee sought discovery from LCPI and certain third parties.

Trustee and LCPI entered into multiple stipulations to continue the Evidentiary Hearing and extend the related deadlines, which were approved by the Court, and the Evidentiary Hearing was ultimtaely continued to June 19, 2009. However, due to the settlement discussions between Trustee and LCPI, the parties entered into a stipulation to take the Evidentiary Hearing off calendar, and to suspend the related deadlines and discovery, subject to the parties' rights to re-notice and/or reinstate the same. Absent approval of the Term Sheet, Trustee expects that LCPI will re-notice the Evidentiary Hearing and seek stay relief to foreclose on its interests in the Properties.

**2. Trustee's Use Of Cash Collateral**

On November 4, 2008, the Trustee filed an Emergency Motion for Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) (the "Emergency Motion"), which was opposed by LCPI. The Emergency Motion was heard on November

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

6, 2008. On November 12, 2008, the Court entered an order granting the Emergency Motion, and authorizing the use of cash collateral through November 20, 2008, pursuant to a very limited budget allowing use of the cash on hand to pay the expenses necessary to preserve the Properties. On December 8, 2008, the Court entered an Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) From November 21, 2008 Through February 28, 2009. Thereafter, Trustee and LCPI stipulated to the use of cash collateral from March 1, 2009, through March 31, 2009, and then from April 1, 2009, through June 30, 2009, on the same terms and conditions as in the Final Order, subject to a reservation of rights, and with such approval to use cash collateral deemed over LCPI's continuing objection. The stipulations were approved by orders of this Court.

On July 2, 2009, Trustee filed and served a Motion for Order Authorizing Use of Cash Collateral Through September 30, 2009 (the "Cash Collateral Motion"), and an Application for Order Shortening Time on the Cash Collateral Motion (the "OST Application"). On that same date, the Court entered an order granting the OST Application, and setting the hearing on the Cash Collateral Motion on July 16, 2009. On July 16, 2009, the Court authorized the interim use of cash collateral pending a final hearing on August 4, 2009. Prior to the final hearing, LCPI and Trustee stipulated to the use of cash collateral through September 30, 2009, on substantially the same terms and conditions as in prior cash collateral stipulations and orders of this Court, to allow Trustee to use the cash on hand only as necessary to preserve and maintain the value of the Properties and protect these estates from liability. LCPI and Trustee have further stipulated to the use of cash collateral through October 31, 2009. As discussed in further detail below, the Term Sheet enables Trustee to use cash collateral to fully administer these estates, as opposed to only to preserve the Properties.

### C. Pre-Petition Events Giving Rise to Claims Against LCPI

Following his appointment, and in connection with the LCPI Stay Relief Motions, Trustee and his professionals analyzed the pre-petition transactions between LCPI and the Debtors. Trustee determined that the estates hold certain potential claims against

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

LCPI. The following is a summary of the relevant facts giving rise to the estates' potential claims. LCPI has indicated that it strongly disputes each of Trustee's claims and assertions.

**1. The First And Second Lien Credit Agreement**

The Parent Debtor, as borrower, entered into three Lien Credit Agreements with LCPI (collectively, the "Lien Credit Agreements"). Pursuant to the First and Second Lien Credit Agreements, which were entered into on or around January 19, 2006, the Parent Debtor borrowed a total of $320 million (collectively, the "January 2006 Loans") as follows: (1) a revolving credit facility of $75 million and term loan facility of $160 million under the First Lien Credit Agreement; and (2) a $85 million term loan facility under the Second Lien Credit Agreement. The Parent Debtor's obligations under First and Second Lien Credit Agreements were guaranteed by the Subsidiary Debtors, and these upstream guaranties were secured by first and second liens against the Properties. The Subsidiary Debtors also contributed approximately $45 million to repay the existing financing secured by the Properties. LCPI was a lender under the January 2006 Loans, and acted as the sole administrative agent, and Lehman Brothers, Inc. ("Lehman Brothers"), served as the advisor, sole lead arranger and syndication agent. Later, Gramercy Warehouse Funding I, LLC, replaced LCPI as the administrative agent under the Second Lien Credit Agreement.

Although the Debtors incurred secured debt totaling $320 million, a significant portion of proceeds from the January 2006 Loans was not available to the Debtors for operations and the development of the Properties. Specifically, pursuant to the First Lien Credit Agreement, the sum of $144 million was paid directly from escrow to the Parent Debtor's equity owners (the "Dividend"). The sum of $10.6 million was paid from escrow to LCPI for its arrangement and administration fee. Approximately $62 million was disbursed to Lehman Ali, Inc., to repay previous loans to the Subsidiary Debtors. Approximately $25 million was immediately set aside by escrow to fund a "Development Account," which the Debtors were not permitted to use, but served as the lenders'

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

collateral. Thus, over $240 million of the $320 million loaned to the Parent Debtor, and upon which the Debtors paid interest, was either disbursed directly to LCPI or other entities, or was otherwise unavailable to the Parent Debtor.

**2. The Third Lien Credit Agreement**

On February 6, 2007, a Third Lien Credit Agreement was entered into by the Parent Debtor, which provided for an additional $75 million term loan (the "February 2007 Loan," collectively with the January 2006 Loans, the "Loans"), guaranteed again by the Subsidiary Debtors and secured by third priority liens against the Properties. From the $75 million loaned to the Parent Debtor under the Third Lien Credit Agreement, $50 million was paid out of escrow directly to LCPI to pay down the obligations under the First Lien Credit Agreement. Just as with the January 2006 Loans, LCPI was a lender and served as the administrative agent, and Lehman Brothers served as advisor, sole arranger and syndication agent. Square Mile Structured Debt (One), LLC, and Square Mile Structured Debt (Two), LLC, collectively, replaced LCPI as the administrative agent under the Third Lien Credit Agreements.

**3. The Debtors' Alleged Defaults Under The Lien Credit Agreements**

Pursuant to a Fourth Amendment and Waiver to the First Lien Credit Agreement dated January 31, 2008 (the "Amendment"), the Parent Debtor was required to increase the cash in the Development Account from $25 million to $50 million within 60 days (*i.e.*, by March 31, 2008). However, the Parent Debtor was unable to increase the amount of funds deposited in the Development Account and, as result, on March 31, 2008, LCPI declared a default. LCPI also declared defaults because: (a) the Debtors missed an interest payment; (b) the Debtors failed to timely deliver financial statements; and (c) the Debtors failed to pay a $100,000 administrative fee and maintain the necessary liquidity requirements. Based on the alleged defaults, LCPI commenced non-judicial foreclosure proceedings, which were stayed by the commencement of these cases. Trustee believes that each of the defaults declared by LCPI were arguably caused by LCPI's conduct or

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

were within the control of its affiliate, Lehman Lakeside. LCPI strongly disputes this and points to the Lien Credit Agreements, which it asserts were negotiated at arms-length.

Based on the facts outlined above, Trustee and the Committee believe that the estates have claims against LCPI to: (1) equitably subordinate the claims of LCPI and cause the liens securing LCPI's claims to be transferred to the estates; (2) avoid the security interests held by LCPI against the Properties as fraudulent transfers and preserve those security interests for the benefit of the estates; and (3) recover damages against LCPI for lender liability. The estates' alleged claims against LCPI are more fully set out in Trustee's opposition to the LCPI Stay Relief Motions, a true and correct copy of which is attached hereto as Exhibit "3." LCPI advised Trustee as to the basis for its defense and contends that it will prevail on any action on the estates' claims. LPCI further contends that it will also prevail on the LCPI Stay Relief Motions and that it has the right to foreclose on all real and personal property of the estates, which serves as LCPI's collateral.

## III. PROPOSED SETTLEMENT

In an effort to avoid the cost and uncertainty associated with litigating the claims against LCPI and the LCPI Stay Relief Motions, Trustee, the Committee and LCPI have entered into a term sheet resolving their disputes. A true and correct copy the Term Sheet is attached hereto as Exhibit "1."[3] The material terms of the settlement are as follows:

1. Allowance of LCPI Claim. The claim of first-position secured lenders of the Debtor (the "1st Lien Lenders"), for which LCPI serves as the administrative agent, will be allowed in the aggregate amount of $230,006,233.98, plus accrued and unpaid interest through the petition date and legal fees. The secured portion of the claim will be allowed in the amount of 1st Lien

[3] If there is a conflict between the summary of the compromise set forth in this Motion and the Term Sheet, the provisions of the Term Sheet shall control.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Lenders' final credit bid for the Properties as discussed below, and the remainder will be deemed an allowed unsecured claim.

2. Distributions on Settlement Effective Date. Trustee will retain $6.5 million from the funds originally held in the Development Account (the "Development Account Funds"). Of this amount: (a) $3 million (the "Administrative Funds") will be available for the administrative expenses of the estates and for potential distribution to non-lender general unsecured creditors; (b) $1.5 million (the "Senior Lien Reserve Funds") will be placed in a segregated account subject to the 1st Lien Lenders' liens to be used in connection with the resolution of the senior lien claims (as discussed below); and (c) $2.0 million (the "Remaining Development Funds") will be retained to pay the operating expenses of the Properties pursuant to an approved budget. The balance of the Development Account Funds (net of the $6.5 million retained by Trustee) will be transferred to the 1st Lien Lenders, and will be included in the calculation of the 1st Lien Lenders' allowed secured claim.

