1  DANIEL H. REISS (State Bar No. 150573)
   dhr@LNBYB.com
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
3  Los Angeles, California 90067
   Telephone: (310) 229-1234
4  Facsimile: (310) 229-1244

5  Counsel for the Official
   Committee of Unsecured Creditors
6

7

8                  **UNITED STATES BANKRUPTCY COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10                     **SANTA ANA DIVISION**

11  In re                                  | Case No. 8:08-bk-15588-ES

12  LBREP/L-Sun Cal Master I, LLC, et al., | Chapter 11

13                          Debtor.        | (Jointly Administered with Case Nos.
                                           | 8:08-bk-15637-ES; 8:08-bk-15639-ES; and
                                           | 8:08-bk-15640-ES)
14  _____ Affects LBREP/L-SunCal Master I,
    LLC Only                               | **FIRST INTERIM APPLICATION FOR**
15                                          | **ALLOWANCE AND PAYMENT OF**
        _____ Affects LBREP/L-SunCal McAllister | **COMPENSATION AND**
16  Ranch, LLC Only                         | **REIMBURSEMENT OF EXPENSES BY**
17      _____ Affects LBREP/L-SunCal McSweeny | **LEVENE, NEALE, BENDER, YOO &**
    Farms Only                              | **BRILL L.L.P., COUNSEL FOR**
18                                          | **OFFICIAL COMMITTEE OF**
        _____ Affects LBREP/L-SunCal Summerwind | **UNSECURED CREDITORS;**
19  Ranch Only                              | **DECLARATION OF DANIEL H. REISS**
                                            | **IN SUPPORT THEREOF**
20   _X__ Affects All Debtors.

21                                          | DATE:     February 1, 2011
                                            | TIME:     10:00 a.m.
22                                          | PLACE:    Courtroom 5A
                                            |           411 W. Fourth St.
23                                          |           Santa Ana, CA 92701

24

25

26

27

28

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P. ("LNBYB"), bankruptcy counsel to the Official Committee of Unsecured Creditors (the "Committee") in the above-referenced administrative consolidated chapter 11 cases LBREP/L-SunCal Master I, LLC (the "Parent Debtor"), and LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC (collectively, the "Subsidiary Debtors," and together with the Parent Debtor, the "Debtors"), hereby submits its First Interim Application for Approval of Fees and Reimbursement of Expenses (the "Application") for services rendered and expenses incurred for the period of November 17, 2008, through and including December 31, 2010 (the "Covered Period").

## I.

## INTRODUCTORY STATEMENT

These bankruptcy cases (the "Bankruptcy Cases") were commenced by the filing of involuntary chapter 11 petitions under the United States Bankruptcy Code (the "Bankruptcy Code"), 11 U.S.C. §§ 101 *et seq.*, on or about September 10 and 11, 2008 (the "Petition Dates"). The Bankruptcy Cases are being jointly administered pursuant to an order of this Court entered on November 13, 2008. On or about October 29, 2008, the Court entered an order approving the appointment of Alfred H. Siegel (the "Trustee") as the chapter 11 trustee of the Bankruptcy Cases.

A.    **Request For Allowance of Fees and Reimbursement of Expenses.**

Pursuant to Local Bankruptcy Rule 2016-1(2), LNBYB requests that this Court:

(1)    Approve LNBYB's fees ($759,160.00) and expenses ($17,901.45) incurred during the Covered Period, for the total sum of $777,061.45; and

(2)    Authorize the Trustee to pay all allowed unpaid fees and expenses.

LNBYB expended a total of 1,437 hours of recorded time for services rendered during the Covered Period. LNBYB respectfully submits that its fees incurred in this case are reasonable under applicable statutory and case law.

///

2

**B.    Proper Notice.**

LNBYB is advised and understands that, pursuant to Federal Rule of Bankruptcy Procedure 2002(a)(7), counsel for the Trustee has served notice of, *inter alia*, this Application and the amount of fees and expenses sought herein upon the Office of the United States Trustee, the Debtors, the Committee, all other creditors entitled to notice, all parties who have requested special notice and all other known parties in interest.

**II.**

**THIS APPLICATION COMPLIES WITH LOCAL BANKRUPTCY RULE 2016-1**

**A.    Brief Narrative History and the Present Posture of the Case (Local Bankruptcy Rule 2016-1(1)(a)(i)(1) and Significant Events During the Covered Period (OUST Fee Guide II.A.4.)**

**1.    Description and History of the Debtors' Business**

The Parent Debtor is a holding company, established to fund the real estate development projects owned by each of its four operating subsidiaries, three of whom are the Subsidiary Debtors, and LBREP/L-SunCal Patterson Ranch LLC ("Patterson Ranch"), which entity is not the subject of a bankrupcty proceeding.[1] The Parent Debtor has cash in accounts with a current aggregate balance of approximately $13 million. The Parent Debtor's primary asset, other than cash, is its interests in its operating subsidiaries. The Parent Debtor is the sole equity member of the Subsidary Debtors, each of which, in turn, owns a real estate development project bearing the same name (each, a "Property" and collectively, the "Properties"). The following is a brief summary of the Properties:

1.    McAllister Ranch:    LBREP/L-SunCal McAllister Ranch LLC ("McAllister Ranch"), owns the real estate development project commonly known as "McAllister Ranch" (the "McAllister Ranch Property"), which is located near Bakersfield in Kern County, California.    The Trustee understands that the

---

[1]    The Trustee abandoned the Parent Debtor's membership interest in Patterson Ranch, which abandonment was approved by order of this Court entered on July 30, 2010.

3

McAllister Ranch Property is designed to be a 2,070 acre master-planned community featuring a golf course, lake, and approximately 6,087 homes. The Trustee further understands that all of the lots have been graded, and the first of five planned subdivisions was nearly complete as of the Petition Dates. In addition, the golf course is completed and the clubhouse is framed and roofed.

2.      McSweeny Farms: LBREP/L-SunCal McSweeny Farms LLC ("McSweeny Farms"), owns the real estate development project commonly known as "McSweeny Farms" (the "McSweeny Farms Property"), which is located near Hemet in Riverside County, California. The Trustee understands that the McSweeny Farms Property is comprised of 673 acres, and a total of 1,640 lots are planned to be included thereon. The Trustee further understands that Phase 1 of the project was completed and sold out as of the Petition Dates.

3.      Summerwind Ranch: LBREP/L-SunCal Summerwind Ranch LLC ("Summerwind Ranch"), owns the real estate development project commonly known as "Summerwind Ranch" (the "Summerwind Ranch Property"), which is located near Calimesa in Riverside County, California. The Trustee understands that the Summerwind Ranch Property is comprised of 2,591 acres with 3,683 lots planned thereon.

As discussed in further detail below, LCPI, as administrative agent for the 1st Lien Lenders, asserts a first-priority lien against the Properties and the Parent Debtor's Cash for the full amount of the loans to the Parent Debtor and guaranteed by the Subsidiary Debtors. The second-position secured lenders (the "2nd Lien Lenders") and the third-position secured lenders (the "3rd Lien Lenders" and collectively with the 1st Lien Lenders and the 2nd Lien Lenders, the "Lien Lenders") also assert liens against the Properties and the Parent Debtor's Cash.

**2. Principals/Affiliates of the Debtors' Business.**

The Committee is informed and believes that the members of the Parent Debtor are LBREP Lakeside SC Master I, LLC ("Lehman Lakeside") and SCC Ranch Ventures, LLC

4

1  ("SunCal"). Ninety percent (90%) of the Parent Debtor is owned by Lehman Lakeside, which
2  is an affiliate of Lehman Bros. Real Estate Partners, LP ("LBREP").[2] The remaining ten
3  percent (10%) of the Parent Debtor is owned by SunCal, which is an affiliate of SCC
4  Acquisitions, Inc., dba SunCal Companies. Lehman Lakeside is the managing member of the
5  Parent Debtor, and SunCal is the operating member. The Parent Debtor is the sole member of
6  each of the Subsidiary Debtors.

7      **3. Management of the Debtors Before and After Bankruptcy.**

8      Prior to the commencement of the Cases, it is Committee's understanding based on
9  information and belief, that SunCal, as the operating member, was responsible for
10 administering the day-to-day business affairs of the Parent Debtor and the Subsidiary Debtors.
11 The Committee further understands on information and belief that the Parent Debtor entered
12 into management agreements with SunCal Management, LLC ("SunCal Management") pre-
13 petition, an affiliate of SunCal, to manage the Properties. At the request of the Trustee, SunCal
14 Management has continued to manage the Properties post-petition.

15      **4. Events Leading to Chapter 11 Filing.**

16          a.      The January 2006 Loans.

17      Based on a review by the Committee of relevant documents, the Parent Debtor, as
18 borrower, entered into three lien credit agreements with LCPI (collectively, the "Lien Credit
19 Agreements"). Pursuant to that certain First Lien Credit Agreement dated January 19, 2006
20 (the "First Lien Credit Agreement") and that certain Second Lien Credit Agreement dated
21 January 19, 2006 (the "Second Lien Credit Agreement"), the Parent Debtor borrowed the
22 principal amount of $320 million (collectively, the "January 2006 Loans") as follows: (1) a
23 revolving credit facility of $75 million and term loan facility of $160 million under the First
24 Lien Credit Agreement; and (2) a $85 million term loan facility under the Second Lien Credit
25 Agreement.   LCPI was a lender under the January 2006 Loans, and acted as the sole
26 administrative agent, and Lehman Brothers, Inc. ("Lehman Brothers"), served as the advisor,

27

28          [2]    Both LCPI and LBREP are affiliates of Lehman Brothers Holding, Inc.