3. Sale of Properties Under the Plan. The Properties will be sold pursuant to a plan under 11 U.S.C. § 1123(a)(5)(D) in accordance with the bidding procedures attached to the Term Sheet as Exhibit "B." The 1st Lien Lenders shall be the initial bidder with an initial credit bid in the aggregate amount of $62 million, and shall be allowed to increase their credit bid up to the entire amount of their allowed claim.

4. Resolution of Senior Liens. Promptly after the "Settlement Effective Date," the parties will cooperate to file estimation motions to determine whether there are liens superior to the liens of the 1st Lien Lenders (*e.g.*, mechanics liens) against the Properties (the "Senior Liens"). Trustee shall afford the title insurer, Fidelity National Title Insurance Company ("Fidelity"), a reasonable opportunity to participate in the estimation process. To the

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

extent that there are liens determined to be senior liens and that Fidelity has not accepted the defense and payment of such senior liens, Trustee will negotiate for the release of such liens with such lienholders and/if necessary, commence litigation against the alleged lienholders. Trustee may use the Senior Lien Reserve Fund in connection with such efforts. If Trustee is able to sell the Properties free and clear of all liens, then the estates shall retain the balance of the Senior Lien Reserve Fund. If not, the balance will be transferred to the 1st Lien Lenders, however, Trustee will retain the Administrative Funds in any event.

5. Distributions Pursuant to the Plan.

a. Distributions of Other Recoveries. The plan will provide that all proceeds recovered from sources other than the sale of the Properties (*e.g.*, from fraudulent transfer litigation) ("Other Recoveries"), after the payment of administrative and priority unsecured claims, will be split 50/50 between the 1st Lien Lenders and the holders of allowed claims other than the 1st, 2nd and 3rd lien lenders (the "Trade Creditors") (on an administratively consolidated pro rata basis) until the Trade Creditors are paid in full. To the extent necessary to effectuate the foregoing distribution scheme, the 1st Lien Lenders will assign the estates their allowed unsecured claims and their rights under the Amended and Restated Intercreditor Agreement among the 1st, 2nd and 3rd lien lenders (the "Intercreditor Agreement").[4]

[4] A true and correct copy of the Intercreditor Agreement is attached hereto as Exhibit "2." The Intercreditor Agreement provides that any payments to the 2nd lien lenders (the "2nd Lien Lenders") and the 3rd lien lenders (the "3rd Lien Lenders") be paid over to the 1st Lien Lenders, until the 1st Lien Lenders are paid in full. (*See* Ex. 2 at §§ 2.1, 4.2.) The Intercreditor Agreement also provides that the 2nd and 3rd Lien Lenders cannot benefit from avoidance of the 1st Lien Lender's lien, rather, any proceeds received by the 2nd and 3rd Lien Lenders as a result of the avoidance must be paid over to the 1st Lien Lenders. (*See id.* at § 6.5.) For this reason, via the assignment of the 1st Lien Lenders' unsecured claim, any cash payable to

(Continued...)

b. Trustee's Participation in Gross Recovery. Pursuant to the plan, from the subsequent disposition of the Properties by the 1st Lien Lenders, Trustee will receive the lesser of 3.5% of the "Gross Recovery" by the 1st Lien Lenders, and the amount necessary to pay the allowed claims of the Trade Creditors (the "Trustee Participation"). The Trustee Participation shall be distributed to non-lender creditors.

6. Trustee Loss Collateral. On the Settlement Effective Date, LCPI on behalf of the 1st Lien Lenders will deliver to Trustee cash or irrevocable letters of credit acceptable to Trustee in the aggregate amount of $500,000 (the "Trustee Loss Collateral"). The Trustee Loss Collateral will be used to cover proven losses that occur during the period from the Settlement Effective Date to the date of transfer of title to the Properties (the "Trustee Maintenance Period") based on claims of simple negligence or strict liability in connection with the ownership, operation, maintenance and management of the Properties, to the extent such losses are not covered by insurance and subject to a formula set forth in section G of the Term Sheet. Upon a termination event or the effective date of the plan, Trustee will deliver any remaining Trustee Loss Collateral to LCPI.

7. Releases. LCPI on behalf of the 1st Lien Lenders immediately releases Trustee (and not the estates) in his trustee and individual capacity with respect to all claims related to the subject matter of the Term Sheet or actions taken with respect to the Properties arising prior to the transfer of title to the Properties to the 1st Lien Lenders or any third party, except to the extent of any gross negligence or gross malfeasance. Upon the effective date of the plan or if there is a "Termination Event" (as defined below),

---

(...Continued)
the 2nd and 3rd Lien Lenders would be paid to the estates up to the full amount of the 1st Lien Lenders' unsecured claim. The 2nd and 3rd Lien Lenders are no worse off because the cash disbursed to the estates would have otherwise been paid to the 1st Lien Lenders as required by the Intercreditor Agreement.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Trustee and the estates, on the one hand, and LCPI and the 1st Lien Lenders, on the other hand, will mutually release each other from all claims (other than the allowed claims of the 1st Lien Lenders discussed above). The Term Sheet does not provide for releases against Lehman Lakeside, SCC Ranch Ventures, LLC, SCC Acquisitions, Inc., or SCC Acquisitions, LLC.

8. Termination Event. If a final Plan confirmation order is not in effect by January 15, 2010 (or extended pursuant to an agreed upon extension of the original date), or if the settlement otherwise terminates by its own terms, then: (a) the 1st Lien Lenders will be granted relief from the automatic stay to immediately foreclose on the Properties, and Trustee (and any party claiming by or through any of the Debtors) shall be prohibited from interfering with such foreclosure; (b) Trustee will retain the Administrative Funds free from the secured claims of the 1st, 2nd and 3rd lien lenders; (c) the 1st Lien Lenders will retain the balance of the Development Account Funds; (d) Trustee shall immediately pay over to the 1st Lien Lenders the unused portion of the Senior Lien Reserve Funds and the Remaining Development Funds, and the Trustee Loss Collateral free of all claims and interests; (e) the parties will be deemed to have mutually released each other as discussed above.

## IV. LEGAL ANALYSIS

Federal Rule of Bankruptcy Procedure ("Rule") 9019(a) provides:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

"The bankruptcy court has great latitude in approving compromising agreements." *See In re A & C Props.*, 784 F.2d 1377, 1380-81 (9th Cir. 1986). In approving a settlement agreement, the court must find that it is fair and equitable, and the product of good faith negotiations. *See id.* To this end, the court must consider the following criteria:

> (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.*

Generally speaking, the court may defer to a trustee's business judgment in deciding whether to settle a matter. *See In re Mickey Thompson Entertainment Group, Inc.,* 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003). The court need not conclude that the proposed settlement is the best possible compromise, but only that the settlement is "within the reasonable range of litigation possibilities." *See In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006). Similarly, the court need not, and should not conduct a "mini-trial" on the compromised claims but simply determine that disputes related to those claims exist. *See In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997) ("When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required."); *see also In re Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr. D. Colo. 1986) ("[T]he court's assessment does not require resolution of the issues, but only their identification, so that the reasonableness of the settlement may be evaluated."). It is enough that the court conclude the probability of success is uncertain. *See, e.g.*, *In re America West Airlines, Inc.*, 214 B.R. 382, 386 (Bankr. D. Ariz. 1997).

## A. The Probability Of Success In The Litigation

As discussed above, Trustee believes that the estates have claims to equitably subordinate LCPI's secured claims, avoid LCPI's liens, and to recover damages against LCPI for lender liability (collectively, the "Estate Claims"). Trustee believes that these claims have merit. However, Trustee's success will require the resolution of a number of

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

legal and factual issues by this Court, all of which are disputed by LCPI and the 1st Lien Lenders. In fact, LCPI and certain of the 1st Lien Lenders disputed a number of Trustee's allegations in connection with the LCPI Stay Relief Motions. For example, disputes exist regarding the relationship between LCPI and Lehman Lakeside, whether LCPI's pre-petition conduct was inequitable or otherwise actionable and whether such conduct, even if found inequitable, is attributable to the other 1st Lien Lenders, and whether the Debtors were insolvent or undercapitalized at the time or because of the Loans and the related transfers and encumbrances.[5] Thus, Trustee's success on the Estate Claims is, at best, uncertain.

For the Estate Claims to have value Trustee must also succeed in defending against the LCPI Stay Relief Motions. As LCPI is a debtor in its own bankruptcy case, any redress for LCPI's alleged misconduct (and, thus, the repayment of creditors) would likely have to come from the cash on hand or the value in the Properties (as opposed to the payment of money damages), which is not possible if LCPI obtains stay relief and is able to foreclose. In opposition to the LCPI Stay Relief Motions, Trustee argued that, among other things, that stay relief was not appropriate because the amount and validity of LCPI's secured claims were in dispute. However, the Court could conclude that, assuming Trustee has viable claims against LCPI, such claims should not be considered in the context of stay relief proceedings and could grant the LCPI Stay Relief Motions, which would render the estates' equitable subordination and avoidance claims meaningless and without value to the estates.