5

1   sole lead arranger and syndication agent.   Later, Gramercy Warehouse Funding I, LLC
2   ("Gramercy"), replaced LCPI as the administrative agent under the Second Lien Credit
3   Agreement.

4        The Parent Debtor's obligations under the First Lien Credit Agreement and the Second
5   Lien Credit Agreement were guaranteed by the Subsidiary Debtors, and these upstream
6   guaranties were secured by first and second liens against the Properties (subject to such other
7   existing or statutorily senior liens, such as alleged mechanics liens and real property tax liens, if
8   any).   The Committee is informed and believes that the Subsidiary Debtors also contributed
9   cash (approximately $45 million) to repay certain previous loans made by Lehman Ali, Inc.
10   ("Lehman Ali"), to the Subsidiary Debtors and secured by the Properties (the "Lehman Ali
11   Loans"), which were repaid at the origination of the January 2006 Loans using, in part, a
12   portion of the proceeds from the January 2006 Loans.

13        The Debtors incurred secured debt totaling $320 million pursuant to the First and
14   Second Lien Credit Agreements.   However, the Committee is informed that a significant
15   portion of the proceeds from the January 2006 Loans was not available to the Debtors for
16   operations and other uses.   Pursuant to the First Lien Credit Agreement, the sum of
17   approximately $144 million was paid directly from escrow to the Parent Debtor's equity owners
18   (the "Dividend").   Of this total sum, the Trustee alleges that approximately $116.5 million was
19   distributed to Lehman Lakeside, and approximately $27.5 million was distributed to SunCal.
20   The sum of approximately $10.6 million was paid from escrow to LCPI for its arrangement and
21   administration fee.   Approximately $62 million was disbursed to Lehman Ali to repay the
22   Lehman Ali Loans.   Approximately $25 million of the loan proceeds was immediately set aside
23   to fund a "Development Account," which the Debtors were not permitted to use, except under
24   certain circumstances, but served as the Lien Lenders' collateral.   Thus, the Trustee has alleged
25   that only up to approximately $79 million of the $320 million from the January 2006 Loans was
26   available to fund operations or for other uses.

27
28

6

b.     The February 2007 Loan.

By that certain Third Lien Credit Agreement dated February 6, 2007 (the "Third Lien Credit Agreement"), the Committee is informed that Parent Debtor obtained an additional $75 million term loan (the "February 2007 Loan," collectively with the January 2006 Loans, the "Loans"). The February 2007 Loan was guaranteed by the Subsidiary Debtors and secured by third-priority liens against the Properties. From the $75 million loaned to the Parent Debtor under the Third Lien Credit Agreement, the Trustee has alleged that $50 million was paid out of escrow directly to LCPI to pay down the obligations under the First Lien Credit Agreement, allegedly leaving $25 million to fund operations and for other uses. The Committee is informed that, with respect to the February 2007 Loan, LCPI was a lender and served as the administrative agent, and Lehman Brothers served as advisor, sole arranger and syndication agent. Square Mile Structured Debt (One), LLC, and Square Mile Structured Debt (Two), LLC ("Square Mile"), collectively, later replaced LCPI as the administrative agent under the Third Lien Credit Agreement.

Following the funding of the Loans, the Committee is informed that LCPI assigned a portion of its rights and obligations under the Lien Credit Agreements and the loan commitments thereunder to third parties. However, LCPI currently owns approximately 30% of the Debtors' obligations under the First Lien Credit Agreement, approximately 15% of the Debtors' obligations under the Second Lien Credit Agreement, and approximately 64% of the Debtors' obligations under the Third Lien Credit Agreement.

c.     The Intercreditor Agreement.

In connection with the Lien Credit Agreements, LCPI, Gramercy, and Square Mile, in their capacity as administrative agents for their respective Lien Lenders, entered into that certain Amended and Restated Intercreditor Agreement (the "Intercreditor Agreement"), dated as of February 6, 2007. The 1st Lien Lenders have contended that, under the Intercreditor Agreement, any payments to the 2nd Lien Lenders and the 3rd Lien Lenders must be paid over to the 1st Lien Lenders, until the 1st Lien Lenders are paid in full. The 1st Lien Lenders further

7

1  contend that the Intercreditor Agreement provides that the 2nd and 3rd Lien Lenders cannot

2  benefit from avoidance of the 1st Lien Lender's lien, rather, any proceeds received by the 2nd

3  and 3rd Lien Lenders as a result of the avoidance must be paid over to the 1st Lien Lenders.

4  Gramercy has disputed some or all of the foregoing contentions by the 1st Lien Lenders. The

5  Committee has not taken a formal position with respect to the Intercreditor Agreement,

6  although LNBYB has undertaken an analysis of its provisions and has advised the Committee

7  in this regard.

8             d.      The Debtors' Alleged Defaults Under the Lien Credit

9                     Agreements.

10          Pursuant to a Fourth Amendment and Waiver to the First Lien Credit Agreement dated

11  January 31, 2008 (the "Amendment"), the Parent Debtor was required to increase the cash in

12  the Development Account from \$25 million to \$50 million within 60 days (*i.e.*, by March 31,

13  2008). The Committee is informed that the Parent Debtor was unable to increase the amount of

14  funds deposited in the Development Account and, as result, on March 31, 2008, LCPI declared

15  a default. LCPI also declared defaults because the Debtors allegedly: (a) missed an interest

16  payment; (b) failed to timely deliver financial statements; and (c) failed to pay a \$100,000

17  administrative fee and maintain necessary liquidity requirements.

18          Based on the alleged defaults, LCPI commenced non-judicial foreclosure proceedings,

19  and foreclosure sales were scheduled for September 12, 2008. To prevent foreclosure, on

20  September 10, 2008, Gramercy filed an involuntary petition against the Parent Debtor.

21  Gramercy and certain trade creditors filed involuntary petitions against the Subsidiary Debtors

22  on September 11, 2008. The involuntary petitions filed against the Debtors shall hereinafter be

23  collectively referred to as the "Involuntary Petitions." The commencement of the Cases stayed

24  the foreclosure sales.

25  ///

26  ///

27  ///

28

8

1

### 5.  Significant Events During the Bankruptcy Cases.

2

a.   The Lehman Bankruptcy Cases

3      Shortly after the commencement of the Cases, on September 15, 2008, Lehman

4  Brothers Holdings Inc. ("LBHI") filed a voluntary petition under chapter 11 of the Bankruptcy

5  Code in the Southern District of New York (the "New York Bankruptcy Court").

6  Subsequently, 22 affiliates of LBHI, including LCPI (but not Lehman Lakeside), filed

7  voluntary petitions under chapter 11 of the Bankruptcy Code.  The bankruptcy cases of LBHI,

8  LCPI and the 21 remaining affiliates of LBHI (collectively, the "Lehman Bankruptcy Cases")

9  are being jointly administered under the lead case of LBHI, Case No. 08-13555 (JMP).

10

b.   The Appointment of the Trustee and the Order for Relief.

11     Following the commencement of the Cases, on October 15, 2008, the petitioning

12  creditors, excluding Gramercy, filed a motion for the appointment of an interim trustee (the

13  "Interim Trustee Motion"), which LCPI, as administrative agent for the 1st Lien Lenders, and

14  the Debtors opposed.  On October 22, 2008, the Debtors answered the Involuntary Petitions,

15  consented to the entry of orders for relief, and then filed motions to convert the Cases from

16  chapter 11 to chapter 7 (collectively, the "Motions to Convert").  On October 28, 2008, the

17  Court heard the Interim Trustee Motion, the Motions to Convert, and the stay relief motions

18  filed by LCPI (discussed below).  The Court granted the Interim Trustee Motion and denied the

19  Motions to Convert.

20     On October 29, 2008, the Office of the United States Trustee (the "OUST") filed an

21  application to appoint Alfred H. Siegel as the chapter 11 trustee.  On October 30, 2008, the

22  Court entered orders directing the appointment of a chapter 11 trustee and granting the OUST's

23  application to appoint Alfred H. Siegel as the chapter 11 trustee.  Also on October 30, 2008, the

24  Court entered orders for relief (the "Orders for Relief") in each of the Debtors' cases.  The

25  Cases are being jointly administered pursuant to Court orders entered on November 13, 2008.

26

27

28

9

1

     c.     The LCPI Stay Relief Motions.