In short, Trustee's success on the Estate Claims and in defending the LCPI Stay Relief Motions is certainly not a given. Rather, Trustee must prevail on a number of

---

[5] LCPI and the 1st Lien Lenders contend, and have contended, that the Debtors' inability to satisfy its creditors is the result of the collapse of the credit market generally and the real estate market in southern California in particular, all of which and the severity of which could not have been reasonably contemplated when the Loans were made. LCPI and the 1st Lien Lenders contend that there was nothing inequitable in connection with the loan transactions which were governed and controlled by the loan agreements between the parties. Accordingly, LCPI and the 1st Lien Lenders contend that the overriding predicate of the estates' potential claims simply cannot be true: at the time the Loans were made, the Debtors were not insolvent and were not unreasonably capitalized.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

disputed issues of fact and law, which this Court has yet to resolve. Accordingly, this factor supports approval of the Term Sheet.

**B. The Difficulties To Be Encountered In The Matter Of Collection**

Trustee will likely be unable to collect money damages from LCPI. LCPI is a debtor in its own bankruptcy case. Thus, even if Trustee obtains a judgment against LCPI, it will simply result in an unsecured claim, and he may be able to recover only a small portion, if any, of the amount awarded. To the extent that Trustee seeks to subordinate LCPI's secured claim or avoid LCPI's liens, collectibility is not an issue. However, if LCPI obtains stay relief, the estates' equitable subordination and avoidance claims would essentially be meaningless, and Trustee will be unable to recover any value for the estates on account of the Estate Claims. Thus, Trustee faces difficulties in both collecting money damages from LCPI and preserving the claims to recover value from LCPI's collateral for the benefit of the estates. Accordingly, this fact supports approval of the Term Sheet.

**C. The Complexity, Expense, Inconvenience, and Delay**

The Estates Claims will be difficult to prove and expensive to litigate. The claims against LCPI involve numerous complex and disputed issues of fact and law surrounding the loan transactions between the Debtors and LCPI and LCPI's conduct related thereto, and the financial condition of the Debtors. The litigation likely will require significant discovery and a lengthy drawn-out trial. Moreover, Trustee likely will need to seek stay relief in LCPI's bankruptcy case to pursue the Estate Claims, resulting in additional expense and delay. The Term Sheet also resolves the LCPI Stay Relief Motions, which, in the absence of a settlement, LCPI would continue to pursue. The LCPI Stay Relief Motions were set for an evidentiary hearing, and will necessitate discovery by Trustee. Without the proposed settlement, Trustee would also likely face continued objections by LCPI to the use of cash collateral to preserve the Properties and administer these

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

estates.[6] Thus, the Term Sheet resolves numerous disputes, thereby saving the estates substantial administrative expense.

Litigation related to the Estate Claims and the LCPI Stay Relief Motions will delay the conclusion of the Debtors' bankruptcy case. Trustee would be forced to devote significant time and energy to pursuing the Estate Claims and defending against the LCPI Stay Relief Motions, time that could otherwise be devoted to pursuing confirmation of a plan. Absent the proposed settlement, a plan submitted by Trustee and/or the Committee would likely be vigorously opposed by LCPI and the 1st Lien Lenders. Moreover, distributions under any nonconsensual plan would likely be based on the outcome of the Estate Claims, which could take significant time to resolve. Approval of the Term Sheet, on the other hand, will clear the way for Trustee and the Committee to immediately prepare and propose a plan with the support of LCPI and move expeditiously towards confirmation, providing creditors with some certainty regarding the outcome of these cases. Accordingly, this factor supports approval of the Term Sheet.

**D. The Paramount Interests Of Creditors**

The Term Sheet will provide the estates with immediate funds and the potential for substantial additional cash in the future. First, Trustee will immediately receive $6.5 million. Of this sum, $3.0 million is guaranteed to the estates and is available to administer these estates and for potential distribution to creditors, $2.0 million is available to preserve the Properties, and $1.5 million is to be used to settle potential Senior Liens.[7] Second, any proceeds from the litigation to avoid and recover the Dividend, which could total approximately $144 million, or from other avoidance actions will be split 50/50 with LCPI. Third, via the "Trustee's Participation," the estates are entitled to receive cash from

---

6 If the Trustee were to pursue the Estate Claims against LCPI, he would need to maintain the Properties in the meantime. With erosion and dust control, security and other necessary expenditures, the Trustee would be required to spend several hundred thousand dollars a month, and LCPI asserts a lien in all the cash on hand.

7 However, the estates are entitled to retain the balance of the $1.5 million Senior Lien Reserve Fund, if Trustee is able to sell the Property free and clear of all liens.

LCPI's subsequent disposition of the Properties in the lesser amount of (a) unpaid allowed trade claims, or (b) 3.5% of the recovery by the 1st Lien Lenders.

Without the proposed settlement, the non-lender unsecured creditors could receive nothing or substantially less. Again, Trustee's success on the Estate Claims and in defending against the LCPI Stay Relief Motions is uncertain, and there are numerous complex issues that impact the unsecured creditors potential distribution. If Trustee is unsuccessful, any cash or value in the Properties would be transferred solely to the 1st Lien Lenders on account of their secured claims.[8] To the extent that Trustee is successful in avoiding LCPI's lien, but not subordinating LCPI's secured claim, LCPI would still hold significant unsecured claims against the estates and be entitled to share in any distributions to unsecured creditors on a *pro rata* basis. Similarly, the 2nd and 3rd Lien Lenders would be entitled to distributions on account of any unsecured deficiency claims (although such disbursements would be paid to LCPI until paid in full). Moreover, it is likely that, absent substantive consolidation, any unencumbered cash held by the Parent Debtor would first have to be used to repay the Parent Debtor's creditors, which would include the claims of the lien lenders, including any unsecured or subordinated claims of LCPI, before such cash could be used to repay the Subsidiary Debtors' creditors. Thus, the proposed settlement not only provides these estates with immediate cash and the potential for significant distributions in the future, but also provides a mechanism to disburse those funds to the unsecured trade creditors.

In sum, the proposed settlement is fair and equitable, and in the best interests of the estates. The Term Sheet resolves multiple proceedings, thereby saving the estates significant administrative expense. The Term Sheet entitles the estates to $6.5 million to administer these cases and preserve the Properties. Of this sum, the estates are guaranteed $3.0 million upon approval of the Tern Sheet, even if the proposed plan is not

---

[8] Sale of the Properties under 11 U.S.C. § 363(f) would likely result in a recovery far less than the amount owed to LCPI and the 1st Lien Lenders. Moreover, Trustee's efforts to sell the Properties would likely be opposed by the lien lenders attempting to credit bid their claims.

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

## DECLARATION OF ALFRED H. SIEGEL

I, Alfred H. Siegel, declare as follows:

1. I am the chapter 11 trustee of the of the jointly administered estates of LBREP/L-SunCal Master I, LLC, LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC. I make this declaration in support of the Motion to Approve Compromise Between Trustee, the Official Committee of Unsecured Creditors, and Lehman Commercial Paper, Inc., (the "Motion"). All terms as defined in the Motion are incorporated herein by this reference. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated, and, if called as a witness, I could and would competently testify with respect thereto.

2. Following my appointment, and in connection with the LCPI Stay Relief Motions, my professionals and I analyzed the pre-petition transactions between LCPI and the Debtors. Based on the facts outlined in the Motion related to the loan transactions between the Debtors and LCPI, I believe that the estates have meritorious claims against LCPI to: (1) equitably subordinate the claims of LCPI and cause the liens securing LCPI's claims to be transferred to the estates; (2) avoid the security interests held by LCPI against the Properties as fraudulent transfers and preserve those security interest for the benefit of the estates; and (3) recover damages against LCPI for lender liability.

3. In an effort to avoid the cost and uncertainty associated with litigating the Estate Claims and the LCPI Stay Relief Motions, I have entered into a term sheet with the Committee and LCPI to resolve our disputes. A true and correct copy the Term Sheet is attached hereto as Exhibit "1."

4. While I believe that the Estate Claims have merit, they will be difficult and costly to prove as I must prevail on multiple complex issues of fact and law, which are disputed by LCPI and the 1st Lien Lenders. Due to these numerous outstanding disputed issues, success on the Estate Claims is uncertain. Pursuit of the Estate Claims will

require significant discovery and a lengthy trial and, therefore, will take significant time to conclude and will result in significant administrative expense. Moreover, I will need to seek stay relief in LCPI's bankruptcy case to pursue the Estate Claims, which will result in additional expense and delay.