2          On October 2, 2008, LCPI filed a motion for relief from the automatic stay each

3 individual Case (collectively, the "LCPI Stay Relief Motions"), to foreclose on the 1st Lien

4 Lenders' security interests in the Properties and the Parent Debtor's Cash. The LCPI Stay

5 Relief Motions were originally scheduled for hearing on October 28, 2008.   The Court

6 continued the hearing to November 20, 2008 to allow the Trustee an opportunity to analyze the

7 motions and prepare a response, if necessary. Both the Trustee and the Committee opposed the

8 LCPI Stay Relief Motions, in part, because they disputed the amount and validity of LCPI's

9 security interests based on the facts and circumstances surrounding the Loans. Following a

10 hearing on October 28, 2008, the Court set the LCPI Stay Relief Motions for an evidentiary

11 hearing on February 6, 2009 (the "Evidentiary Hearing"). The Court also set certain related

12 deadlines to designate experts, file expert reports, and file trial briefs. To prepare for the

13 Evidentiary Hearing, the Trustee sought discovery from LCPI and certain third parties.

14          The Trustee and LCPI entered into multiple stipulations to continue the Evidentiary

15 Hearing and extend the related deadlines, which were approved by the Court, and the

16 Evidentiary Hearing was ultimately continued to June 19, 2009. However, in connection with

17 the first round of settlement discussions between the Trustee and LCPI, which are discussed

18 below, the parties entered into a stipulation, which was approved by the Court, to take the

19 Evidentiary Hearing off calendar, and to suspend the related deadlines and discovery, subject to

20 the parties' rights to re-notice and/or reinstate the same. In light of the settlement among the

21 Trustee, the Committee, and LCPI and the 1st Lien Lenders, the LCPI Stay Relief Motions have

22 not been re-noticed and are not being pursued.

23          d.     The Settlement with LCPI and the 1st Lien Lenders.

24          (1)     The Original Term Sheet

25          On October 9, 2009, after months of negotiations, the Trustee filed a motion (the "First

26 Compromise Motion") to approve a term sheet between the Trustee, the Committee, and LCPI

27 (the "Original Term Sheet"). The First Compromise Motion was, for various reasons, opposed

28

1  by multiple third parties, including Lehman Lakeside, Gramercy, SunCal Management, and
2  Fidelity National Title Insurance Company ("Fidelity"). The First Compromise Motion was
3  initially heard on November 3, 2009. The Court continued the hearing on the First
4  Compromise Motion to December 17, 2009. On November 25, 2009, the Trustee filed an *ex*
5  *parte* motion to further continue the hearing for 30-45 days to allow the Trustee an opportunity
6  to resolve the objections to the First Compromise Motion. On December 2, 2009, the Court
7  entered an order granting the Trustee's *ex parte* motion, and continued the hearing to February
8  2, 2010.

9      Certain of the issues raised by the parties opposing the First Compromise Motion, and,
10 in particular, Fidelity, highlighted an ambiguity in the Original Term Sheet, the interpretation of
11 which resulted in a dispute between the settling parties. The Trustee, the Committee, and LCPI
12 attempted to resolve the dispute regarding the interpretation of the Original Term Sheet, and the
13 hearing on the First Compromise Motion was continued on multiple occasions to give the
14 parties an opportunity to reach a consensual resolution. However, the parties were unable to
15 resolve their differences. As a result, on January 25, 2010, the Trustee filed a notice of
16 withdrawal of the First Compromise Motion. By letter dated March 30, 2010, LCPI notified
17 the Trustee of its termination of the proposed settlement.

18                    (2)    The Amended Term Sheet

19     In July 2010, the Trustee, the Committee, and LCPI resumed settlement discussions in
20 an attempt to resolve their disputes regarding the Original Term Sheet. The Trustee, the
21 Committee, and LCPI, in its individual capacity and as administrative agent for the 1st Lien
22 Lenders, negotiated an amended and restated term sheet (the "Amended Term Sheet").

23     On September 2, 2010, LCPI filed a motion to approve the Amended Term Sheet (the
24 "LCPI Compromise Motion") in its own bankruptcy case pending in the New York Bankruptcy
25 Court. The LCPI Compromise Motion was opposed by Gramercy and Lehman Lakeside, and
26 Fidelity filed a reservation of rights. The LCPI Compromise Motion was heard on September
27 22, 2010. On September 29, 2010, the New York Bankruptcy Court entered an order granting
28

11

the LCPI Compromise Motion over the objections of Lehman Lakeside and Gramercy. On September 21, 2010, the Trustee filed his motion to approve the Amended Term Sheet in the Court (the "Second Compromise Motion"). A hearing on the Second Compromise Motion was held before this Court on December 21, 2010, at which hearing all oral argument was concluded. The Court continued the hearing to December 22, 2010 to issue an oral ruling. At that continued hearing, the Court approved the Amended Term Sheet (the "LCPI Settlement"), with certain relatively minor but important modifications. LNBYB played an instrumental role in negotiating the LCPI Settlement with LCPI as well as participating in the drafting of pleadings and appearance at Court hearings that resulted in its approval.

The material terms of the LCPI Settlement are summarized as follows:

i.     Allowance of LCPI Claim. Upon the date that the settlement becomes effective under the Amended Term Sheet (the "Settlement Effective Date"),[3] the Claim of the 1st Lien Lenders, for which LCPI serves as the administrative agent, will be an Allowed Claim in each of the Cases in the aggregate amount of $230,006,233.98, plus accrued and unpaid interest through the Petition Dates and legal fees.

ii.    Distributions on Settlement Effective Date.

a.     Distribution of the Development Account Funds. The Trustee will retain $5.5 million from the funds originally held in the Development Account (the "Development Account Funds"). Of this amount: (a) $3.5 million (the "Administrative Funds") will be available for the administrative expenses of the Estates and for potential distribution to the Holders of Claims other than the Lien Lenders (the "Trade Creditors" or "General Unsecured Trade Creditors"); and (b) $2.0 million (the "Remaining Development Funds") will be retained to pay the operating expenses of the Properties pursuant to an approved budget. The balance of the Development Account Funds (net of the $5.5 million retained by Trustee) will be transferred to the 1st Lien Lenders (the "Retained Settlement Funds") on the Settlement

---

[3]     The Settlement Effective Date will occur on the date the Court's order granting the Second Compromise Motion becomes a "Final Order" (as defined in the Amended Term Sheet). As of the filing of this Application, an order has not yet been entered approving the Second Compromise Motion.

12

1  Effective Date. If the Remaining Development Funds are not sufficient to the operating
2  expenses of the Properties, the 1st Lien Lenders have agreed, subject to certain conditions and
3  limitations, to the further use of cash collateral to preserve the Properties.

4              b.      Allocation of the Yucaipa Funds. The funds currently on deposit with
5  the Yucaipa Valley Water District ("YVWD") and paid to the Trustee pursuant to that certain
6  Settlement Agreement and Release Agreement (the "Yucaipa Settlement Agreement") between
7  the Trustee and Oak Valley Partners, L.P. (the "Yucaipa Funds"),will be split 50/50 between
8  the Trustee and the 1st Lien Lenders. The Trustee's 50% portion of the Yucaipa Funds (the
9  "Trustee's YFP") will be retained by the Trustee free and clear of liens, Claims, interests, and
10 encumbrances. The Trustee's YFP will constitute additional Administrative Funds and will be
11 immediately available for use in the administration of the Cases or any other purpose.

12             iii.    Sale of Properties Under the Plan. The Properties will be sold pursuant to a plan
13 under 11 U.S.C. § 1123(a)(5)(D) in accordance with bidding procedures developed by the
14 parties in consultation with a broker or brokers of their choosing (individually and collectively,
15 the "Approved Broker") and approved by the Court. The 1st Lien Lenders will be entitled to
16 credit bid for the Properties. The initial credit bid by the 1st Lien Lenders shall be in the
17 aggregate amount of at least $45 million (the "Aggregate Minimum Credit Bid Amount") and
18 the 1st Lien Lenders' aggregate credit bid will not exceed the maximum credit bid amount
19 established by the parties prior to the Settlement Effective Date (the "Aggregate Maximum
20 Credit Bid Amount"). Prior to the Settlement Effective Date, the Aggregate Maximum Credit
21 Bid Amount and the Aggregate Minimum Credit Bid Amount will be allocated among the
22 Properties by the parties in consultation with the Approved Broker (each, an "Allocated
23 [Minimum or Maximum] Credit Bid Amount" and collectively, the "Allocated [Minimum or
24 Maximum] Credit Bid Amounts"). As of the filing of this Application, an Aggregate and
25 Allocated Maximum Credit Bid had not yet been established; the Court, however, has required
26 that the 1st Lien Lenders establish a Maximum Credit Bid before an order approving the LCPI
27 Settlement is entered.