5. For the Estate Claims to have value I must also succeed in defending against the LCPI Stay Relief Motions, which in the absence of a settlement, LCPI would continue to pursue. As LCPI is a debtor in its own bankruptcy case, any redress for LCPI's alleged misconduct (and, thus, the repayment of creditors) would likely have to come from the cash on hand or the value in the Properties (as opposed to the payment of money damages), which is not possible if LCPI obtains stay relief and is able to foreclose. The Court could conclude that, assuming the estates have viable claims against LCPI, such claims should not be considered in the context of stay relief proceedings and could grant the LCPI Stay Relief Motions, which would render the estates' equitable subordination and avoidance claims meaningless.

6. Without the proposed settlement, I would also likely face continued objections by LCPI to the use of cash collateral to preserve the Properties and/or to administer these estates. Thus, the Term Sheet resolves numerous disputes, thereby saving the estates substantial administrative expense.

7. Litigation related to the Estate Claims and the LCPI Stay Relief Motions will delay the conclusion of the Debtors' bankruptcy case. If the Term Sheet is not approved, the Committee and I would be forced to devote significant time and energy to pursuing the Estate Claims and defending against the LCPI Stay Relief Motions, time that we could otherwise devote to pursuing confirmation of a plan. Moreover, absent the proposed settlement, any plan submitted by myself and/or the Committee would likely be opposed by LCPI and the 1st Lien Lenders. Distributions under any nonconsensual plan would likely be based on the outcome of the Estate Claims, which could take significant time to resolve. Approval of the Term Sheet, on the other hand, will enable the Committee and I to immediately prepare and propose a joint plan with the support of LCPI and to move

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

confirmed. The Term Sheet also entitles the estates to significant additional sums from any subsequent disposition of the Properties by LCPI or from the pursuit of avoidance actions against third parties. The estates are not settling all claims arising from the facts outlined above, but only the estates' claims against LCPI and the 1st Lien Lenders. The estates are retaining their claims against other third parties to avoid and recover the Dividend, and, due to the proposed settlement, the estates will have funds to pursue such claims. Therefore, there is a real possibility that the estates will receive significant cash in the future to distribute to unsecured trade creditors. Accordingly, Trustee respectfully requests that the Court approve the Term Sheet.

## V. CONCLUSION

Based on the foregoing, Trustee respectfully requests that the Court approve the Term Sheet, and such other and further relief as the Court deems just and proper.

Dated: October 9, 2009

WEILAND, GOLDEN,
SMILEY, WANG EKVALL & STROK, LLP

By: [signature]
EVAN D. SMILEY
ROBERT S. MARTICELLO
Attorneys for Alfred H. Siegel
Chapter 11 Trustee,

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

# DECLARATION OF ALFRED H. SIEGEL

I, Alfred H. Siegel, declare as follows:

1. I am the chapter 11 trustee of the of the jointly administered estates of LBREP/L-SunCal Master I, LLC, LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC. I make this declaration in support of the Motion to Approve Compromise Between Trustee, the Official Committee of Unsecured Creditors, and Lehman Commercial Paper, Inc., (the "Motion"). All terms as defined in the Motion are incorporated herein by this reference. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated, and, if called as a witness, I could and would competently testify with respect thereto.

2. Following my appointment, and in connection with the LCPI Stay Relief Motions, my professionals and I analyzed the pre-petition transactions between LCPI and the Debtors. Based on the facts outlined in the Motion related to the loan transactions between the Debtors and LCPI, I believe that the estates have meritorious claims against LCPI to: (1) equitably subordinate the claims of LCPI and cause the liens securing LCPI's claims to be transferred to the estates; (2) avoid the security interests held by LCPI against the Properties as fraudulent transfers and preserve those security interest for the benefit of the estates; and (3) recover damages against LCPI for lender liability.

3. In an effort to avoid the cost and uncertainty associated with litigating the Estate Claims and the LCPI Stay Relief Motions, I have entered into a term sheet with the Committee and LCPI to resolve our disputes. A true and correct copy the Term Sheet is attached hereto as Exhibit "1."

4. While I believe that the Estate Claims have merit, they will be difficult and costly to prove as I must prevail on multiple complex issues of fact and law, which are disputed by LCPI and the 1st Lien Lenders. Due to these numerous outstanding disputed issues, success on the Estate Claims is uncertain. Pursuit of the Estate Claims will

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

require significant discovery and a lengthy trial and, therefore, will take significant time to conclude and will result in significant administrative expense. Moreover, I will need to seek stay relief in LCPI's bankruptcy case to pursue the Estate Claims, which will result in additional expense and delay.

5. For the Estate Claims to have value I must also succeed in defending against the LCPI Stay Relief Motions, which in the absence of a settlement, LCPI would continue to pursue. As LCPI is a debtor in its own bankruptcy case, any redress for LCPI's alleged misconduct (and, thus, the repayment of creditors) would likely have to come from the cash on hand or the value in the Properties (as opposed to the payment of money damages), which is not possible if LCPI obtains stay relief and is able to foreclose. The Court could conclude that, assuming the estates have viable claims against LCPI, such claims should not be considered in the context of stay relief proceedings and could grant the LCPI Stay Relief Motions, which would render the estates' equitable subordination and avoidance claims meaningless.

6. Without the proposed settlement, I would also likely face continued objections by LCPI to the use of cash collateral to preserve the Properties and/or to administer these estates. Thus, the Term Sheet resolves numerous disputes, thereby saving the estates substantial administrative expense.

7. Litigation related to the Estate Claims and the LCPI Stay Relief Motions will delay the conclusion of the Debtors' bankruptcy case. If the Term Sheet is not approved, the Committee and I would be forced to devote significant time and energy to pursuing the Estate Claims and defending against the LCPI Stay Relief Motions, time that we could otherwise devote to pursuing confirmation of a plan. Moreover, absent the proposed settlement, any plan submitted by myself and/or the Committee would likely be opposed by LCPI and the 1st Lien Lenders. Distributions under any nonconsensual plan would likely be based on the outcome of the Estate Claims, which could take significant time to resolve. Approval of the Term Sheet, on the other hand, will enable the Committee and I to immediately prepare and propose a joint plan with the support of LCPI and to move

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

expeditiously towards confirmation. Therefore, I believe that approval of the Term Sheet will help to move these cases forward towards a successful conclusion, and will provide creditors with some certainty regarding the outcome of these cases.

8. I believe that the Term Sheet will provide significant benefits to the estates. The Term Sheet entitles the estates to $6.5 million to administer these cases and preserve the Properties. Of this sum, the estates are guaranteed $3.0 million upon approval of the Term Sheet, even if the proposed plan is not confirmed. The Term Sheet also provides the estates with the potential to recover significant cash in the future from any avoidance action recoveries or the subsequent disposition of the Properties by LCPI, and a mechanism to distribute such cash to unsecured trade creditors. The estates are not settling all claims arising from the facts outlined in the Motion, but only those against LCPI and the 1st Lien Lenders. The estates are retaining their claims against other third parties to recover the Dividend and, due to the proposed settlement, the estates will have funds to pursue such claims. Therefore, I believe there is a real possibility that the estates will receive additional cash in the future.

9. I estimate there to be approximately $60 million of non-lender creditor claims in these cases based upon the Debtors schedules and proofs of claim filed. Due to the significant secured claims asserted by the lien lenders and the potential unsecured deficiency claims, without the proposed settlement, the non-lender unsecured creditors could receive nothing or substantially less. Success on the Estate Claims and in defending against the LCPI Stay Relief Motions is uncertain, and there are numerous complex issues that impact the unsecured creditors potential distribution.

10. For all these reasons, I believe that the Term Sheet is fair and equitable, and in the best interests of the bankruptcy estates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of October, at Los Angeles, California.

Alfred H. Siegel

Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

# EXHIBIT 1

BINDING TERM SHEET AMONG
LCPI AS ADMINISTRATIVE AGENT FOR THE 1st LIEN LENDERS,
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
AND THE CHAPTER 11 TRUSTEE

This Term Sheet dated as of September [23], 2009 (this "Term Sheet") is by and among ALFRED H. SIEGEL, solely in his capacity as the chapter 11 trustee (the "Trustee") of the administratively-consolidated estates of LBREP/L-SunCal Master I LLC ("Parent Debtor"), LBREP/L-SunCal McAllister Ranch LLC ("McAllister Ranch"), LBREP/L-SunCal McSweeny Farms LLC ("McSweeny Farms"), and LBREP/L-SunCal Summerwind Ranch LLC ("Summerwind Ranch"; with McAllister Ranch, McSweeny Farms and Summerwind Ranch being referred to collectively as the "Subsidiary Debtors," and together with the Parent Debtor, as the "Debtors") in their respective bankruptcy cases (the "SunCal Bankruptcy Cases") now pending in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court"); THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS of the Debtors (the "Creditors' Committee"); and LEHMAN COMMERCIAL PAPER INC. solely in its capacity as administrative agent ("LCPI") for the first-position secured lenders of the Debtors (the "1st Lien Lenders"); and is acknowledged and agreed as to certain provisions by one or more 1st Lien Lenders, in order to reach interim agreement with respect to the distribution of certain funds, to establish certain parameters for a chapter 11 plan of reorganization for the Debtors and otherwise to establish the terms for globally resolving all disputes between the parties. Notwithstanding any references to the contrary contained herein, each and every reference in this Term Sheet to "Trustee" shall mean and refer to ALFRED H. SIEGEL, solely and exclusively in his capacity as the chapter 11 trustee of the administratively-consolidated estates of the Debtors, and in no other capacity.