28
                                            13

iv.     Resolution of Senior Liens.  The Trustee will reasonably cooperate with the 1st Lien Lenders in their efforts to determine whether any liens are senior in priority to the liens of the 1st Lien Lenders against the Properties (the "Senior Liens") and to determine the amount of such Senior Liens.  However, the Trustee will not be obligated to take any action that would cause the Trustee or the Estates to incur material cost or liability.

v.     Distributions Pursuant to the Plan.

a.     Distributions of Other Recoveries.   The plan will provide that all proceeds recovered from sources other than the sale of the Properties or the Yucaipa Funds (e.g., from fraudulent transfer litigation), subject to the payment of administrative and priority unsecured claims, will be split 50/50 between the 1st Lien Lenders, on the one hand, and the Trade Creditors (on an administratively consolidated *pro rata* basis), on the other hand, until the Trade Creditors are paid in full (the "50/50 Distribution Scheme").   If, under the Intercreditor Agreement, any distributions to the 2nd and 3rd Lien Lenders must be paid to the 1st Lien Lenders, then the distributions shall be split 50/50 between the 1st Lien Lenders and the Trade Creditors.  If, on the other hand, the Intercreditor Agreement is found not to require that the 2nd and 3rd Lien Lenders pay any and all distributions to the 1st Lien Lenders, then the Allowed Unsecured Claims of the 1st Lien Lenders, and, to the extent necessary, the Allowed Unsecured Claims of LCPI, in its capacity as a 2nd Lien Lender and as a 3rd Lien Lender, shall be assigned to the Estates for the benefit of the Trade Creditors for the purpose of providing the Trade Creditors with the equivalent of what they would have received under the 50/50 Distribution Scheme.[4]

b.     The Trustee's Participation.  The Trustee shall be entitled to, and shall recover and receive the lesser of (i) the amount necessary to pay the Allowed Claims of the Trade Creditors (the "Allowed Unsecured Trade Claims"), or (ii) 3.5% of the net sale proceeds

---

[4]     Under this alternative, the Estates will receive up to 100% of the *pro rata* distribution to the 1st Lien Lenders and LCPI through an assignment of their Allowed Unsecured Claims in order to provide the Estates with 50% of the total recovery.  Under either alternative, except for LCPI, the 2nd and 3rd Lien Lenders will receive any amounts they are otherwise entitled to receive under the Intercreditor Agreement.

14

1  from the sale of the Properties to a third party through the plan or, if the 1st Lien Lenders

2  acquire the Properties through the plan by way of a credit bid, then from the proceeds from the

3  subsequent disposition of the Properties by the 1st Lien Lenders.

4          vi.    Releases. On the Settlement Effective Date, the Trustee shall be deemed to have

5  released the 1st Lien Lenders and LCPI (in its individual capacity and as administrative agent

6  for the 1st Lien Lenders), and, except those entities specifically carved out below, their

7  respective affiliated parties, officers, directors, employees, agents and attorneys, and the 1st

8  Lien Lenders and LCPI (in its individual capacity and as administrative agent for the 1st Lien

9  Lenders), shall be deemed to have released the Estates and the Trustee and the Trustee's agents

10  and attorneys, in each case for and from all claims (as defined in § 101(5) of the Code and

11  including any claims that could be brought by or against the Trustee pursuant to the Code) other

12  than the rights and benefits granted and preserved under the Amended Term Sheet, including,

13  without limitation, the Allowed Claims set forth in the Amended Term Sheet and the rights to

14  receive Distributions based on those Allowed Claims. The Amended Term Sheet does not

15  include a release of any Causes of Action against any third parties other than the 1st Lien

16  Lenders and LCPI and their respective affiliated parties, officers, directors, employees, agents

17  and attorneys, and specifically does not include a release of Lehman Lakeside, SunCal, SCC

18  Acquisitions, Inc., or SCC Acquisitions, LLC, or any Causes of Action related to the acts of the

19  owners of any of the Debtors including any transfers of funds by any of the owners of any of

20  the Debtors. If the Settlement Effective Date does not occur for any reason, the foregoing

21  releases will be of no force or effect.

22          e.    Cash Collateral and the Management of the Properties.

23          During these Cases, the Trustee has been authorized to use cash collateral solely to pay

24  the expenses necessary to preserve and maintain the value of the Properties and protect the

25  Estates from liability pursuant to budgets prepared by SunCal Management. Shortly after his

26  appointment, on November 4, 2008, the Trustee filed an Emergency Motion for Order

27  Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) (the "Emergency Cash

28                                        15

1  Collateral Motion"), which was opposed by LCPI. On November 5, 2008, the Trustee filed a
2  supplement to the Emergency Cash Collateral Motion to compel turnover to the Trustee of the
3  Development Account Funds, which were deposited in accounts of the Debtors at First Bank.
4  The Emergency Cash Collateral Motion was heard on November 6, 2008. On November 12,
5  2008, the Court entered an order granting the Emergency Cash Collateral Motion, and
6  authorizing the use of cash collateral on an interim basis pending a final hearing on November
7  20, 2008. On November 24, 2008, the Court entered an order directing First Bank to turnover
8  the Development Account Funds to the Trustee. On December 8, 2008, the Court entered an
9  order granting the Emergency Cash Collateral Motion on a final basis through February 28,
10  2009.

11      On a number of occasions thereafter, the Trustee and LCPI stipulated to the use of cash
12  collateral on substantially the same terms and conditions, subject to a reservation of rights, and
13  with such approval to use cash collateral deemed over LCPI's continuing objection. Each
14  stipulation was approved by the Court. However, on other occasions, the Trustee has been
15  required to seek authorization to use cash collateral by motion. In all, the Trustee has filed
16  seven motions for authority to use cash collateral, the majority of which have been opposed by
17  LCPI.

18      Unable to reach an agreement with LCPI regarding the use of cash collateral beyond
19  November 30, 2009 (due to the break down in negotiations related to the Original Term Sheet),
20  the Trustee filed motions for the use of cash collateral through December 31, 2009, March 31,
21  2010, and June, 30, 2010. LCPI filed a limited objection to each motion, and each motion was
22  granted over LCPI's limited objection. On May 27, 2010, the Trustee filed a motion for
23  authority to use cash collateral through and including September 30, 2010. LCPI filed an
24  opposition to the motion. On June 17, 2010, the Court heard and granted the motion over
25  LCPI's opposition. On June 25, 2010, the Court entered an Order Granting Motion for Order
26  Authorizing Use of Cash Collateral Through September 30, 2010 (the "Cash Collateral Order").
27  On July 9, 2010, LCPI filed a notice of appeal of the Cash Collateral Order (the "Appeal"). In

28

16

1  light of the Amended Term Sheet, the Trustee and LCPI stipulated to stay the Appeal, and by
2  order of the United States Bankruptcy Appellate Panel of the Ninth Circuit entered on
3  September 21, 2010, the Appeal has been temporarily stayed until November 5, 2010, and all
4  dates and deadlines are currently suspended.  The Trustee expects that the Appeal will be
5  dismissed by the Confirmation Hearing.

6        As discussed above, at the request of the Trustee, SunCal Management has continued to
7  maintain the Properties post-petition, and has prepared the Trustee's cash collateral budgets.
8  SunCal Management has been compensated on an hourly basis pursuant to interim applications
9  for payment of management fees in accordance with the Court's various cash collateral orders.

10              f.    The Trustee's Stay Relief Motion.

11        Following the breakdown in negotiations with LCPI regarding the Original Term Sheet,
12  the Trustee began diligently pursuing other alternatives.  The Trustee decided to sell the
13  Properties free and clear of liens and other interests, subject to overbid, and to pursue the
14  Estates' Causes of Action against LCPI and the other 1st Lien Lenders and certain of other
15  entities.  The Trustee selected a broker, whose retention is subject to Court approval, to market
16  and sell the Properties.   The Trustee received multiple letters of intent to purchase the
17  Properties, and the Trustee entered into an asset purchase agreement with a prospective buyer,
18  subject to Court approval.  The Trustee also began preparing a motion to authorize the sale of
19  the Properties free and clear of liens and other interests, for approval of overbid procedures, to
20  deny credit bid rights, and for certain related relief.  However, before further pursuing the sale
21  of the Properties, the Trustee decided to seek stay relief in the Lehman Bankruptcy Cases.

22        On June 17, 2010, the Trustee filed a motion in the New York Bankruptcy Court for
23  relief from the automatic stay (the "Trustee's Stay Relief Motion") to, among other things, sell
24  the Properties free and clear of liens, including the lien of LCPI, and to deny Lehman
25  Commercial Paper's credit bid rights.  LCPI filed an opposition to the Trustee's Stay Relief
26  Motion.  The Trustee's Stay Relief Motion was initially heard on July 14, 2010.  The New York
27  Bankruptcy Court continued the hearing to August 18, 2010, and strongly suggested to the

28

1  Trustee, the Committee, and LCPI that they focus their attention on attempting to resolve their

2  differences as opposed to planning for expensive and protracted litigation.  As suggested by the

3  New York Bankruptcy Court, the parties engaged in further settlement discussions following

4  the hearing and the result of such discussions was the Amended Term Sheet.  In light of the

5  Amended Term Sheet, which provides for the sale of the Properties pursuant to a consensual

6  process with LCPI, the Trustee's Stay Relief Motion has been taken off calendar and is no

7  longer being pursued.

8              g.      The Yucaipa Settlement.