**DEAL TERMS**

**The Compromise Motion**

A. 1. The Trustee will seek approval of this compromise by filing a motion (the "Compromise Motion") under Federal Bankruptcy Rule 9019 within ten calendar days of the Trustee's actual receipt of a copy of this Term Sheet fully executed by all non-Trustee parties hereto. The Trustee shall file the Compromise Motion in all of the SunCal Bankruptcy Cases and LCPI shall file the Compromise Motion in the LCPI bankruptcy case (the "LCPI Bankruptcy Case", and together with the SunCal Bankruptcy Cases, the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court", and together with the California Bankruptcy Court, the "California Bankruptcy Court" and together with the New York Bankruptcy Court, the "Bankruptcy Courts") to obtain approval of this Term Sheet. The orders approving the Compromise Motions (the "Compromise Orders") must be obtained, and become final orders, by no later than [November 12], 2009 (or, provided the Trustee has filed the Compromise Motion by no later than [October 2], 2009, such date that is the soonest available Court hearing date thereafter), unless this date is extended by mutual agreement of the

Trustee, LCPI and the Creditors' Committee. If the Compromise Orders have not become final orders on or before [November 12], 2009, this Term Sheet and any Settlement Agreement, and the terms and provisions hereof and thereof shall become null and void and of no further force and effect. Immediately upon the last of the Compromise Orders becoming final orders, this Term Sheet shall be binding on LCPI, the Trustee, the Creditors' Committee and each other party hereto (the date of such entry, the "Settlement Effective Date"). All parties hereto acknowledge that all other parties hereto intend to and will rely on the binding nature of this Term Sheet as of the Settlement Effective Date in moving forward with the Bankruptcy Cases. The Trustee, the Creditors' Committee, LCPI and each other party hereto, will diligently work together in good faith to incorporate the substance of this Term Sheet into a mutually-agreeable settlement agreement (the "Settlement Agreement") which shall be attached to the Compromise Orders. If the parties hereto are unable to agree to the final language of the Settlement Agreement, this Term Sheet shall constitute the Settlement Agreement and the California Bankruptcy Court shall be given the exclusive authority to clarify the meaning of the Settlement Agreement if there are ever any issues arising regarding the meaning thereof. The terms of the Settlement Agreement will then be incorporated into one or more plans of reorganization to be filed by the Trustee (the "Plan") in consultation with, or jointly with, the Creditors' Committee in the California Bankruptcy Court with respect to the SunCal Bankruptcy Cases. The Trustee and the Creditors' Committee shall work together in good faith with LCPI to ensure that the Plan is consistent with this Term Sheet and the Settlement Agreement. If LCPI believes that the Plan filed does not conform to this Term Sheet or the Settlement Agreement, then LCPI shall have the right to object to the Plan solely with respect to the alleged nonconformity with the Term Sheet or Settlement Agreement. The Plan shall be subject to LCPI's consent prior to filing, and such consent shall not be unreasonably withheld if the Plan is in a form and substance consistent with the Term Sheet or Settlement Agreement. Notwithstanding the prior language in this paragraph, if LCPI determines that entry into this Term Sheet and performance of its terms does not require the New York Bankruptcy Court's approval, LCPI may file a written statement to that effect concurrently with the filing by the Trustee of the Compromise Motion with the California Bankruptcy Court, in which case the Term Sheet and any Settlement Agreement shall be deemed binding on all parties hereto immediately upon the Settlement Effective Date which shall be deemed to occur on the date the Compromise Order is entered. If this Term Sheet becomes null and void for any reason (subject to any provision of this Term Sheet which is expressly stated to survive termination of this Term Sheet), and to the extent that 11 U.S.C. § 362(d)(3) applies to the Subsidiary Debtors, the time period within which to file a chapter 11 plan under 11 U.S.C. § 362(d)(3)(A) shall be extended for 30 days after the date on which this Term Sheet becomes null and void.

2. As of the date hereof, the Trustee and the Creditors' Committee shall stipulate to LCPI being granted immediate relief from the automatic stay to record a new notice of default with respect to the Parent Debtor and Subsidiary Debtors so as to allow LCPI to re-commence the period within which a foreclosure sale may be conducted, which expired on August 21, 2009.

**Allowance of Claim of LCPI; Claims Filed by Second and Third Lien Lenders**

B. Upon the Settlement Effective Date: (i) the claims of the 1st Lien Lenders in the aggregate amount of $230,006,233.98 plus accrued and unpaid interest calculated through September 10, 2008 (the "Petition Date") and accrued and unpaid legal fees shall be allowed; provided, however, the 1st Lien Lenders' allowed secured claims against the Subsidiary Debtors shall be in the amount of the 1st Lien Lenders' final credit bid under 11 U.S.C. Section 1123(a)(5)(d) pursuant to the Plan, as set forth in paragraphs E and F below (or, in the case of one or more successful bids by any third party purchasers at the related sales pursuant to the Plan, the aggregate amount of such successful third party bids), plus any amounts received by the 1st Lien Lenders as described in paragraph D below, and minus any amounts paid by the 1st Lien Lenders as described in paragraph H below. Any amount not deemed a portion of the 1st Lien Lenders' allowed secured claim shall be deemed an allowed unsecured claim against all of the Debtors as further described in paragraph F below. Proofs of claim have been filed in the Bankruptcy Cases by second position lenders (the "2nd Lien Lenders") and third position lenders (the "3rd Lien Lenders", with the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders being referred to collectively as the "Lenders"). The Lenders alleged that their loans to the Parent Debtor are guaranteed by each of the Subsidiary Debtors. This Term Sheet is not intended to affect the rights of the 2nd Lien Lenders and the 3rd Lien Lenders, if any, against the Debtors (including without limitation the Subsidiary Debtors) or any other Person (as defined in the First Lien Credit Agreement (hereinafter defined)).

**Distributions Upon Settlement Effective Date**

C. On the Settlement Effective Date, the Trustee will retain $4.5 million from those certain Debtor funds previously held by First Bank & Trust and subsequently transferred to the Trustee for the benefit of the Debtors' estates, which funds are currently subject to the liens and rights of the 1st Lien Lenders (the "Development Account Funds"), of which (1) $3.0 million shall be available for use by the Trustee in administration of the SunCal Bankruptcy Cases (the "Administrative Funds"); and (2) $1.5 million shall be placed in a segregated account subject to the 1st Lien Lenders' security interest (the "Senior Lien Reserve Funds"). The Administrative Funds shall be available (i) immediately to pay administrative claims owing in the SunCal Bankruptcy Cases and (ii) upon the effective date of the Plan to make distributions to non-Lender creditors in respect of unsecured claims. In addition to the $3.0 million in Administrative Funds and $1.5 million in Senior Lien Reserve Funds, the Trustee shall also retain $2.0 million of the Development Account Funds (the "Remaining Development Funds"), which Remaining Development Funds may be used by the Trustee solely to fund the ongoing current expenses of maintaining the real property owned by McAllister Ranch, McSweeny Farms, and Summerwind Ranch (together, the "Properties") pursuant to cash collateral orders of the California Bankruptcy Court in a manner consistent with the budget attached as Exhibit "A" hereto (the "Approved Budget") or otherwise for uses for which the Trustee obtains the 1st Lien Lenders' consent or which are approved by the California Bankruptcy Court after notice to the 1st Lien Lenders. Any unused Remaining Development

Funds will be transferred to the 1st Lien Lenders within five business days of the date that the Debtors no longer hold title to the Properties.

D. Upon the Settlement Effective Date, the Trustee shall immediately transfer to the 1st Lien Lenders, free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, all Development Account Funds less the aggregate $6.5 million in Administrative Funds, Senior Lien Reserve Funds, and Remaining Development Funds to be retained by the Trustee pursuant to paragraph C above (the funds to be transferred to the 1st Lien Lenders hereafter referred to as the "1st Lien Lenders Retained Settlement Funds").

**Sale Of Properties Under The Plan**

E. The Properties shall be sold free and clear of Liens (hereinafter defined) under the Plan pursuant to 11 U.S.C. Section 1123(a)(5)(d). The 1st Lien Lenders together shall be the initial bidder with respect to each of the Properties and shall credit-bid their allowed secured claims with respect to each Property in accordance with the bidding procedures set forth in paragraphs F and P below, and Exhibit "B" hereto (together, the "Bidding Procedures"). With respect to those Properties for which the 1st Lien Lenders are determined to be the Winning Bidders (as defined in the Bidding Procedures) and purchase by way of credit bid, such Properties shall be transferred to the 1st Lien Lenders free and clear of Liens. As used in this Term Sheet, "Liens" shall mean liens, claims, encumbrances and interests, including without limitation Senior Liens (hereinafter defined), other than (1) the lien of 1st Lien Lenders and (2) liens, claims, encumbrances or interests that satisfy clause (b), (c) and/or (d) of the definition of "Permitted Exceptions" set forth in the First Lien Credit Agreement dated January 19, 2006 (as amended) among LCPI, Parent Debtor, the 1st Lien Lenders, and certain other parties (the "First Lien Credit Agreement").