9      On August 13, 2010, the Trustee filed a motion to approve the Yucaipa Settlement

10  Agreement (the "Yucaipa Settlement Motion").  The Yucaipa Settlement Agreement settles

11  disputes between Summerwind Ranch's Estate and Oak Valley Partners, L.P. ("Oak Valley")

12  with respect to ownership of the $1,008,000 on deposit with the YVWD (the "Yucaipa

13  Deposit").  Pursuant to the Yucaipa Settlement Agreement, the Summerwind Ranch Estate and

14  Oak Valley agreed to split the Yucaipa Deposit 50/50, after payment of up to $140,000 to a

15  third party who also claims an interest in the Yucaipa Deposit.  In addition, the Yucaipa

16  Settlement Agreement provides that Oak Valley's Claim against Summerwind Ranch's Estate in

17  the approximate amount of $11,907,650 will be reduced by the sum of $3,271,079 for amounts

18  that Summerwind Ranch asserted was owed to it by Oak Valley.  The Yucaipa Settlement

19  Motion was heard on September 30, 2010, and, on October 8, 2010, the Court entered an order

20  granting the Yucaipa Settlement Motion.  As a result, the Trustee expects to receive $434,000,

21  of which 50% will be paid to LCPI on the Settlement Effective Date pursuant to the Amended

22  Term Sheet.  The remainder will be used for the administration of the Estates.

23              h.      The Trustee's Chapter 11 Plan.

24      On October 27, 2010, the Trustee filed Chapter 11 Plan of Reorganization (the "Plan")

25  and accompanying Disclosure Statement (docket numbers 509 and 510, respectively).  The goal

26  of the Plan is to liquidate the real property and other assets of the Debtors' Estates, including

27  Causes of Action held by the Estates, and to distribute any resulting net proceeds.  Under the

28

18

Plan, and in accordance with the settlement with LCPI, the Properties will be sold to the 1st Lien Lenders on account of the 1st Lien Lenders' Allowed Secured Claim and/or to one or more third parties in accordance with bidding procedures approved by the Court. All other assets of the Debtors' Estates will be transferred to the liquidating trust (the "Liquidating Trust") established on the Effective Date of the Plan. Any and all Avoidance Actions and other Causes of Action of the Estates are reserved under the Plan and will be transferred to the Liquidating Trust, and the Liquidating Trustee will be vested with standing to pursue such Avoidance Actions and Causes of Action. Generally speaking, under the Plan, Distributions can be made from the following three potential sources of Cash: (1) any remaining Administrative Funds; (2) the Estates' share of any proceeds from the sale or other disposition of the Properties; and (3) any net recoveries from any Avoidance Actions or other Causes of Action asserted by the Estates against third parties. The foregoing sources of Cash will be paid to and administered and distributed by the Liquidating Trustee. The primary potential source of repayment for Unsecured Trade Creditors will be any net proceeds from litigation, such as, the Estates' Causes of Action to avoid and recover the Dividend.

Numerous objections were filed to the Disclosure Statement, to which the Trustee and the Committee filed written responses. An initial hearing on the Disclosure Statement was held on December 2, 2010, at which the Court "conditionally" approved the Disclosure Statement. The Court determined that approval of the Disclosure Statement would be contingent on approval of the LCPI Settlement in light of the interrelationship between the Plan and the LCPI Settlement. The Court continued the hearing on the Disclosure Statement to the same time as the hearing on the Second Compromise Motion. Prior to that continued hearing, in consultation with the Committee, the Trustee filed a proposed amended Disclosure Statement (the "First Amended Disclosure Statement") on December 10, 2010. At that continued hearing – i.e., December 22, 2010 (the continued hearing on the Second Compromise Motion) – the Court approved the First Amended Disclosure Statement, the final version of which was filed on January 7, 2011 (docket number 604). The Trustee also filed its First Amended Chapter 11

1  Plan of Reorganization on January 7, 2010 (the "First Amended Plan") (docket number 605).

2  Confirmation hearings on the First Amended Plan are currently set for April 1 and 8, 2011.

3          **6.      Date of Entry of the Order Approving LNBYB's Employment and**

4          **Date Services Commenced (Local Bankruptcy Rule 2016-1(1)(a)(ii) and OUST Fee**

5          **Guide II.A.1.)**

6          On November 12, 2008, the OUST appointed the Committee to represent the interests

7  of the general unsecured creditors of the jointly administered Estates.  The members of the

8  Committee are: (1) TC Construction Co., Inc.; (2) West Coast Structures, Inc., dba West

9  Structures; (3) Stantec Consulting, Inc.; (4) Hemet Manufacturing Co., Inc., dba Genesis

10  Construction; (5) Weston Mason Marketing; (6) Nissho of California, Inc.; (7) Lennar Homes

11  of California, Inc.; (8) Superior Pipelines, Inc.; and (9) John D. Scripter, dba Masonry Plus.

12  Following its appointment, the Committee employed LNBYB as its counsel, whose

13  employment subsequently approved by order of the Court entered on March 31, 2009, effective

14  November 17, 2008.  A true copy of the order approving LNBYB's employment is annexed

15  hereto as Exhibit "A".

16          **7.      Fees and Expenses Previously Requested (Local Bankruptcy Rule**

17          **2016-1(1)(a)(iii) and OUST Fee Guide II.A.2.)**

18          This is LNBYB's first interim fee application. LNBYB has not received payment of any

19  fees in the Bankruptcy Cases.

20          **8.      Source and Amount of Cash Available to Pay LNBYB's Allowed**

21          **Fees and Expenses (Local Bankruptcy Rule 2016-1(1)(a)(iii) and OUST Fee Guide**

22          **II.A.2. and II.A.3.)**

23          LNBYB shall be paid when funds become available in the Trustee's business judgment.

24  ///

25  ///

26  ///

27  ///

28

**9.      Brief Narrative Statement of Services Rendered and Time Expended, Fees Charged for Each Category and Benefits to the Estate During the Covered Period (Local Bankruptcy Rule 2016-1(1)(a)(iv) and OUST Fee Guide II.A.5)**

Pursuant to the Guidelines of the OUST, LNBYB has classified all services performed for which LNBYB seeks compensation into one of twelve categories.  LNBYB has attempted to place the services performed in the category that best relates to the service provided.  However, because certain services may relate to one or more categories, services pertaining to one category may in fact be included in another category.

a.      Asset Analysis and Recovery (01)

Time in this category includes efforts by LNBYB to analyze the Debtors' Estates' assets and any potential sources of value for the estates and their creditors, and take steps to recover such assets.  During the Covered Period, the entries in this category relate to:

1) Research and factual investigation of potential claims against third parties, including all Lenders;

2) Settlement negotiations with LCPI and constituent lender group with respect to settlement of disputes;

3) Interviewing and consultation with prospective special litigation counsel regarding the potential causes of action, Gramercy Litigation, and potential terms of retention;

4) Prepare, review and revise the settlement documentation with respect to the LCPI Settlement;

5) analysis of potential avoidance actions;

6) review Fidelity title insurance documents;

7) analysis of title and claims regarding the Properties;

8) assist Trustee counsel with respect preparation and prosecution of numerous motions to approve settlement pursuant to Federal Bankruptcy Rule 9019, including the Yucaipa Settlement, the LCPI Settlement; and

9) other services attendant to the analysis and recovery of estate assets as set forth in the detailed billing statement annexed hereto.

During the Covered Period, LNBYB expended a total of 19.8 hours performing services related to this category during the Covered Period. The amount of fees attributable to this category is $10,630.00.

               b.     Asset Disposition (02)

Services rendered in this category relate to all aspects of the disposition of property of the bankruptcy estate. During the Covered Period, LNBYB's services in this category related primarily to issues relating to the disposition of the Properties – the only tangible assets of the Debtors – and included:

1) Review and negotiation of terms of employment of a real estate broker to market the Properties;

2) Conferences with the Trustee, proposed broker and counsel regarding options for marketing and disposition of the Properties;

3) Preparation of draft bid procedures with respect to the Properties in connection with a sale pursuant to the LCPI Settlement or on a standalone basis;

4) telephone conversations, meetings and written correspondence with parties expressing interest in the Properties;

5) Review offers or letters of intent with respect to the purchase of the Properties;

6) Review of pleadings relate to the abandonment of the Trustee's interest in the Patterson Ranch property and subsidiary; and

7) other services attendant to the disposition of assets of these Bankruptcy Estates as set forth in the detailed billing statement annexed hereto.

During the Covered Period, LNBYB expended a total of 37.7 hours performing services related to this category during the Covered Period. The amount of fees attributable to this category is $19,305.00.

///

22

c. Business Operations (03)

Services rendered in this category related to LNBYB's role with respect to the ongoing need to administer the Properties, consisting of thousands of acres of undeveloped and partially developed parcels. These services included:

1) Discussions with current secured creditors regarding use of cash collateral;

2) Communications with individual creditors and the Committee regarding the business and operational issues facing the Bankruptcy Cases;

3) Review, analysis and comments regarding pleadings filed with respect to post-petition financing by Gramercy, management by SunCal Management, and cash collateral issues;

4) Consultation with Trustee counsel regarding business issues;

5) Research and analysis regarding title insurance issues;

6) Written and oral discussions with secured creditors and others regarding financing proposals;

7) Written and oral discussions with secured creditors and others regarding options for disposing of Properties;

8) Analysis of the Estates' expenses, tax issues and other liabilities of the Estates post-petition.

9) Analysis and comment regarding cash collateral and operating budgets;

10) Review offers or letters of intent with respect to the purchase of the Properties; and

11) Other services relating to the post-petition business operations of these Estates as set forth in the detailed billing statements annexed hereto.