F. The initial credit bids by the 1st Lien Lenders shall be in the aggregate amount of $62 million allocated among the three Properties based on the appraisals obtained by the 1st Lien Lenders in November 2008 in the following amounts: McAllister Ranch $28.2 million; Summerwind Ranch $25.8 million; and McSweeny Farms $8 million (each, a "Credit Bid Price"). The 1st Lien Lenders shall be entitled to increase their respective credit bid for each Property to a maximum amount equal to $250,000 in excess of the highest competing bid for such Property, if any, up to the entire amount of their allowed claims (in the aggregate for all of the Lenders' credit bids with respect to the Properties, with no set-offs, reductions or other defenses) in their discretion in accordance with the Overbid Procedures (as defined in the Bidding Procedures) (the "Maximum Credit Bid"). If one or more of the Properties are successfully bid upon by a Qualified Bidder (as defined in the Bidding Procedures) under the Overbid Procedures, the Trustee may, subject to the right of the 1st Lien Lenders to submit a greater bid, sell such Property(ies) to such third party free and clear of all Liens (including the lien of the 1st Lien Lenders). Except for the "Trustee's Participation" under Paragraph R, the lien of the 1st Lien Lenders shall attach to any monies received from the sale to a third party and such monies, net of any ordinary course sales costs, shall be paid to the 1st Lien Lenders simultaneous

with payment of the Trustee's Participation to the Trustee. The 1st Lien Lenders shall have an allowed unsecured claim as set forth in paragraph B above (for the avoidance of doubt, in accordance with paragraph B above, the calculation of the 1st Lien Lenders' allowed unsecured claim shall take into account (1) the 1st Lien Lenders' aggregate credit bids for those Properties that were included in their Winning Bids (as defined in the Bidding Procedures) minus any liabilities assumed by the 1st Lien Lenders in connection with the transfer of title to such Properties to the 1st Lien Lenders pursuant to such Winning Bids and (2) any proceeds received by the 1st Lien Lenders from the sale pursuant to the Plan of any of the Properties that were not included in the 1st Lien Lenders' Winning Bids to one or more third parties).

**Use of Remaining Development Funds; Trustee Loss Collateral**

G. During the period from the Settlement Effective Date until the transfer of title of the Properties to the 1st Lien Lenders or any third party, either pursuant to the Plan or by way of a foreclosure by the 1st Lien Lenders (the "Trustee Maintenance Period"), the Trustee shall be authorized to pay all expenses incidental to the ownership, operation and maintenance of the Properties from the Remaining Development Funds in amounts not to exceed those on the Approved Budget (plus a variance of 10% on a line-item basis of the amounts set forth therein), without the further consent of the 1st Lien Lenders. Upon the Settlement Effective Date, LCPI on behalf of the 1st Lien Lenders shall deliver to the Trustee cash or one or more irrevocable letters of credit acceptable to the Trustee in his reasonable discretion (together, the "Trustee Loss Collateral") in the aggregate amount of $500,000. During the Trustee Maintenance Period, in the event the Trustee incurs proven losses (not otherwise covered by insurance) based upon claims of simple negligence or strict liability in connection with his ownership, operation, maintenance and management of the Properties, but not in the event of any gross negligence or gross malfeasance on the part of the Trustee, the Trustee shall have the right to draw and recover from the Trustee Loss Collateral an amount not to exceed in the aggregate the lesser of (i) the amount of such losses multiplied by a fraction, the numerator of which is the amount of the 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders (including any unused Remaining Development Funds actually paid over to the 1st Lien Lenders pursuant to paragraph C above) and the denominator of which is the aforementioned amount plus $6.5 million[1], and (ii) the full amount of the Trustee Loss Collateral, and in the event such recovery from the Trustee Loss Collateral is insufficient to cover such losses, the Trustee shall have the right to apply Administrative Funds to cover such losses. Upon the earlier to occur of (i) a Termination Event or (ii) the effective date of the Plan, the Trustee shall deliver any remaining Trustee Loss Collateral to LCPI for the benefit of the 1st Lien Lenders. Further, LCPI on behalf of the 1st Lien Lenders hereby fully and forever releases and discharges the Trustee both in his capacity as trustee and in his individual capacity

[1] As an example only, in the case of an $800,000 loss, if the amount of 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders is $8.5 million, then the numerator will be $8.5 million, the denominator will be $15 million (i.e. $8.5 million plus $6.5 million), and therefore the resulting fraction will be 8.5/15 (= 0.57). The Trustee's recovery will be the lesser of (i) $456,000 (i.e., $800,000 multiplied by 0.57) and (ii) $500,000 (i.e., the full amount of the Trustee's Loss Collateral). Thus, the Trustee's recovery will be $456,000.

with respect to any acts or omissions occurring or claims arising in any way related to the subject matter hereof or the Trustee's actions or duties with respect to the Debtors or the Properties prior to the conclusion of the Trustee Maintenance Period, except to the extent of any gross negligence or gross malfeasance on the part of the Trustee.

H. To the extent that the Remaining Development Funds are inadequate to fund the Trustee's reasonable and necessary expenses with respect to the preservation and maintenance (but not development) of the Properties through and including [January 15], 2010, the 1st Lien Lenders agree to pay for such reasonable and necessary expenses to the extent they are (i) consistent in nature and amount with expenses provided for in prior cash collateral budgets approved by the California Bankruptcy Court and (ii) in an aggregate amount not to exceed fifty percent (50%) of the amount of the 1st Lien Lenders Retained Settlement Funds actually received by the 1st Lien Lenders. These expenses shall be paid upon written request by the Trustee to LCPI; however, if there is a dispute as to the reasonableness or necessity of any of the expenses incurred by the Trustee, the California Bankruptcy Court shall retain jurisdiction to hear and determine the Trustee's motion to compel payment of such expenses. Pending payment of such expenses by the 1st Lien Lenders, the Trustee shall be authorized to use the Administrative Funds for the purposes set forth in this paragraph.

**Information Regarding Title Insurance Policy**

I. LCPI has heretofore provided the Trustee with a complete copy of that certain Title Insurance Policy number 27-44-94-120334 (the "Title Insurance Policy") issued by Fidelity National Title Insurance Company ("Fidelity") for the benefit of LCPI as administrative agent for the 1st Lien Lenders for the Properties. Promptly upon execution of this Term Sheet LCPI will provide the Trustee with all documents and information reasonably related to the Title Insurance Policy and any and all claims made thereunder so as to allow the Trustee to comply with the requirements of paragraphs J and K below and otherwise to proceed with matters to conclusion.

**Resolution of Senior Liens; Availability of Title Insurance**

J. Promptly following the Settlement Effective Date and after due and proper notice to Fidelity, the parties hereto shall cooperate to file estimation motions with the California Bankruptcy Court (the "Estimation Process") to determine whether any Liens are superior to the 1st Lien Lenders' lien in the applicable Properties and to estimate the amount of any such superior Liens ("Senior Liens"). The Trustee shall afford Fidelity reasonable opportunity to participate in the Estimation Process (including without limitation participation in any process to determine whether a Lien is a Senior Lien), promptly furnish to Fidelity all notices and information reasonably related to the Estimation Process, and otherwise cooperate in all reasonable respects with Fidelity in connection with the Estimation Process and the Title Insurance Policy so as not to adversely affect the rights of LCPI and the 1st Lien Lenders under the Title Insurance Policy. In the event that any Senior Lien is identified pursuant to the Estimation Process and Fidelity shall not have accepted without reservation the

defense and payment (as applicable) of such Senior Lien promptly following the conclusion of the Estimation Process:

i. the Trustee shall negotiate with the lienor of such Senior Lien (each, an "Unaccepted Senior Lien") in order to obtain the release of such Senior Lien, and if necessary to obtain such release, the Trustee may elect to make a payment out of the Senior Lien Reserve Funds and/or the Administrative Funds to such lienor in an amount as may be agreed between the Trustee and such lienor, subject in the case of payments out of the Senior Lien Reserve Funds to the approval of the 1st Lien Lenders in their sole discretion (for the avoidance of doubt, the 1st Lien Lenders may elect to withhold approval of such payments in the event that such payments are not proposed to be made in connection with a comprehensive settlement of all Senior Liens); and/or

ii. the Trustee shall confirm one or more Plans that provide that any party holding a Senior Lien not otherwise released pursuant to clause (i) above shall have recourse solely against the proceeds of the Title Insurance Policy and not to the Properties.