During the Covered Period, LNBYB expended a total of 29.8 hours performing services related to this category during the Covered Period. The amount of fees attributable to this category is $16,999.00.

///

23

1                          d.    Case Administration (04)

2        This category includes ongoing administrative functions including telephone

3   conferences with Committee members, Committee meetings, conferences with the Debtors'

4   counsel, Trustee's counsel and their other representatives, the Office of the United States

5   Trustee, review of the Court record, attendance at chapter 11 status conferences, formulation of

6   case strategy, review and analysis of the Trustee's operations and financial data, including

7   monthly operating reports, and all services relating to the Amended Term Sheet and the Second

8   Compromise Motion (discussed in detail above in Section II.A.5.d(2)), including but not

9   limited to:

10       1)    Telephone conferences with Committee members;

11       2)    Periodic Committee meetings;

12       3)    Conferences with Trustee's counsel and other representatives relating to various

13   administrative aspects of the case;

14       4)    Appearances at status conferences;

15       5)    Written and oral communications with the Office of the United States Trustee;

16       6)    Review of the Court record and docket in main cases and pending adversary

17   proceedings;

18       7)    Formulation of overall case strategy;

19       8)    Review of monthly operating reports and other economic information;

20       9)    Drafting, revising and discussing Committee by-laws and procedures;

21       10)   Preparation of agendas for Committee meetings and action items;

22       11)   Communications with the Committee regarding potential claims, settlements and

23   litigation;

24       12)   Analysis of cash collateral issues and pleadings;

25       13)   Review and analysis re exit strategies and meeting with potential plan sponsors;

26       14)   extensive negotiations with LCPI, the 1st Lien Lenders and the Trustee respect to

27   the Amended Term Sheet;

28

24

1      15)    review of all Trustee's pleadings relating to Second Compromise Motion and the

2  approval of the Amended Term Sheet and comments thereon;

3      16)    review and analysis of all pleadings filed in opposition to the Second

4  Compromise Motion and Amended Term Sheet;

5      17)    extensive consultation with Trustee's counsel and the Committee regarding the

6  Amended Term Sheet and oppositions thereto;

7      18)    discussions with LCPI and 1st Lien Lenders counsel with respect to the Second

8  Compromise Motion, the oppositions thereto, revisions to the Amended Term Sheet;

9      19)    preparation for the hearing in the New York Bankruptcy Court with respect to

10  the Second Compromise Motion;

11      20)    Written and oral communications with LCPI and Trustee re LCPI Settlement;

12      21)    Appearance at hearing in the New York Bankruptcy Court regarding the LCPI

13  Settlement; and

14      22)    Other services relating to the administration of this case.

15      During the Covered Period, LNBYB expended a total of 279.4 hours performing

16  services related to this category, during the Covered Period.  The amount of fees attributable to

17  this category is $150,539.00.

18               e.    Claims Administration and Objections (05)

19      This category relates to services rendered in connection with claims made against these

20  Bankruptcy Estates.  During the Covered Period, these services included:

21      1)    Review and analysis of all proofs of claim;

22      2)    Preparing claims charts to determine universe of creditor claims and estimate

23  claims to project potential distributions to creditors under numerous scenarios;

24      3)    Review and analysis of mechanics' lien claims;

25      4)    Written and oral communication with lien claimants and unsecured creditors

26  regarding their claims;

27      5)    Research and analysis regarding potential Fidelity claims;

28

25

6)      Analysis of pleadings regarding SunCal Management administrative claim;

7)      Consideration and analysis regarding LCPI's claims and related oral and written communications;

8)      Negotiations with LCPI regarding the terms of a settlement and related preparation, research and analysis;

9)      Preparation and numerous revisions of both the Original and Amended Term Sheets leading up to the LCPI Settlement;

10)     Committee discussions relating to the LCPI Settlement and claim treatment; and

11)     Other services related to the claims filed against these bankruptcy estates.

During the Covered Period, LNBYB expended a total of 241.7 hours performing services related to this category during the Covered Period. The amount of fees attributable to this category is $134,344.00.

f.      Employee Benefits/Pensions (06)

During the Covered Period, LNBYB did not expend any time on services related to this category.

g.      Employment of Professionals and Fee Applications and Objections (07)(08)

The fees in this category relate to professional employment and compensation. The fees in this category include, but are not limited to: (1) preparation of all pleadings relating to LNBYB's application to be employed as Committee counsel and the order thereon; (2) negotiations regarding terms of retention of special counsel in connection potential litigation to be prosecuted on behalf of these estates, including but not limited to, Orrick, Herrington & Sutcliffe; (3) review and analysis of all pleadings relating to the employment of professionals employed at the expense of these estates; (4) the preparation of LNBYB's first interim application, and (5) attendance at all hearings in relation thereto.

During the Covered Period, LNBYB expended a total of 43.3 hours performing services related to this category during the Covered Period. The amount of fees attributable to this category is $21,498.50.

                        h.      Financing (09)

Time in this category related primarily to the cash collateral issues in this case discussed in detail, above, in Section II.A.5.e., including, but not limited to:

                (1)     The review and analysis of all pleadings and documents relating to the use of cash collateral, including the Trustee's multiple cash collateral motions and, when appropriate, certain cash collateral stipulations;

                (2)     Conversations, correspondence and negotiations with the Trustee, counsel for SunCal and counsel to LCPI/1st Lien Lenders relating to Committee concerns;

                (3)     Analysis of cash collateral budgets proposed by the Trustee and consultation with Trustee's counsel with respect thereto;

                (4)     Attendance at hearings relating to continued use of cash collateral;

                (5)     Review of all pleadings filed by the 1st Lien Lenders with respect to oppositions to use of cash collateral and the currently pending appeal; and

                (6)     Other services relating to the financing of the Trustee's post-petition operation of the Parent and Subsidiary Debtors as set forth in the detailed billing statements annexed hereto.

During the Covered Period, LNBYB expended a total of 41.0 hours performing services related to this category during the Covered Period. The amount of fees attributable to this category is $21,321.00.

                        i.      Relief from Stay (10)

Time in this category related to motions for relief from stay filed by GE Capital and the 1st Lien Lenders (discussed above, in Section II.A.5.c.), the relief from stay motion filed by the Trustee in the LCPI bankruptcy case in the New York Bankruptcy Court (discussed above, in Section II.A.5.f.), and the Original Term Sheet (discussed in detail above in Section II.A.5.d(1))

27

1  that was entered into to resolve the 1st Lien Lenders relief from stay motions, including, but not

2  limited to:

3         (1)    review of voluminous pleadings filed by the 1st Lien Lenders and

4  documents related thereto with respect efforts to obtain relief from stay against all of the

5  Properties as well as the development funds held by the Parent Debtor;

6         (2)    extensive consultation with the Trustee and the Committee with respect

7  to arguments in opposition to the 1st Lien Lenders' motions;

8         (3)    preparing Committee pleadings in opposition to motions for relief from

9  stay;

10         (4)    review of all Trustee's draft pleadings with respect to oppositions to the

11  relief from stay motions by GE and the 1st Lien Lenders, and commenting thereon;

12         (5)    review of all Trustee's draft pleadings with respect to its motion for relief

13  from stay in the New York Bankruptcy Court, and commenting thereon;

14         (6)    correspondence and negotiations with GE with respect to its relief from

15  stay motion;

16         (7)    preparation for and attendance at all relief from stay motions, including

17  the Trustee's motion in the New York Bankruptcy Court;

18         (8)    review and analysis of all related hearing transcripts;

19         (9)    extensive negotiations with LCPI, the 1st Lien Lenders and the Trustee

20  respect to the Original Term Sheet;

21        (10)    review of all Trustee's pleadings relating to First Compromise Motion

22  and the approval of the Original Term Sheet and comments thereon;

23        (11)    review and analysis of all pleadings filed in opposition to the First

24  Compromise Motion and Original Term Sheet;

25        (12)    extensive consultation with Trustee's counsel and the Committee

26  regarding the Original Term Sheet and oppositions thereto;

27

28

1    (13)    discussions with LCPI and 1st Lien Lenders counsel with respect to First

2    Compromise Motion, the oppositions thereto, the need to withdraw the First Compromise

3    Motion, and the Trustee's New York relief from stay motion; and

4    (14)    all other services relating to relief from stay motions affecting these

5    bankruptcy estates.

6    During the Covered Period, LNBYB expended a total of 341.8 hours performing

7    services related to this category during the Covered Period.  The amount of fees attributable to

8    this category is $176,685.00.

9    j.    Meeting of Creditors (11)

10    The services relating to this category primarily relate to certain early administrative

11    aspects of the Committee, the preparation for and attendance at the initial meeting of creditors

12    under 11 U.S.C. § 341(a), and related follow-up.

13    During the Covered Period, LNBYB expended a total of 16.9 hours performing services

14    related to this category during the Covered Period.  The amount of fees attributable to this

15    category is $8,145.00.