In the event that all Senior Liens have been released pursuant to clause (i) above, and/or have had recourse thereunder transferred to the Title Insurance Policy pursuant to clause (ii) above, the Trustee shall be entitled to retain all unused Senior Lien Reserve Funds solely for the benefit of non-Lender administrative and general unsecured claims. In the event that all Senior Liens have not been so released and/or recourse thereunder has not been so transferred, the Trustee shall immediately turn over to the 1st Lien Lenders the balance remaining of the Senior Lien Reserve Funds after deduction for accrued and unpaid legal fees and related expenses related to removal of Senior Liens (see paragraph K(ii) below), and all other aspects of the Term Sheet shall be fully enforceable.

K. i. In furtherance of the foregoing, in the event that one or more Senior Liens shall have been identified pursuant to the Estimation Process, for so long as this Term Sheet and the Settlement Agreement are in full force and effect and after due and proper notice to Fidelity (the sufficiency of which notice shall be an express finding by the California Bankruptcy Court (and if necessary, the New York Bankruptcy Court) in the Compromise Orders), (a) the Trustee (and any successor in interest) shall have all of the rights, standing and privileges of an "insured claimant" as that term is used under the Title Insurance Policy so that the Trustee (and any successor in interest) can take such actions (on his own behalf in his capacity as Trustee or successor thereto and/or on behalf of LCPI), including but not limited to (1) filing a declaratory relief action in the California Bankruptcy Court to establish whether such Senior Liens are covered by the Title Insurance Policy and (2) commencing litigation and filing claims that will constitute insured claims against the Title Insurance Policy for the purpose of recovering under the Title Insurance Policy in respect of such Senior Liens; and (b) LCPI and the 1st Lien Lenders shall assign to the Trustee their respective rights under the Title Insurance Policy to receive proceeds thereof relating to such Senior Liens, and in

connection therewith, take such actions as are reasonably necessary to accomplish such assignment. Notwithstanding anything to the contrary contained herein, nothing in this Term Sheet or the Settlement Agreement shall constitute a representation or warranty by LCPI or the 1st Lien Lenders that Fidelity will accept, acknowledge or agree to the matters contemplated by this subparagraph K(i).

ii. The Trustee anticipates that significant professional fees and expenses will be incurred in connection with the Trustee's efforts to recover under the Title Insurance Policy and/or negotiate with the lienors of Unaccepted Senior Liens, as the case may be. To the extent that the Trustee is successful in resolving the Senior Liens through such efforts, such resolution will inure to the primary benefit of the 1st Lien Lenders. Consequently, the Trustee shall have the right to utilize a portion of the Senior Lien Reserve Funds not to exceed $250,000 as necessary to pay reasonable legal fees and reasonable related expenses in connection with such efforts with such fees and expenses subject to approval of the California Bankruptcy Court.

iii. Upon the sale of the Properties free and clear of all Liens pursuant to the Plan as provided in paragraph E above, the Trustee shall be entitled to retain the remaining balance of the Senior Lien Reserve Funds for the benefit of all non-Lender creditors and any and all proceeds from the Title Insurance Policy. Alternatively, if the Properties are sold subject to any Senior Liens, the balance of the Senior Lien Reserve Funds shall be transferred to the 1st Lien Lenders and any and all proceeds from the Title Insurance Policy shall be paid to LCPI for the benefit of the 1st Lien Lenders.

**Support of the Plan**

L. LCPI hereby agrees that, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan, which Disclosure Statement and other solicitation materials (A) implement this Term Sheet and the terms of the Settlement Agreement and (B) are not otherwise materially inconsistent with such terms, it being recognized that the Settlement Agreement shall not constitute an agreement by LCPI to take any step or action that would violate any provision of applicable bankruptcy law or any other applicable laws, and to the extent any provision hereof shall be construed as constituting such a violation, such provision shall be deemed stricken herefrom and of no force and effect without liability to any of the parties, LCPI will, as promptly as practicable following the California Bankruptcy Court's approval of the Disclosure Statement and solicitation materials, present the Plan and related materials to the 1st Lien Lenders and recommend that the 1st Lien Lenders vote to accept the Plan, provided that to the extent the Plan contains additional terms and provisions unrelated to the substantive provisions of the Term Sheet and the Settlement Agreement, such additional terms and provisions are acceptable to LCPI and the 1st Lien Lenders. Also, subject to the occurrence of the Settlement Effective Date, LCPI and those other 1st Lien Lenders who have signed this Term Sheet agree, prior to the occurrence of a Termination Event, not to vote in favor of any other plan

that fails to incorporate the substantive provisions of this Term Sheet and the Settlement Agreement until such time (if any) as the provisions set forth in paragraph R below are in effect.

M. All 1st Lien Lenders who are on the "steering committee" shall be parties to the Settlement Agreement. All parties to the Settlement Agreement agree, prior to the occurrence of a Termination Event, to support confirmation of the Plan provided the same is consistent in all material respects with the terms of the Term Sheet and the Settlement Agreement and does not contain material terms and provisions which have not been approved by LCPI and the "steering committee" of 1st Lien Lenders. Notwithstanding anything to the contrary contained herein, nothing in this Term Sheet or the Settlement Agreement shall constitute a representation or warranty by LCPI that the 1st Lien Lenders will vote in favor of the Plan by the requisite majorities under the Bankruptcy Code to obtain acceptance of the Plan by the class of 1st Lien Lenders nor shall LCPI have any liability in respect of such voting by the 1st Lien Lenders.

N. Nothing contained in this Term Sheet or Settlement Agreement shall limit or interfere, in any way, with the ability of any 1st Lien Lender or member of the "steering committee" to transfer or assign its interests under the First Lien Credit Agreement. However, if such transferor or assignor has signed this Term Sheet, its transferees or assignees shall be bound by the provisions of this Agreement to the same extent such transferor or assignor was bound thereby. The transfer or assignment of all or part of such transferor's or assignor's interests under the First Lien Credit Agreement shall constitute a novation, whereby, such transferor or assignor shall automatically receive a release of its obligations under this Term Sheet and any Settlement Agreement by and to the same extent that its transferee or assignee is bound by the provisions of this Term Sheet and any Settlement Agreement.

**Key Plan Provisions**.

O. The 1st Lien Lenders will be classified as a separate class under the Plan.

P. The Plan will provide that the Trustee will sell the Properties (including without limitation any related personal property) pursuant to 11 U.S.C. Section 1123(a)(5)(d) to the 1st Lien Lenders and/or one or more successful third party Qualified Bidders under the Overbid Procedures, as the case may be, free and clear of Liens for the aggregate amount of $62 million by way of credit bid (or such other amount by way of cash bid as may be assented to by the 1st Lien Lenders in the case of a successful third party Qualified Bidder) as set forth in the Bidding Procedures.

Q. The Plan will provide that until such time as the earliest to occur of (a) all holders of allowed claims, other than the Lenders, have been paid in full the allowed amounts of their respective claims according to their respective legal priorities, (b) the Lenders have been paid the full amount of their allowed claims, or (c) the Settlement Agreement or this Term Sheet terminates in accordance with their respective terms,

any recovery of proceeds from any avoidance action, litigation (including, without limitation, litigation in respect of any claims of fraudulent conveyance), asset disposition (excluding the sale of the Properties), or other recovery by the Trustee prior to or after Plan confirmation (the "Other Recoveries"), after payment in full of all allowed administrative and other priority unsecured claims in all four of the SunCal Bankruptcy Cases (collectively, the "Unsecured Priority Claims"), shall be split 50/50 between the 1st Lien Lenders (based on the understanding of the parties hereto that, and only if, all such proceeds would be distributed to the 1st Lien Lenders under the Intercreditor Agreement, defined below in this paragraph) and the holders of allowed claims other than the Lenders (the "Trade Creditors", which term excludes any and all claims by the Lenders). The portion of the Other Recoveries that is allocated to the Trade Creditors (the "Trade Creditor Allocation") shall be distributed to Trade Creditors pursuant to a confirmed administratively-consolidated chapter 11 plan on a pro rata basis among those Trade Creditors based on the allowed amount of their respective claims. Distributions to Trade Creditors shall be made out of a single fund consisting of Other Recoveries that shall be administered by an appropriate fiduciary. This division of Other Recoveries shall be enforceable in the Bankruptcy Courts and any court of competent jurisdiction notwithstanding (1) the effect or terms of any agreement among the Lenders; (2) that assets, claims or causes of action may be held or pursued on behalf of one or only some of the Debtors; and (3) that Parent Debtor has few if any creditors other than the Lenders. After all Trade Creditors of the Debtors' estates are paid in full, the balance of the funds in the Debtors' estates, if any, shall be distributed to the Lenders in accordance with their respective priorities but subject to that certain Amended and Restated Intercreditor Agreement among the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders, dated as of February 6, 2007 (the "Intercreditor Agreement"). If the foregoing allocations are either altered without the consent of the parties hereto or not approved by one or both of the Bankruptcy Courts, then any allowed unsecured claim of the 1st Lien Lenders shall be deemed assigned to the Debtors' bankruptcy estates (the "Assigned 1st Lien Lenders' Claim") for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the Lenders, but without representation or warranty and only for the purpose of effectuating the distributions provided for in this paragraph Q. The proceeds from the Assigned 1st Lien Lenders' Claim shall be distributed first, to all unpaid Unsecured Priority Claims and second, to all Trade Creditors on a pro rata basis. After all of the Unsecured Priority Claims and Trade Creditors are paid in full, the remaining proceeds from the Assigned 1st Lien Lenders' Claim shall be paid to the 1st Lien Lenders.