16    k.    Plan and Disclosure Statement (12)

17    Services in this category relate to LNBYB's efforts relating to a plan of reorganization

18    in this case, including but not limited to:

19    (1)    analysis of potential chapter 11 plan alternatives;

20    (2)    preparation of plan outlines and rough drafting of a Committee chapter 11 plan;

21    (3)    analysis of plan alternatives outlined by third parties as well as the Trustee;

22    (4)    analysis of the impact of the Intercreditor Agreement on relative priorities,

23    classification of creditors and ultimate treatment;

24    (5)    analysis of sale of Properties through a chapter 11 plan versus by way of a

25    motion under Section 363;

26    (6)    research regarding all potential legal issues facing a Trustee or Committee plan;

27

28
                                        29

1    (7) negotiation, analysis, and drafting of Original Term Sheet with respect to terms

2  affecting the chapter 11 plan contemplated therein;

3    (8) written and oral communications with Committee, individual secured and

4  unsecured creditors, Trustee's counsel, and other interested parties with respect to chapter 11

5  plan alternatives, strategies and terms;

6    (9) review, analysis and commentary on the Trustee's original and amended chapter

7  11 plan and disclosure statement;

8    (10) review, analysis and formulation of responses (in consultation with Trustee's

9  counsel) with respect to all objections filed to the Trustee's original and amended disclosure

10  statement;

11    (11) appearances and oral argument at all hearings relating to the approval of the

12  First Amended Disclosure Statement and related preparation for such hearings;

13    (12) draft Committee response to oppositions to the approval of the Trustee's

14  disclosure statement and letter from Committee to be included in the plan solicitation package;

15  and

16    (13) all other services rendered with relating to the negotiation, formulation,

17  preparation and approval of a chapter 11 plan and disclosure statement in this case.

18    During the Covered Period, LNBYB expended a total of 213.6 hours performing

19  services related to this category during the Covered Period.  The amount of fees attributable to

20  this category is $116,899.00.

21      l. Litigation (20)

22    Time in this category includes services rendered relating to all litigation in this

23  bankruptcy case, including but not limited to, (1) LNBYB's analysis and participation on behalf

24  of the Committee with respect to the fraudulent conveyance action commenced by Gramercy

25  prior to the entry of an order for relief in this bankruptcy cases; (2) LNBYB's   analysis   and

26  research with respect to potential causes of action against various parties, including, but not

27  limited to, LCPI, the 1st, 2nd and 3rd Lien Lenders, which analysis and research included all

28  30

1  applicable state and federal case law in Ninth and Second Circuits, New York and California
2  with respect to equitable subordination, fraudulent conveyance, breaches of duty, contract
3  interpretation, and other myriad legal theories and issues; (3) fact investigation with respect to
4  the foregoing potential causes of action and issues; (4) review all discovery responses and
5  requests with respect propounded by and among the Trustee, Lehman Lakeside, LCPI and
6  others; (5) extensive oral and written communications among the Trustee and Committee with
7  respect to litigation matters; (6) analysis of motion by Lehman Lakeside to intervene in relief
8  from stay litigation and preparation of response thereto; (7) analysis of impact of Intercreditor
9  Agreement on distribution of potential litigation proceeds; (8) consultations with proposed
10  special litigation counsel regarding causes of action and litigation strategy; (9) review and
11  comment regarding draft complaints filed by Trustee on behalf of estate against Lehman
12  Lakeside, Gramercy, SunCal Management, and others; (10) analysis and fact investigation with
13  respect to potential preference and other avoidance actions; (11) analysis of the impact of
14  settlement with 1st Lien Lenders on potential litigation claims and distribution of litigation
15  proceeds; and (12) all other service rendered with respect to litigation issues as set forth in the
16  annexed detailed billing statements.

17         During the Covered Period, LNBYB expended a total of 172.0 hours performing
18  services related to this category.  The amount of fees attributable to this category during the
19  Covered Period is $82,794.50.

20         **10.    Detailed Listing of All Time Spent by the Professional on the Matter**
21         **for Which Compensation is Sought (Local Rule 2016-1(1)(a)(v)).**

22         LNBYB expended a total of 1,437 hours of recorded time for services rendered
23  during the Covered Period.  LNBYB respectfully submits that its fees incurred in this Case are
24  extremely reasonable.  A summary of the time expended by and the billing rates of the
25  particular professionals and paraprofessionals performing services, and the total fees for
26  services performed in this case is included in Exhibit "B" attached hereto.  A detailed
27  description of the actual services rendered is included in Exhibit "C" attached hereto.

28
                                          31

1    In compliance with Guideline "B" promulgated by the OUST, LNBYB's billing

2  statements reflect a format in which the entries are listed in chronological order by an activity

3  code category. The activity code categories utilized were created in conformity with the OUST

4  guidelines.

5          **11.    Detailed Listing of Expenses by Category (Local Rule 2016-**

6      **1(1)(a)(vi)).**

7    Attached hereto as Exhibit "D" is a summary listing by category and an itemization of

8  all expenses that LNBYB advanced on behalf of the Committee during these cases.  These

9  include LNBYB's expenses incurred in photocopying, making long distance telephone calls,

10  telecopying, mailing, and hiring messenger services.  LNBYB generally handles regular and

11  routine photocopying in-house for which LNBYB charges clients twenty cents per page.  While

12  LNBYB believes that this is less than LNBYB's actual expenses incurred with regard to the

13  photocopying machines, supplies and labor associated with providing photocopying services,

14  this charge reflects the photocopying charge recommended by the OUST.    LNBYB's

15  photocopy machines automatically record the number of copies made when the person that is

16  photocopying enters the client's account number into a device attached to the photocopy

17  machine.  Whenever feasible, LNBYB sends large copying projects to outside copy services

18  that charge bulk rates for photocopying.  In such instances, LNBYB charges clients the same

19  amount that LNBYB pays the outside service.  LNBYB has further voluntarily reduced its

20  photocopying charges in this case to ten cents per page to correspond with what LNBYB

21  understands to be the policy of this Court.

22    LNBYB charges clients $1.00 per page for sending telecopies and $.20 per page for

23  receiving telecopies which LNBYB believes is less than LNBYB's actual expenses incurred

24  with regard to telecopying but again is a decision by LNBYB to comply with the standards set

25  forth by the OUST.  All expenses that LNBYB advanced on behalf of the Committee were

26  necessarily incurred and are properly charged as administrative expenses of these Bankruptcy

27  Estates.

28

1      **12.    Description of Professional Education and Experience (Local Rule**

2      **2016-1(1)(a)(viii))**

3          LNBYB is comprised of attorneys who specialize in and limit their practice to matters

4    of insolvency, reorganization and bankruptcy law and is well qualified to represent the

5    Committee.  All attorneys comprising or associated with LNBYB are admitted to practice law

6    in the California courts and in the United States District Court for the Central District of

7    California.

8                                  **III.**

9                            **STANDARD OF LAW**

10         Prior to the enactment of the Bankruptcy Code, the rule with respect to compensation

11   requests in the Ninth Circuit was that the Bankruptcy Court should award attorneys' fees in

12   accordance with a "strict rule of economy test." In re THC Financial Corp., 659 F.2d 951, 955

13   n.2 (9th Cir. 1981), cert. denied, 456 U.S. 977 (1982).  This is no longer the law.  The

14   legislative history to Section 330 of the Bankruptcy Code indicates that Congress was primarily

15   concerned with protecting the public interest in the smooth, efficient operation of the

16   bankruptcy system by encouraging competent bankruptcy specialists to remain in the field.

17   First National Bank of Chicago v. Committee of Creditors Holding Unsecured Claims (In re

18   Powerline Oil Co.), 71 B.R. 767, 770 (Bankr. 9th Cir. 1986); In re Baldwin-United Corp., 79

19   B.R. 321, 346 (Bankr. S.D. Ohio 1987).  Toward this end, Congress specifically disavowed

20   notions of economy of administration, and provided that compensation in bankruptcy case

21   should be comparable to what is charged in nonbankruptcy matters.  Id. at 346.

22         Under the lodestar approach, the Court is to determine the number of hours reasonably

23   expended in an attorney's representation of a debtor or creditors' committee and multiply such

24   number by a reasonable hourly rate for the services performed.  See Delaware Valley Citizens'

25   Council for Clear Air, 478 U.S. at 565; Powerline Oil Co., supra, 71 B.R. 770.  A reasonable

26   hourly rate is presumptively the rate the marketplace pays for the services rendered.  Missouri

27

28
                                     33

1 | v. Jenkins by Agyei, 491 U.S. 274, 109 S.Ct. 2463, 2469 (1989); Burgess v. Klenske (In re

2 | Manoa Finance Co., Inc.) 853 F.2d 687, 691 (9th Cir. 1988).

3 |      Recognizing that the determination of an appropriate "market rate" for the services of a

4 | lawyer is inherently difficult, the Supreme Court stated: "Market prices of commodities and

5 | most services are determined by supply and demand. In this traditional sense there is no such

6 | thing as a prevailing market rate for the service of lawyers in a particular community. The type

7 | of services rendered by lawyers, as well as its experience, skill, and reputation, varies

8 | extensively -- even within a law firm. Accordingly, the hourly rates of lawyers in private

9 | practice also vary widely. The fees charged often are based on the product of hours devoted to

10 | the representation multiplied by the lawyer's customary rate." Blum v. Stenson, 465 U.S. 886,

11 | 895 n.11 (1984). The Supreme Court has stated that a reasonable attorney's fee "means a fee

12 | that would have been deemed reasonable if billed to affluent plaintiffs by its own attorneys."