R. The Trustee shall be entitled to, and shall recover and receive from each Gross Recovery (hereinafter defined) that the 1st Lien Lenders receive from subsequent dispositions of the Properties by the 1st Lien Lenders the lesser of (1) the amount sufficient to pay in full the allowed amount of the claims of the holders of allowed claims other than the Lenders to the extent not previously paid, and (2) 3.5% of such Gross Recovery (the "Trustee's Participation"); provided that at the time of any such subsequent disposition the holders of allowed claims other than the Lenders shall not have otherwise been paid the full allowed amount of their claims. The Trustee's Participation in each portion of any Gross Recovery that consists of cash shall be

immediately due and payable to the Trustee from the 1st Lien Lenders in cash upon the 1st Lien Lenders' receipt of such portion of the applicable Gross Recovery. The Trustee's Participation shall be transferred to the Trustee free and clear of Lender liens for the sole benefit of all allowed non-Lender unsecured claims. As used herein, "Gross Recovery" shall mean all cash and other property actually received by the 1st Lien Lenders, or any of their affiliates or principals, either directly or indirectly, from the disposition of each Property, including the proceeds from the sale of any of the Properties under Paragraph E to a party other than the 1st Lien Lenders, whether such proceeds are received in a single lump sum or on a piecemeal basis over time, excluding cash and other property used to satisfy any Senior Liens not otherwise satisfied under the Title Insurance Policy or the Plan. For the avoidance of doubt, in the case of such property actually received that consists of promissory notes and/or equity interests (direct or indirect) in any entities taking title to the Properties, the Trustee shall be entitled to receive, at the time such promissory notes and/or equity interests are received by the 1st Lien Lenders or their applicable affiliates or principals, a profits participation or similar right to receive the applicable amount representing the Trustee's Participation from all cash actually received by such entities taking title to each Property from the disposition of such Property and by the Lenders and their applicable affiliates and principals in respect of such promissory notes, which profits participation or similar right shall be provided for in the operating, partnership, or similar governing documents of such entities and in such promissory notes (as the case may be), such provisions to be enforceable by the Trustee. The California Bankruptcy Court shall retain jurisdiction with respect to the determination of the value of any component of each Gross Recovery. Without limiting the foregoing, if the 1st Lien Lenders form a joint venture with, or borrow funds from, any party, including themselves or affiliates to obtain funding necessary to develop one or more of the Properties or to maintain and/or operate the Properties prior to any disposition, the funds required to repay such unaffiliated equity or debt, as the case may be, shall reduce dollar-for-dollar the Gross Recovery for the applicable Properties. The 1st Lien Lenders agree to act in good faith to carry out the terms of this paragraph R and to effectuate this participation interest of the Trustee. The 1st Lien Lenders will, at their sole expense, provide a report and accounting to the Trustee or the Trustee's successor in interest as soon as possible following receipt of Proceeds and shall provide semi-annual financial reports relating to the Properties. In addition, the 1st Lien Lenders will provide such documents and other information reasonably requested by the Trustee or the Trustee's successor in interest to monitor the 1st Lien Lenders' compliance with this paragraph R. Finally, the Plan may contain such other reasonable provisions as may be required to effectuate the performance of the terms of this paragraph R.

S. The Plan shall provide that as of the effective date of the Plan (i) the Trustee in his capacity as such and the Debtors' estates through the Trustee will be deemed to have released the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders) and, subject to the last sentence of this paragraph S, their respective affiliated parties, officers, directors, employees, agents and attorneys, and (ii) LCPI (in its individual capacity as a 1st Lien Lender and in its capacity as administrative agent for the 1st Lien Lenders but not in any other

capacity) and the 1st Lien Lenders will be deemed to have released the Debtors' estates and the Trustee, for and from all claims (as defined in section 101(5) of the Bankruptcy Code and including any claims that could be brought by or against the Trustee pursuant to the Bankruptcy Code) and causes of action other than distribution and other rights as set forth above. Notwithstanding the foregoing and for the avoidance of doubt, the releases to be exchanged shall not include claims and causes of action against any third parties other than the 1st Lien Lenders and LCPI and their respective affiliated parties, officers, directors, employees, agents and attorneys acting in their capacities as lenders, agents, loan administrators or advisors thereto, and such releases specifically shall *not* include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"); SCC Acquisitions, Inc. ("SCC Inc."); SCC Acquisitions, LLC ("SCC LLC"); or SCC Ranch Ventures LLC (collectively with SCC Inc. and SCC LLC, "SCC") or any claims related to the acts of the owners of any of the Debtors including any transfers of funds by any of the owners of any of the Debtors.

**Certain Rights and Releases Upon Termination Event**

T. If a final order confirming the Plan shall not have been obtained by [January 15], 2010 (or such later date as may be mutually agreed upon by the Trustee, LCPI and the Creditors' Committee, such later date in no event to be later than [January 29], 2010) or this Term Sheet or the Settlement Agreement shall otherwise terminate in accordance with their respective terms (any of the foregoing events, a "Termination Event"), then:

i. The 1st Lien Lenders immediately will be granted relief from stay to foreclose on the Properties. The Bankruptcy Court will grant this relief upon the presentation of an order by LCPI, accompanied by a declaration signed by an authorized representative of LCPI, confirming that a Termination Event has occurred. No party in interest, including without limitation the Trustee and the Creditors' Committee, shall be entitled to or permitted (A) to challenge the presentation of or entry of the order granting LCPI relief from stay with respect to the Properties, except to the extent no Termination Event has in fact occurred or (B) to challenge or otherwise interfere with the foreclosure of the Properties. Upon the entry of such order, the Trustee shall cooperate with the 1st Lien Lenders' foreclosure actions.

ii. The Trustee shall retain the Administrative Funds free from the secured claims of the Lenders.

iii. The 1st Lien Lenders shall retain the 1st Lien Lenders Retained Settlement Funds and the Trustee shall immediately pay over to the 1st Lien Lenders (A) the unused portion of the Senior Lien Reserve Funds, (B) the unused portion of the Remaining Development Funds, and (C) the unused portion of the Trustee Loss Collateral, in each case free and clear of any claims or interests (including without limitation any right to recovery) of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors.

iv. Without any further order of or action by the Bankruptcy Court, (A) the Debtors' estates through the Trustee shall be deemed to have released the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders), and their respective affiliated parties, officers, directors, employees, agents and attorneys, and (B) LCPI (in its individual capacity as a 1st Lien Lender and in its capacity as administrative agent for the 1st Lien Lenders but not in any other capacity) and the 1st Lien Lenders will be deemed to have released the Debtors' estates and the Trustee, in each case for and from all claims (as defined in Section 101(5) of the Bankruptcy Code and including any claims that could be brought by or against the Trustee pursuant to the Bankruptcy Code) other than the allowance of the Lenders' claims as set forth in paragraph B above and the rights to receive distributions based on those allowed claims, and for the rights set forth in this paragraph T. Notwithstanding the foregoing and for the avoidance of doubt, the releases to be exchanged shall be broad but also shall preserve any of the Trustee or the Debtors' estates' claims against any third parties other than the 1st Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the 1st Lien Lenders) and their respective affiliated parties, officers, directors, employees, agents and attorneys, and shall *not* include a release of LBREP Lakeside or SCC.

v. LCPI and the 1st Lien Lenders shall in no event be deemed to have waived any right to object to the substantive consolidation of the Debtors' cases.

vi. The Trustee shall execute and deliver to LCPI any and all instruments and documents necessary to terminate and/or assign back to LCPI, as applicable, all rights, standing and privileges of the Trustee as an "insured claimant" under the Title Insurance Policy and all rights to receive proceeds thereof assigned to the Trustee pursuant to subparagraph K(i) above.

vii. Except as provided in this paragraph T, this Term Sheet and the Settlement Agreement shall be of no further force or effect, including any obligation contained in paragraphs L and M.

**No Substantive Consolidation**

U. The parties hereto acknowledge and agree that neither any provision of this Term Sheet nor any of the transactions contemplated herein, including without limitation the contemplated terms and provisions of the Settlement Agreement and the Plan, do nor shall (i) effect substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors, (ii) suggest that any such substantive consolidation is or might be possible, or (iii) affect the right of the 1st Lien Lenders to object to the substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors. However, nothing here shall constitute a waiver of the rights of the parties to seek substantive consolidation of one or more of the Debtors if such is necessary or appropriate in the interests of creditors.

[Signatures appear on the following page]

Dated: 9/24/2009

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee
of the administratively consolidated estates
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

[Signatures continue on the following page]