13 | Missouri v. Jenkins by Agyei, 109 S.Ct. at 2470 (quoting City of Riverside v. Rivera, 477 U.S.

14 | 561, 591 (1986) (Rehnquist, J. dissenting)). Accordingly, a reasonable hourly rate is the hourly

15 | amount to which attorneys in the area with comparable skill, experience and reputation

16 | typically would be entitled as compensation. Blum v. Stenson, 465 U.S. at 895 n.11.

17 |      LNBYB respectfully submits that the hourly rates for its attorneys and paraprofessionals

18 | are reasonable and appropriate in the relevant community and in view of the circumstances of

19 | this case. LNBYB's hourly rates have been approved in numerous other cases similar to the

20 | case at bar. The Committee selected LNBYB as its bankruptcy counsel because of the

21 | Committee's confidence in LNBYB's ability to successfully deal with the issues related to

22 | these Bankruptcy Estates. LNBYB respectfully submits that the foregoing establishes that

23 | LNBYB's fees and expense are reasonable.

24 | ///

25 | ///

26 | ///

27 | ///

28 |

## IV.

## CONCLUSION

**WHEREFORE**, LNBYB respectfully requests that this Court enter an order:

(1)    Approving LNBYB's fees ($759,160.00) and expenses ($17,901.45) incurred during the Covered Period, for the total sum of $777,061.45;

(2)    Authorizing the Trustee to pay the fees and expenses awarded pursuant to this Application; and

(3) granting such other and further relief as the Court deems just and proper.

Dated: January 11, 2011                    LEVENE, NEALE, BENDER, YOO
                                           & BRILL L.L.P.


                                   By:_____/s/ Daniel H. Reiss_____
                                           DANIEL H. REISS
                                           LEVENE, NEALE, BENDER,
                                           YOO & BRILL L.L.P.
                                           Attorneys for Official Committee of
                                           Unsecured Creditors

1

## DECLARATION OF DANIEL H. REISS

2     I, Daniel H. Reiss, hereby declare as follows:

3     1.    I am a partner of Levene, Neale, Bender, Yoo & Brill L.L.P. (the "LNBYB"),

4 bankruptcy counsel to the Official Committee of Unsecured Creditors ("Committee") in the

5 above-captioned chapter 11 bankruptcy cases.

6     2.    I have personal knowledge of the facts set forth below and, if called to testify, I

7 could and would testify competently thereto.

8     3.    I am one of the attorneys at LNBYB primarily responsible for handling this case.

9 I drafted the annexed "First Interim Application Of Levene, Neale, Bender, Yoo & Brill L.L.P.

10 For Approval Of Compensation And Reimbursement Of Expenses" (the "Application") to

11 which this Declaration is attached, and I know the contents thereof. To the best of my

12 knowledge, information and belief, all of the matters stated in the Application are true and

13 correct, and the Application complies with all applicable statutes, rules, regulations and

14 procedures.

15     4.    The amounts requested in the Application for compensation of fees and

16 reimbursement of expenses incurred are based on LNBYB's business records kept in the

17 ordinary course of LNBYB's business.

18     5.    All expenses for outside services such as photocopying services, messenger and

19 express mail services, postage and research services (Lexis and Westlaw) for which LNBYB

20 requests reimbursement are the actual expenses incurred by LNBYB for such services, and

21 LNBYB does not seek any additional amounts or profits with respect thereto.

22     I declare under penalty of perjury pursuant to the laws of the United States of America

23 that the foregoing is true and correct.

24     Executed this 11th day of January 2011, at Los Angeles, California.

25

26                                   */s/ Daniel H. Reiss*

27                                   DANIEL H. REISS

28

| In re:                                | CHAPTER 11 |
|---------------------------------------|------------|
| LBREP/L-SUNCAL MASTER I, LLC, et al.  |            |
|                           Debtor(s).  | CASE NUMBER 8:08-bk-15588-ES |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document described as FIRST INTERIM APPLICATION FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES BY LEVENE, NEALE, BENDER, YOO & BRILL L.L.P., COUNSEL FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS; DECLARATION OF DANIEL H. REISS IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 11, 2011 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Joey R Abramson    jralaw1@pacbell.net
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Joseph P Buchman    jbuchman@bwslaw.com
- Kathleen A Cashman-Kramer    kcashman@psdslaw.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com
- Scott C Clarkson    sclarkson@lawcgm.com
- Geoffrey Crisp    geoffrey@smgarberlaw.com, michelle@smgarberlaw com
- Jonathan S Dabbieri    dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Heather Fowler    heather.fowler@lw.com, colleen.rico@lw.com
- Steven M Garber    steve@smgarberlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Marshall F Goldberg    mgoldberg@glassgoldberg.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Michael J Hauser    michael.hauser@usdoj.gov
- Gil Hopenstand    gh@lnbrb.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Yale K Kim    ykim@allenmatkins.com
- Kerri A Lyman    klyman@irell.com
- John **T** Madden    jmadden@wgllp.com
- Eve A Marsella    emarsella@lawcgm.com
- Robert S Marticello    Rmarticello@wgllp.com
- Robert C Martinez    rmartinez@mclex.com
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, mpritikin@millerbarondess.com
- Ramon Naguiat    rnaguiat@skadden.com
- Samuel A Newman    snewman@gibsondunn.com
- Kurt Ramlo    kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com
- Craig M Rankin - DECEASED -    cmr@lnbrb.com
- Daniel H Reiss    dhr@lnbrb.com
- Todd C. Ringstad    becky@ringstadlaw.com
- Martha E Romero    Romero@mromerolawfirm.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

| In re:                                           | CHAPTER 11                      |
|--------------------------------------------------|---------------------------------|
| LBREP/L-SUNCAL MASTER I, LLC, et al.             |                                 |
|                                      Debtor(s).  | CASE NUMBER 8:08-bk-15588-ES    |

- Ronald Rus    rrus@rusmiliband.com
- Mark C Schnitzer    mschnitzer@rhlaw.com
- Alfred H Siegel    ahstrustee@horwathcal.com, asiegel@ecf.epiqsystems.com
- Gerald N Sims    jerrys@psdslaw.com, bonniec@psdslaw.com
- Evan D Smiley    esmiley@wgllp.com
- Autumn D Spaeth    aspaeth@wgllp.com
- Derrick Talerico    dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com
- Andrew Troop    andrew.troop@cwt.com, scott.griffin@cwt.com;jill.kaylor@cwt.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Michael D Warner    echou@warnerstevens.com
- David R Zaro    dzaro@allenmatkins.com

## II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served):

On January 11, 2011 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Committee Member
Lennar Homes of California, Inc.
Attn: Graham Jones, Chair
25 Enterprise
Aliso Viejo, CA 92656

Committee Member
TC Construction Co., Inc.
Attn: Jack Gieffels
10540 Prospect Avenue
Santee, CA 92071

Committee Member
West Coast Structures, Inc.
dba Western Structures
Attn: Brian M. Skajem
6005 Tyler Street
Riverside, CA 92503

Committee Member
Stantec Consulting, Inc.
Attn: William Roberts
19 Technology Drive
Irvine, CA 92618

Committee Member
Hemet Manufacturing Co., Inc.
dba Genesis Construction
Attn: Bruce Perry
170 East Oakland Avenue
Hemet, CA 92543

Committee Member
Weston Mason Marketing
Attn: Tom Weston
3130 Wilshire Boulevard, 4th Floor
Santa Monica, CA 90403

Committee Member
Nissho of California, Inc.
Attn: Christopher R. Mordy
Peterson & Price A.P.C.
655 West Broadway # 1600
San Diego, CA 92101

Committee Member
Superior Pipelines, Inc.
c/o Klein, Denatale, Goldner, et al.
Attn: T. Scott Belden, Esq.
4550 California Avenue, 2nd Floor
Bakersfield, CA 93309

Committee Member
John D. Scripter dba Masonry Plus
c/o Steven G. Gibbs, Esq.
Law Offices of Steven G. Gibbs
4540 California Avenue, Suite 330
Bakersfield, CA 93309

Committee Member-Atty. for Hemet Mfg. Co.
Inc. and Pacifc States Engineering, Inc.
Gerald W. Mouzis
Monteleone & McCrory, LLP
200 West Santa Ana Blvd., Ste. 200
Santa Ana, CA 92701

General Counsel to TC Construction Co.
Robert C. Martinez, Esq.
McDouglas, Love, Eckis, Boehmer,
Foley & Lough
460 North Magnolia
El Cajon, CA 92020

### Courtesy Copy Served via Federal Express
The Honorable Erithe A. Smith
United States Bankruptcy Court
Courtroom 5A
411 West Fourth Street
Santa Ana, CA 92701

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                 F 9013-3.1

| In re: | | CHAPTER 11 |
|---|---|---|
| LBREP/L-SUNCAL MASTER I, LLC, et al. | Debtor(s). | CASE NUMBER 8:08-bk-15588-ES |

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January __, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

None

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 11, 2011 | John Berwick | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                                    **F 9013-3.1**