Van C. Durrer II (Cal. Bar No. 226693)
Ramon M. Naguiat (Cal. Bar No. 209271)
Kimberly D. Jaimez (Cal. Bar No. 271235)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone:  (213) 687-5000
Facsimile:  (213) 621-5200

Counsel for Gramercy Warehouse Funding I, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:08-bk-15588-ES |
| LBREP/L-Sun Cal Master I LLC, et al., | Chapter 11 |
| Debtor | (Jointly Administered with Case Nos. 8:08-bk-15637-ES; 8:08-bk-15639-ES; and 8:08-bk-15640-ES) |
| ____ Affects LBREP/L-SunCal Master I, LLC Only | **OBJECTION OF GRAMERCY WAREHOUSE FUNDING I, LLC TO FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION (DATED JANUARY 7, 2011)** |
| ____ Affects LBREP/L-SunCal McAllister Ranch, LLC Only | |
| ____ Affects LBREP/L-SunCal McSweeny Farms, LLC Only | DATE:     April 8, 2011 |
| ____ Affects LBREP/L-SunCal Summerwind Ranch, LLC Only | TIME:     10:00 a.m. |
| _X_  Affects All Debtors. | PLACE:   Courtroom 5A |
| | 411 W. Fourth St. |
| | Santa Ana, CA 92701 |

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 3

    I.     Gramercy's Participation ............................................................................. 4

    II.    The Intercreditor Agreement ....................................................................... 5

    III.   Competing Bankruptcies ............................................................................. 6

    IV.   Key Plan Provisions .................................................................................... 8

        A.    Other Recoveries and the Allowance of First Lien Lenders' Claims ............. 8

        B.    Dividend Action ................................................................................ 8

        C.    Intercreditor Dispute ......................................................................... 8

ARGUMENT ........................................................................................................................... 9

    I.     The Plan Fails to Satisfy the Cramdown Requirements of Bankruptcy Code
          Section 1129(b) ......................................................................................... 9

        A.    The Plan Unfairly Discriminates Against Junior Lien Lenders in
             Violation of Section 1129(b)(1) of the Bankruptcy Code. ........................... 10

             i.     Gifting is not a Defense to Unfair Discrimination ........................... 12

             ii.    The Intercreditor Agreement Does Not Justify Unfair
                Discrimination ................................................................................ 14

    II.    The Plan Does Not Provide an Adequate Means for Implementation ..................... 14

    III.   The Plan Impermissibly Classifies Junior Lien Lenders' Claims For the
          Purpose of Unfair Discrimination and Impermissible Gerrymandering ................. 16

        A.    The Plan's Classification Scheme is an Attempt to Circumvent the
             Bankruptcy Code's Priority Rules and Unfairly Discriminate Against
             Junior Lien Lenders ......................................................................... 17

        B.    Plan's Classification Scheme Attempts to Gerrymander an
             Affirmative Vote ............................................................................. 17

    IV.   The Plan is Not Confirmable Due to Improper Solicitation ................................... 18

    V.    The Plan was Proposed in Bad Faith in Violation of Section 1129(a)(3) of
          the Bankruptcy Code .................................................................................. 19

    VI.   The Plan Lacks Sufficient Information Regarding Successors to the Debtors. ......... 20

CONCLUSION ....................................................................................................................... 22

# TABLE OF AUTHORITIES

Page

**CASES**

Barakat v. Life Ins. Co. of Virginia (In re Barakat),
    99 F.3d 1520, 1526 ...................................................................................................... 16, 17

In re Armstrong World Indus.,
    432 F.3d 507 (3d Cir. Del. 2005) .......................................................................................... 13

In re Associated Vintage Group, Inc.,
    283 B.R. 549 (B.A.P. 9th Cir. 2002) ..................................................................................... 15

In re Aztec Co.,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................................................... 12

In re Coram Healthcare Corp.,
    315 B.R. 321, 348 (Bankr. D. Del. 2004) ......................................................................... 16, 17

In re Cranberry Hill Assocs. Limited P'ship,
    150 B.R. 289 (Bankr. D. Mass. 1993) ................................................................................... 12

In re Creekside Landing, Ltd.,
    140 B.R. 713 (Bankr. M.D. Tenn. 1992) ............................................................................... 12

In re DBSD North America, Inc.,
    Case No. 10-1175, 2010 US App. LEXIS 27007, at *32-33 (2d. Cir. Dec. 6, 2010).................. 13

In re Elmwood, Inc.,
    182 B.R. 845, 849 (Bankr. D. Nev. 1995) ............................................................................. 17

In re Future Energy Corp.,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) .................................................................................... 20

In re Greystone III Joint Venture,
    995 F.2d 1274, 1278 (5th Cir. 1992) ..................................................................................... 16

In re Griswold Bldg., LLC,
    420 B.R. 666 (Bankr. E.D. Mich. 2009) ................................................................................ 19

In re Jersey City Med. Ctr.,
    817 F.2d 1055, 1061 (3d Cir. 1987) ...................................................................................... 18

In re Sentry Operating Co. of Tex., Inc.,
    264 B.R. 850 (Bankr. S.D. Tex. 2001) .................................................................................. 12

In re Yates Dev., Inc.,
    258 B.R. 36 (Bankr. M.D. Fla. 2000) .................................................................................... 15

Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship),
    115 F.3d 650 (9th Cir. 1997) ....................................................................................... 10, 11, 12

Official Committee of Unsecured Creditors v. Michelson,
   141 B.R. 715 (Bankr. E.D. Cal. 1992)............................................................................18

Oxford Life Insurance Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage,
   Inc.), 166 B.R. 892 (B.A.P. 9th Cir. 1994)......................................................................12

Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),
   314 F.3d 1070 (9th Cir. 2002)........................................................................................19

Storlow v. Storlow's, Inc. (In re Storlow's Inc.),
   84 B.R. 167 (B.A.P. 9th Cir. 1988)................................................................................19

## STATUTES

11 U.S.C. § 1122.........................................................................................................16, 17

11 U.S.C. § 1123(a)(5)...................................................................................2, 14, 15, 16

11 U.S.C. § 1125..............................................................................................................2, 18

11 U.S.C. § 1125(c)..............................................................................................................18

11 U.S.C. § 1126...................................................................................................................2

11 U.S.C. § 1126(a)............................................................................................................18

11 U.S.C. § 1126(b)(2)......................................................................................................18

11 U.S.C. § 1129(a)............................................................................................................9

11 U.S.C. § 1129(a)(1)......................................................................................................16

11 U.S.C. § 1129(a)(2)...........................................................................................2, 18, 19

11 U.S.C. § 1129(a)(3)...........................................................................................3,.19, 20

11 U.S.C. § 1129(a)(4).........................................................................................3, 20, 21

11 U.S.C. § 1129(a)(3)..................................................................................................3,.20

11 U.S.C. § 1129(a)(5)(A)................................................................................................21

11 U.S.C. § 1129(a)(8)........................................................................................................9

11 U.S.C. § 1129(a)(11)..................................................................................................2, 14

11 U.S.C. § 1129(b)...........................................................................................2, 9, 13, 14

11 U.S.C. § 1129(b)(1)......................................................................................................10

11 U.S.C. § 1129(b)(2)(B)................................................................................................13

1  Gramercy Warehouse Funding I, LLC ("Gramercy"), in its capacity as agent for the lenders

2  under the Second Lien Credit Agreement dated January 19, 2006 among LBREP/L-Sun Cal Master

3  I LLC, as Borrower, The Several Lenders from Time to Time Parties Thereto, Lehman Brothers

4  Inc., as Arranger and Lehman Commercial Paper Inc. ("LCPI"), as the Syndication Agent and the

5  Administrative Agent (as amended, restated, amended and restated, supplemented, or otherwise

6  modified from time to time, the "Second Lien Credit Agreement" and, the lenders thereunder, the

7  "Second Lien Lenders"), and in its capacity as a Second Lien Lender, and a Third Lien Lender

8  (defined below) hereby submits this objection (the "Objection") to the First Amended Chapter 11

9  Plan (Dated January 7, 2011) (the "Plan") (Docket No. 605)[1] filed by Alfred H. Siegel, chapter 11

10 trustee (the "Trustee") of the administratively consolidated estates of LBREP/L-Lehman SunCal

11 Master I, LLC ("Parent Debtor"), LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal

12 McSweeney Farms, and LBREP/L-SunCal Summerwind Ranch (collectively, the "Subsidiary

13 Debtors" and together with the Parent Debtor, the "Debtors").  In support of this Objection,

14 Gramercy respectfully represents as follows:

15 **PRELIMINARY STATEMENT**

16  1.  In the name of expedience, the Plan ignores the fundamental rights and interests of

17 some of the largest creditor constituencies in these cases, primarily for the benefit of the Trustee

18 the estate professionals and an insider of the Debtor, LCPI.  The approval of the settlement

19 between the Trustee and LCPI which serves as the foundation of the Plan does not cure its defects,

20 as the Plan must now be judged under the more stringent legal standards applicable to confirmation

21 under section 1129 of title 11 of the United States Code (the "Bankruptcy Code").  Subject to this

22 heightened scrutiny, the Plan cannot be confirmed for several reasons, as explained in more detail

23 below.

24  2.  First, the Trustee seeks to confirm a Plan which unfairly discriminates against the

25 unsecured deficiency claims of junior lien lenders in favor of unsecured trade creditors with respect

26 to claim treatment.  Among other things, junior lien lenders are also compelled to litigate in order

27 _____

28 [1]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

to be entitled to a recovery from the proceeds of an asset of the Parent Debtor whereas unsecured

trade creditors are guaranteed a recovery from the Parent Debtor proceeds, even though their

claims are only against the Subsidiary Debtors.  The Trustee has not articulated any recognized

basis for this discrimination, nor could he.  This clearly violates section 1129(b) of title 11 of the

United States Code (the "Bankruptcy Code") which requires fair and equitable treatment of

dissenting impaired classes (e.g., the junior lien lenders).

3.      Second, the Trustee has not provided any justification or support for the payment of

unsecured claims against the Subsidiary Debtors with assets of the Parent Debtor other than a

"gifting" theory.  The concept of "gifting" under a plan to circumvent certain creditor classes, if

ever permissible, was recently discredited by the Second Circuit Court of Appeals and should

likewise be rejected by this Court.

4.      Third, the Plan lacks adequate means for implementation in violation of Bankruptcy

Code section 1123(a)(5).  Specifically, the Plan fails to provide any detail regarding the timing or

the procedures for resolution of intercreditor disputes which will ultimately determine the form and

manner of distributions under the Plan.  This defect scuttles the Plan for two independent reasons:

the Plan fails to articulate how the Trustee intends to consummate it, and, perhaps more

importantly, the Plan fails to give any indication of when any creditor (other than the Debtor's

insider) will receive a distribution as a result of this uncertainty.

5.      Fourth, the Plan impermissibly classifies junior lien creditors' unsecured deficiency

claims separately from other unsecured claims.  Assuming that the Plan properly provides for the

transfer of the Parent Debtor assets to the Subsidiary Debtors' creditors (which is contested), then

all such claims should be classified together.  There is no basis for the separate classification of

unsecured claims other than gerrymandering.

6.      Fifth, the Trustee also failed to conduct a proper solicitation for votes on the Plan—

with respect to lien lenders the Trustee only delivered ballots to Gramercy and LCPI.  This is a

clear violation of Bankruptcy Code section 1129(a)(2), which requires that the plan proponent

comply with the "applicable" provisions of title 11, including Bankruptcy Code sections 1125 and

1126 addressing with solicitation.  The improper solicitation alone justifies denial of confirmation in addition to the fact the Plan itself is fundamentally flawed.

7.       Sixth, inasmuch as the primary beneficiaries of the Plan are the Trustee, the estate professionals and an insider of the Debtor, the Plan is not submitted in good faith in violation of 11 U.S.C. § 1129(a)(3).

8.       Seventh, the Plan fails to contain sufficient information regarding the management of assets of the estates post-confirmation, including the selection and compensation of officers and directors.  This is a violation of section 1129(a)(4) and 1129(a)(5) of the Bankruptcy Code.

## **BACKGROUND**

9.       As this Court is aware, prior to the Debtors' bankruptcy filings, the Parent Debtor entered into three lien credit agreements with LCPI (collectively, the "Lien Credit Agreements" and, the lenders thereunder, the "Lien Lenders").  Pursuant to the First Lien Credit Agreement and Second Lien Credit Agreements, which were entered into on or around January 19, 2006, the Parent Debtor borrowed a total of $320 million (collectively, the "January 2006 Loans") as follows: (1) a revolving credit facility of $75 million and term loan facility of $160 million under the First Lien Credit Agreement; and (2) a $85 million term loan facility under the Second Lien Credit Agreement.  LCPI participated in the January 2006 Loans, and acted as the sole administrative agent.

10.       The Parent Debtor's obligations under these agreements were guaranteed by Subsidiary Debtors and secured by first and second liens against the Subsidiary Debtors' real estate developments (the "Properties").

11.       Of the $235 million allegedly loaned to the Parent Debtor under the First Lien Credit Agreement, $144 million was paid from escrow to the Parent Debtors' equity owners (the "Dividend"), $117 million of which was paid to LBREP Lakeside SC Master I, LLC ("Lakeside"), an affiliate of LCPI.  LCPI is an "insider" under the Bankruptcy Code section 101(31) due to its affiliation with the Debtors' equity owner, Lakeside.  Both Lakeside and LCPI share a common parent corporation and are controlled by agents of Lehman Brothers Holding, Inc. See Disclosure Statement, at 6-7.

12.    The Trustee has previously determined that the Dividend can be recovered by the Parent Debtor as a fraudulent transfer.  <u>See</u> Omnibus Opposition of Chapter 11 Trustee to Motions for Relief from the Automatic Stay filed by LCPI, at 14-20 (Docket No. 81); Siegel Declaration re Trustee Stay Relief Opposition, Ex. A (Docket No. 79) (the "<u>LCPI Complaint</u>").

13.    On October 29, 2010, the Trustee filed a complaint against the Debtors' equity owners, including Lakeside, asserting fraudulent conveyance and other claims relating to the Credit Agreements and the Dividend (the "<u>Dividend Action</u>").  <u>See</u> Complaint, Siegel v. LBREP Lakeside SC Master I, LLC. et al., No. 10-8191 (C.D. Cal. 2010) (Docket No. 1).  Orrick, Herrington & Sutcliffe LLP ("<u>Orrick</u>") has been retained by the Trustee to litigate the Dividend Action. <u>See</u> Disclosure Statement, at 25.

## I.    <u>Gramercy's Participation</u>

14.    After the Dividend took place and the January 2006 Loans closed, on February 6, 2006, Gramercy purchased a $45 million interest under the Second Lien Credit Agreement.  The following year, the Parent Debtor entered into the Third Lien Credit Agreement dated as of February 6, 2007 among LBREP/L-Sun Cal Master I LLC, as Borrower, The Several Lenders from Time to Time Parties Thereto, Lehman Brothers Inc., as Arranger and LCPI, as the Syndication Agent and the Administrative Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Third Lien Credit Agreement</u>" and, the lenders thereunder, the "<u>Third Lien Lenders</u>"), which provided the Parent Debtor with access to an additional $75 million.  This obligation was also guaranteed by the Subsidiary Debtors and secured by a cross-collateralized lien on the Properties.  A year later, on February 6, 2008, Gramercy succeeded to Gramercy Investment Trust's interest of approximately $16.9 million under the Third Lien Credit Agreement.

15.    In February 2008, Gramercy replaced LCPI as the administrative agent under the Second Lien Credit Agreement pursuant to a letter dated February 15, 2008.  <u>See</u> Objection of Gramercy Warehouse Funding I, LLC to Motion for Approval of Disclosure Statement Describing Chapter 11 Plan (Docket No. 543), Ex. 2.  At or around the same time, Square Mile Structured Debt (One), LLC and Square Mile Structured Debt (Two), LLC (collectively, "<u>Square Mile</u>")

1    replaced LCPI as administrative agent under the Third Lien Credit Agreement.  Meanwhile, LCPI

2    remained the administrative agent for the lenders under the First Lien Credit Agreement (the "<u>First</u>

3    <u>Lien Lenders</u>"). Further, LCPI currently owns approximately (i) 30% of the Debtors' obligations

4    under the First Lien Credit Agreement (e.g., $70.5 million); (ii) 15% of the Debtors' obligations

5    under the Second Lien Credit Agreement (e.g., $12.8 million); and (ii) approximately 64% of the

6    Debtors' obligations under the Third Lien Credit Agreement (e.g., $48 million). <u>See</u> Disclosure

7    Statement, at 9.

8    **II.    <u>The Intercreditor Agreement</u>**

9         16.    Prior to the participation of Gramercy and Square Mile, LCPI in its capacity as

10    administrative agent for the First Lien Lenders, the Second Lien Lenders, and the Third Lien

11    Lenders, entered into the Amended and Restated Intercreditor Agreement dated as of February 6,

12    2007 (the "<u>Intercreditor Agreement</u>").  <u>See</u> Motion to Approve the Amended and Restated

13    Compromise Between the Chapter 11 Trustee, the Official Committee Of Unsecured Creditors, and

14    Lehman Commercial Paper Inc., in its Individual Capacity and as Administrative Agent for the 1st

15    Lien Lenders, Ex. 3.  Gramercy and Square Mile succeeded LCPI's interests under the Intercreditor

16    Agreement as administrative agent with respect to the Second Lien Lenders and the Third Lien

17    Lenders (collectively, the "<u>Junior Lien Lenders</u>") respectively.  It is Gramercy's position that the

18    Intercreditor Agreement allocates the parties' rights to the Lien Lenders' collateral.  Indeed the

19    priority and pay-over provisions only relate to proceeds stemming from "Lien[s] on the Collateral."

20    <u>See</u> Intercreditor Agreement, § 2.1, 4.2.  The First Lien Lenders, however, assert that the First Lien

21    Lenders must be paid in full before the Junior Lien Lenders can enjoy any recovery on their claims.

22    <u>See</u> Disclosure Statement, at 9.

23         17.    With respect to the disputes between the Lien Lenders, the Trustee determined that

24    he and his counsel were "not going to get involved."  <u>See</u> Siegel Deposition, at 221:11-18.

25    Specifically, the Trustee has stated that he and his counsel will "not be asking anybody to

26    determine what the rights are of the parties to the [I]ntercreditor [A]greement."  <u>See id.</u> The Trustee

27    confirmed this sentiment while answering cross examination questions during the hearing on the

28    Motion to Approve Amended and Restated Compromise between the Trustee, the Official

Committee of Unsecured Creditors, and Lehman Commercial Paper Inc., in its Individual Capacity and as Administrative Agent for the 1st Lien Lenders (Docket No. 487) (the "CA Settlement Motion")  (discussed below). See Transcript regarding Hearing Held 12/21/10 Re: CA Settlement Motion (Docket No. 613) (the "CA Settlement Hearing").

### III.    Competing Bankruptcies

18.    As the Court is aware, on September 10 and 11, 2008 (the "Petition Dates") involuntary bankruptcy cases (the "Cases") were initiated against the Debtors.

19.    On September 15, 2008, Lehman Brothers Inc. and various of its affiliates, including LCPI, filed voluntary petitions under chapter 11 of the Bankruptcy Code in the southern district of New York (collectively, the "Lehman Bankruptcy Cases").

20.    On October 2, 2008, LCPI sought relief from the automatic stay in each of the Debtors' individual Cases in hopes of foreclosing the First Lien Lenders' security interests the Properties (the "LCPI Stay Relief Motions").  The Trustee in these Cases defended against the LCPI Stay Relief Motions, arguing that the amount and validity of such security interests were in dispute in light of LCPI's inequitable conduct, which gave rise to potential fraudulent transfer, equitable subordination, and lender liability claims (mostly in connection with the Dividend orchestrated by LCPI) (the "Estate Claims").

21.    In the context of the LCPI Stay Relief Motion, the Trustee attempted to investigate the Estate Claims against LCPI but was thwarted by LCPI's use of its own automatic stay imposed by the Lehman Bankruptcy Cases.  See, e.g., Response of LCPI to Omnibus Opposition of Chapter 11 Trustee to Motions for Relief from the Automatic Stay, at 10, n.11 (Docket No. 89) (asserting that the Trustee needed to request stay relief to embark on formal discovery).  As a result, the evidentiary hearing date with respect to the LCPI Stay Relief Motions was continued several times and eventually removed from the court's calendar.

22.    In August 2010, however, LCPI, the Trustee, and the Official Committee of Unsecured Creditors (the "Committee") in these Cases reached a settlement with respect to their disputes and respective recoveries as evidenced by the amended and restated term sheet dated August 18, 2010 (the "Settlement").  Neither Gramercy nor Square Mile, in their capacities as

1  agents to the Junior Lien Lenders, were contacted to participate in the Settlement negotiations.  <u>See</u>

2  Hearing Transcript, at 160, Sept. 22, 2010, In re Lehman Brothers Holding Inc., No. 08-13555 (the

3  "<u>Lehman Hearing Transcript</u>").

4        23.    On September 29, 2010 the bankruptcy court in the Lehman Bankruptcy Cases

5  entered an order approving the Settlement.  <u>See</u> Order Approving that Certain Amended and

6  Restated Compromise By and Among LCPI, Alfred H. Siegel, as Chapter 11 Trustee for the

7  SunCal Debtors, and the Committee in the SunCal Bankruptcy Cases, Lehman, No. 08-13555

8  (Docket No. 11683).

9        24.    On September 21, 2010, the Trustee filed with the Court the CA Settlement Motion

10  to approve the Amended Term Sheet.  In connection with that CA Settlement Motion, Gramercy

11  and other parties conducted discovery regarding the Settlement, including a deposition of the

12  Trustee, which occurred on November 30, 2010 (the "<u>Siegel Deposition</u>").

13        25.    On January 27, 2011, this Court entered an Order approving Settlement.  <u>See</u> Order

14  Granting Motion to Approve Amended and Restated Compromise between the Trustee, the Official

15  Committee of Unsecured Creditors, and Lehman Commercial Paper Inc., in its Individual Capacity

16  and as Administrative Agent for the 1st Lien Lenders (Docket No. 626) (the "<u>CA Settlement</u>

17  <u>Order</u>").  On the same date this Court entered an order approving the First Amended Disclosure

18  Statement Describing the First Amended Chapter 11 Plan (Dated January 7, 2011).  <u>See</u> Order

19  Approving First Amended Disclosure Statement (the "<u>Disclosure Statement</u>") Describing First

20  Amended Chapter 11 Plan (Docket No. 627) (the "<u>Disclosure Statement Order</u>").  In the Disclosure

21  Statement Order, the Court set January 21, 2011 as the deadline for the Trustee to serve on parties

22  in interest ballots, copies of the Disclosure Statement, and Plan (the "<u>Mailing Deadline</u>").

23        26.    Notably, the CA Settlement Order is on appeal, which was brought by SunCal

24  Management, LLC.  <u>See</u> Notice of Appeal re:  Order Granting Motion to Approve Amended and

25  Restated Compromise Between the Trustee, the Official Committee of Unsecured Creditors, and

26  Lehman Commercial Paper Inc., in its Individual Capacity and as Administrative Agent for the 1st

27  Lien Lenders (Docket No. 639).

28

IV.    **Key Plan Provisions**

    A.    **Other Recoveries and the Allowance of First Lien Lenders' Claims**

        27.    The Plan provides for the sale of the Subsidiary Debtors' Properties, allowing LCPI to credit bid up to $ 70,000,000.00.  See CA Settlement Order, at 3.  The aggregate final credit bid of LCPI (plus any remaining cash collateral) will constitute the allowed secured claim of the First Lien Lenders.  See Plan, 10-11.  The unsecured portion of the aggregate First Lien Lenders' claim will be paid from 50% of the "Net Other Recoveries," which is defined in the Plan as the "proceeds form any avoidance action, litigation . . . or other recovery" net certain administrative fees and expenses.  See Plan, at 60-61.  The remaining 50% of the Net Other Recoveries will be assigned to the general unsecured trade creditors (the "Trade Creditors") in classes 9(a)-9(d) (collectively, "Class 9").  This gift will be assigned to the Trade Creditors as a "carve-out" from the First Lien Lenders' right, as the Parent Debtor's largest unsecured creditor, in the Net Other Recoveries (the "50/50 Distribution Scheme").  See Chapter 11 Trustee's Omnibus Reply to Objections to Disclosure Statement Describing Chapter 11 Plan (Docket No. 551) (the "Trustee DS Reply"), at 5.  Junior Lien Lenders, classified in classes 8(a)-8(d) (collectively, "Class 8"), would not receive anything under the 50/50 Distribution Scheme until the Trade Creditors are completely paid in full.  See Plan, at 18.

    B.    **Dividend Action**

        28.    The Plan assumes that the Trustee will be successful in litigating the Parent Debtors' fraudulent transfer action related to the Dividend.  See Disclosure Statement, at 31.  The Dividend Action is the fundamental source of the Net Other Recoveries.  Importantly, the Net Other Recoveries will provide the primary source of financing for the Plan distributions to unsecured creditors (and in particular the Trade Creditors).  See Disclosure Statement, at 31 ("The Trustee believes that the recovery of the Dividend will be the primary source of recovery for Trade Creditors").

    C.    **Intercreditor Dispute**

        29.    The Plan assumes that the Net Other Recoveries will be split under the 50/50 Distribution Scheme between the First Lien Lenders and the unsecured creditors of all estates.  The

Plan also offers an alternative distribution scheme (the "Alternative Distribution Scheme") if the Intercreditor Agreement is held to be inapplicable to Junior Lien Lender recovery from the Dividend Action.

30.    Under the Alternative Distribution Scheme, the Junior Lien Lenders and the First Lien Lenders would share the proceeds of the Net Other Recoveries pro rata (with the First Lien Lenders assigning their share to unsecured Trade Creditors in an attempt to satisfy those claims in full). See Plan, at 19. Regardless of whether the 50/50 Distribution Scheme or the Alternative Distribution Scheme, the Trustee expects to pay the Class 9 unsecured Trade Creditors in full. See Disclosure Statement, Ex. 10 (liquidation analysis noting that Unsecured trade Creditors would likely receive a 100% recovery, while Junior Lien Lenders would only receive a 43.3% recovery).

31.    The Plan further adds that once the Net Other Recoveries are obtained, the Liquidating Trustee will interplead 50% of such recoveries for a determination by this Court on the Intercreditor Agreement (the "Interpleader Action"). See Plan, at 19. No distribution to any unsecured creditors (Trade Creditors and Lien Lenders alike) will be permitted until the Interpleader Action is complete.

## ARGUMENT

**I.    The Plan Fails to Satisfy the Cramdown Requirements of Bankruptcy Code Section 1129(b)**

32.    The Trustee's Plan is patently unconfirmable because it fails to satisfy the cramdown requirements of section 1129(b) of the Bankruptcy Code.

33.    For a plan to be confirmed, all thirteen requirements of Bankruptcy Code section 1129(a) must be satisfied. If, however, Bankruptcy Code section 1129(a)(8) is unsatisfied—because a class of impaired claims has not accepted the plan—a plan may nonetheless be confirmed if the cramdown requirements of section 1129(b) are met with respect to such class.[2] Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115

---

[2] Gramercy reserves all rights to address voting issues (if any) given that the Trustee has not yet filed a ballot analysis.

F.3d 650, 653 (9th Cir. 1997).  The cramdown requirements mandate that a plan (i) must be fair and equitable and (ii) must not be unfairly discriminatory with respect to a dissenting class.  Id.

34.    Here, the Trustee's Plan fails to satisfy the second requirement of cramdown—that the Plan not unfairly discriminate against a dissenting impaired class.  The Trustee's Plan unabashedly provides for near payment in full to Class 9 Trade Creditors.  Meanwhile, the Plan offers Junior Lien Lenders in Classes 8 a pro rata distribution on account of their unsecured claims which will result in a recovery of less than 50%.  See Disclosure Statement, Ex. 10.

**A.    The Plan Unfairly Discriminates Against Junior Lien Lenders in Violation of Section 1129(b)(1) of the Bankruptcy Code.**

35.    The Court cannot confirm the Plan if it discriminates *unfairly* against a dissenting class in violation of section 1129(b)(1) of the Bankruptcy Code.  Discrimination between classes is only "fair" if each of the following criteria are met:  "(1) the discrimination must be supported by a reasonable basis; (2) the debtor could not confirm or consummate the Plan without the discrimination; (3) the discrimination is proposed in good faith; *and* (4) the degree of discrimination is directly related to the basis or rationale for the discrimination."  In re Ambanc, 115 F.3d at 656 (emphasis added).

36.    Under the Plan, the Trustee is proposing (i) to provide unsecured Trade Creditors with a likely 100% recovery and (ii) to provide unsecured Junior Lien Lenders a pro rata fractional recovery on account of their deficiency claim.  See Plan, at 18-19; Disclosure Statement, Ex. 10; Siegel Deposition, 147:17-20 (noting that the Trade Creditors would benefit from the Settlement which allows them to receive funds from the Dividend Action without mentioning any benefit to unsecured Junior Lien Lenders).

37.    If the 50/50 Distribution Scheme is invoked, the Plan states that "[a]fter all Allowed Unsecured Trade Claims are paid in full, on each Distribution Date, any Net Other Recoveries shall be distributed on a *pro rata* basis to the Lien Lenders on account of their Allowed Unsecured Deficiency Claims subject to the Intercreditor Agreement."  See Plan, at 18-19.  If the Alternative Distribution Scheme is invoked, then the "Net Other Recoveries shall be distributed on a *pro rata* basis to the respective administrative agents for the Holders of Allowed Class 8 Unsecured

1   Deficiency Claims" and First Lien Lenders will assign their deficiency claims to Trade Creditors.

2   See Plan, at 19.  Regardless of the distribution scheme invoked, then, the Plan is designed such that

3   the allowed unsecured Trade Claims will receive close to 100% recovery.  Meanwhile, Junior Lien

4   Lenders, with deficiency claims of over $200 million, will only receive a fractional recovery from

5   the $144 million Dividend Action once the First Lien Lenders take their share.  See Declaration of

6   Michael Kavourias in Support of Gramercy Warehouse Funding I, LLC to First Amended Chapter

7   11 Plan of Reorganization (Dated January 7, 2011) (the "Kavourias Declaration"), ¶6 (noting the

8   current amount owed under the Second Lien Agreement and the Third Lien Agreement).

9   Consequently, the Trustee estimates that the Junior Lien Lender recovery on unsecured claims

10  would be approximately 43%.  See Disclosure Statement, Ex. 10.  The differential between the

11  recoveries of Trade Creditors compared to unsecured Junior Lien Lenders is more than 55%.

12         38.     Such disparate treatment of unsecured claims cannot be justified under the above

13  Ambanc test for fairness.  Assuming the Intercreditor Agreement permits Junior Lien Lenders to

14  participate in the Net Other Recoveries and the Alternative Distribution Scheme is invoked, the

15  Trustee has offered no explanation as to why Trade Creditors should be paid in full while Junior

16  Lien Lenders should be paid a fraction of their claims.  Nor has the Trustee offered any business or

17  economic justification for the separate classification of the unsecured Trade Creditors from the

18  deficiency claims of Junior Lien Lenders.  The claims are otherwise similarly situated to the

19  general unsecured claims in every other respect.  There is no legal distinction between these

20  unsecured claims that could justify different classification and different treatment.

21         39.     In reality, the differential treatment is explained by the fact that the Junior Lien

22  Lenders were not party to the Settlement.  Because the Junior Lien Lenders were excluded from the

23  Settlement upon which this Plan is based, their recovery is reduced.  This differential treatment did

24  not occur in good faith but was simply the payment scheme offered to the Committee for the Trade

25  Creditors so that the Committee would support the Settlement, and, ultimately the Plan.  This is not

26  a reasonable basis for discrimination; therefore, the discrimination is not fair under the Ambanc

27  test.

28

40.     Furthermore, courts have repeatedly held that such disparate treatment of unsecured deficiency claims and trade creditor claims is unfair discrimination rendering a plan unconfirmable. See Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.), 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) (noting that there was disparate treatment of classes that have identical legal rights where plan proposed to pay 100% of trade claims and only 10% of deficiency claims); In re Aztec Co., 107 B.R. 585, 588 (Bankr. M.D. Tenn. 1989) (holding that it was unfair discrimination to pay insider unsecured claims in full while paying nonrecourse deficiency claim 3%); In re Creekside Landing, Ltd., 140 B.R. 713, 714 (Bankr. M.D. Tenn. 1992) (holding that the 55% differential between trade creditor recovery and deficiency claim recovery was unfair discrimination); see also In re Cranberry Hill Assocs. Ltd. P'ship, 150 B.R. 289, 291 (Bankr. D. Mass. 1993) (finding unfair discrimination where trade creditors were to be paid in full on confirmation in cash, while deficiency claims would be paid over nine years without interest, and then only if property is sold).  Additionally, courts have held that discrimination is not justified by the fact that the plan proponent might be seeking to maintain goodwill with cooperating parties. See In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850, 862-64 (Bankr. S.D. Tex. 2001) (denial of confirmation to plan which paid 100% to one class of unsecured creditors, with whom the reorganized debtor believed it would have to deal, while remaining unsecured creditors were paid 1% of claims).

41.     Unfair discrimination against Junior Lien Lenders holding the same priority as unsecured Trade Creditors, therefore, is a fundamental flaw to the Trustee's Plan.  The Bankruptcy Codes is premised on the "rule of equity of treatment" so that "[c]reditors with claims of equal rank are entitled to equal distribution."  Id. at 864.  The Trustee's Plan clearly violates that premise.

i.     Gifting is not a Defense to Unfair Discrimination

42.     In previous pleadings, the Trustee has attempted to justify the Class 9 recovery by proffering that LCPI and the Fist Lien Lenders would be granting Class 9 claimants a "carve-out" or a gift from the First Lien Lenders' right in the Net Other Recoveries (because the first Lien Lenders are the Parent Debtor's largest unsecured creditor).  See Trustee DS Reply, at 5.

43.    Courts of Appeals from various circuits, however, have held and recently reiterated that such gifting is not permissible where the gift results in a violation of core chapter 11 principles, such as honoring the absolute priority rule.  See Dish Network Corp. v. DSD N. Am., Inc. (In re DBSD N. Am.), Docket Nos. 10-1175, 10-1201, 10-1352, 2010 US App. LEXIS 27007, at *31-33 (2d. Cir. Dec. 6, 2010) (holding that gifting by the secured creditor to shareholders violated the "absolute priority rule" embodied in section 1129(b)(2)(B) of the Bankruptcy Code.); In re Armstrong World Indus., 432 F.3d 507, 514 (3d Cir. Del. 2005) (holding that a plan contemplating a gift by unsecured creditors to equity holders over the objections of a dissenting class of creditors was not confirmable because it violated the absolute priority rule).

44.    In DBSD, the Court of Appeals for the second circuit flatly rejected the "gifting" argument of lien lenders. Id., at *49. Under the DBSD plan, lien lenders assigned their rights in certain shares and warrants to existing shareholders, while general unsecured creditors received a fractional recovery on their claims. Id., at *39. A general unsecured creditor argued that this was a violation of the absolute priority rule embedded in the fair and equitable cramdown requirement of section 1129(b). Id., at *12.  The second circuit rejected the argument that the lien lenders (with an unsatisfied deficiency claim) could share its would-be distribution with whomever it saw fit. Id, at *40-41. Instead, the court noted that "[w]hatever the secured creditors … did not take remains in the estate for the benefit of other claim-holders." Id., at *45. The lien lenders in DBSD could not use "gifting" as an end-run aroung the fair and equitable requirement in Bankruptcy Code section 1129(b).

45.    The First Lien Lenders make the same argument here as the DBSD lenders did in that flawed plan in New York.  LCPI and the First Lien Lenders intend to gift or assign their rights in Net Other Recoveries to unsecured Trade Creditors so that Trade Creditors may potentially receive a full recovery.  Meanwhile, unsecured Junior Lien Lenders receive less than 50% recovery. As in DBSD, this gift results in a blatant violation of cramdown requirements under Bankruptcy Code section 1129(b).  The First Lien Lenders and LCPI may not use gifting to maneuver around section 1129(b)'s prohibition against unfair discrimination.

ii.    The Intercreditor Agreement Does Not Justify Unfair Discrimination

46.    Plan proponents might argue that the issue of unfair discrimination against Junior Lien Lenders is moot pursuant to the Intercreditor Agreement (which ultimately determines recoveries of Junior Lien Lenders).  See Disclosure Statement, at 9 (stating that First Lien Lenders assert that Junior Lien Lenders may not recover until the First Lien Lenders are paid in full).

47.    It is Gramercy's long held position, however, that the Intercreditor Agreement only applies to collateral and because the Net Other Recoveries are not collateral, the agreement is irrelevant.  Because this issue is contested the Trustee saw the need to establish an alternative distribution scheme.  To be an effective distribution scheme, therefore, it must comply the Bankruptcy Code requirements for a cramdown plan (and may not discriminate against a class of dissenting creditors).

48.    Even if the Intercreditor Agreement is interpreted against the Junior Lien Lenders, DBSD indicates that, as a rule, senior creditors may not use "gifting" to circumvent the cramdown requirements with respect to a dissenting impaired class. In DBSD the lien lenders wanted to gift their expected distribution to shareholders, which violated section 1129(b). Here, the First Lien Lenders expect to gift their share of Net Other Recoveries to Trade Creditors outside the Parent Debtor's estate.  So, even if the Intercreditor Agreement makes the Junior Lien Lenders the lowest priority in the Parent Debtor estate, such Junior Lien Lenders would still be allowed to the Net Other Recoveries before Trade Creditors from *other* Subsidiary Debtor estates under the logic of DBSD.

49.    Nevertheless, Gramercy agrees that the better option would be to litigate the Intercreditor Agreement first, for multiple reasons to be further explored below.

**II.    The Plan Does Not Provide an Adequate Means for Implementation**

50.    Inasmuch as the Plan fails to address the intercreditor dispute, it lacks adequate means of implementation.  The intercreditor dispute will ultimately determine distribution to all creditors.  The Trustee's failure to provide adequate means for resolution of this issue prior to confirmation amounts a failure to articulate how the Trustee will consummate the Plan. This a violation of Bankruptcy Code section 1123(a)(5), which is another basis for denial of confirmation.

1  See In re Associated Vintage Group, Inc., 283 B.R. 549, 560 (B.A.P. 9th Cir. 2002) (observing that

2  adequate means for plan implementation is "essential element" of a chapter 11 plan).

3      51.    The Plan currently provides two options for distribution:  the 50/50 Distribution

4  Scheme and the Alternative Distribution Scheme.  See Plan, at 18-19.  Determination of which

5  scheme applies will depend solely upon litigation as to whether the Intercreditor Agreement

6  requires that, amount the Lien Lenders, all Net Other Recoveries must be paid to the First Lien

7  Lenders.  See Plan, at 19.

8      52.    In spite of the far reaching implications of the intercreditor dispute, the Plan hardly

9  addresses the intercreditor dispute.  No date is given for when a lawsuit will be filed, nor is there

10  any information on the procedures that would apply.  Specifically, the Plan only states that within a

11  "reasonable time following the Liquidating Trustee's receipt of any Net Other Recoveries, the

12  Liquidating Trustee will interplead fifty percent (50%) of the Net Other Recoveries to be

13  distributed (the "Interpled Funds") with the Court for a determine of the Lien Lenders' rights under

14  the Intercreditor Agreement."  See Plan, at 20. This, however, provides no information to non-

15  insider (e.g., non-LCPI) creditors as to when they can expect recovery on their claims.  A

16  "reasonable" time after the Trustee receives Net Other Recoveries is not adequately specific about

17  when distributions will occur. Courts have repeatedly held that when a distribution date is

18  completely unknown, the plan cannot be confirmed. See In re Yates Dev., Inc., 258 B.R. 36, 42

19  (Bankr. M.D. Fla. 2000) (plan was not confirmable under section 1123(a)(5) because the only

20  circumstances under which the effective date existed was contingent upon a future appellate ruling

21  in the Debtor's favor).

22      53.    This cursory treatment of the Intercreditor dispute is explained by the fact that the

23  Trustee thinks the dispute unimportant.  In fact, the Trustee, has previously testified that the

24  intercreditor dispute is of no consequence to confirmation and that the Lien Lenders should

25  determine the issue between themselves.  See Siegel Deposition, at 221:11-18.

26      54.    To the contrary, however, as noted above the intercreditor dispute will ultimately

27  determine (i) the timing of the distributions under the Plan, and (ii) the amount of distributions to

28  creditors.  Failure to adequately address and resolve the intercreditor dispute is failure to

implement a legitimate distribution scheme.  Such a failure amounts to a failure to implement the Trustee's Plan and is a violation of Bankruptcy Code section 1123(a)(5), making the Plan unconfirmable.

**III.    The Plan Impermissibly Classifies Junior Lien Lenders' Claims For the Purpose of Unfair Discrimination and Impermissible Gerrymandering**

55.    Confirmation of the Plan should also be denied because the Plan unlawfully proposes to classify Junior Lien Lender deficiency claims as a class separate from unsecured Trade Creditors in violation of section 1122 of the Bankruptcy Code.  See Plan, at 20-21.  Accordingly, unless the Trustee reclassifies the unsecured deficiency claims of Junior Lien Lenders, the Plan cannot be confirmed. See 11 U.S.C. § 1129(a)(1) ("The court shall confirm a plan only if ... [t]he plan complies with the applicable provisions of [the Bankruptcy Code.]").

56.    While the language of section 1122 of the Bankruptcy Code does not expressly prohibit the separate classification of claims, courts interpreting section 1122 of the Bankruptcy Code have established certain rules governing such classification.  In general, courts have held that (a) "ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class," (In re Greystone III Joint Venture, 995 F.2d 1274, 1278 (5th Cir. 1992)); and (b) "'[u]nsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor [because] they are claimants of equal rank entitled to share pro rata in values remaining after payment of secured and priority claims.'" In re Coram Healthcare Corp., 315 B.R. 321, 348 (Bankr. D. Del. 2004) (citation omitted).

57.    The unsecured deficiency claims of Junior Lien Lenders, therefore, may not be separately classified from unsecured  Trade Creditors absent a legitimate reason.  See Barakat v. Life Ins. Co. of Virginia (In re Barakat), 99 F.3d 1520, 1526 (9th Cir. 1996) (legally created recourse debt cannot be separately classified from other unsecured claims absent legitimate business or economic justification).

A.    **The Plan's Classification Scheme is an Attempt to Circumvent the Bankruptcy Code's Priority Rules and Unfairly Discriminate Against Junior Lien Lenders**

58.    As proposed, the classification scheme violates section 1122 because it is an end-run around the Bankruptcy Code's requirement of equal treatment among similarly situated claims by according the Junior Lien Lenders' deficiency claims significantly worse treatment than unsecured Trade Creditors in Class 9.  In a properly structured classification scheme, however, all unsecured claims would be "entitled to share pro rata in values remaining after payment of secured and priority claims" as discussed by the Coram Healthcare court and above in Section I.  In re Coram Healthcare..

59.    The fact that the Trade Creditors and the Junior Lien Lenders differ in terms of "creditor type" is irrelevant. The analysis for classification of claims "'centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. '" In re Coram Healthcare, 315 B.R. at 349 (citation omitted).

60.    The Trustee has offered no business or economic justification for the separate classification of the unsecured Trade Creditors from the deficiency claims of Junior Lien Lenders. The claims are otherwise similarly situated to the general unsecured trade claims in every other respect and are entitled to share pro rata in the Debtors' remaining assets (e.g., Net Other Recoveries) after Junior Lien Lender collateral is transferred to the First Lien Lenders.

B.    **Plan's Classification Scheme Attempts to Gerrymander an Affirmative Vote**

61.    Courts in the Ninth Circuit have also clearly held that classification with the specific purpose of gerrymandering is impermissible. See In re Elmwood, Inc., 182 B.R. 845, 849 (Bankr. D. Nev. 1995) (holding that separate classification is impermissible gerrymandering if basis of such classification is existence of deficiency claim…); In re Barakat, 99 F.3d at 1525 ("' one clear rule that emerges from otherwise muddled case law on §1122 claims classification:  thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.'") (citation omitted).

62.    This is because "'[t]he potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a

1  debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan

2  and placing them in their own class.'" In re Jersey City Med. Ctr., 817 F.2d 1055, 1061 (3d Cir.

3  1987) (citations omitted).

4      63.    Here, the Trade Creditors have been classified separately, in Class 9, so that the

5  Trustee could guarantee the presence of an impaired, accepting class (which would be recognized

6  by the Court without objection). This gerrymandering is proposed by the Trustee so that he may

7  have an affirmative vote by a non-insider class (e.g., LCPI). Such gerrymandering in claim

8  classification is not permissible, thereby making the Plan unconfirmable.

9  **IV.    The Plan is Not Confirmable Due to Improper Solicitation**

10     64.    In addition to the substantive flaws above, the Plan is not confirmable due to the

11 Trustee's failure, as a plan proponent, to comply with applicable provisions of the Bankruptcy

12 Code regarding solicitation. According to section 1129(a)(2) of the Bankruptcy Code, a plan may

13 only be confirmed if plan proponents comply with applicable provisions of the Bankruptcy Code.

14 Specifically, section 1126(a) of the Bankruptcy Code provides that the "holder of a claim or

15 interest allowed under section 502 of this title may accept or reject a plan." 11 U.S.C. § 1126(a).

16 Solicitation of votes on the plan follows dissemination of the disclosure statement as provided in

17 section 1125, which requires that disclosure statements and ballots "be transmitted to each holder

18 of a claim or interest of a particular class." See 11 U.S.C. §§ 1125(c), 1126(b)(2). Indeed,

19 "[c]ompliance with the disclosure and solicitation requirements is the paradigmatic example of

20 what the Congress had in mind when it enacted section 1129(a)(2)." Official Comm. of Unsecured

21 Creditors v. Michelson (In re Michelson), 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992).

22     65.    Here, this Court required that ballots be served by the Mailing Deadline, January 21,

23 2011. See Disclosure Statement Order, ¶ 4. On or about February 5, 2011, Gramercy determined

24 that the Trustee had not served and solicited all of the Junior Lien Lenders (except for Gramercy

25 and LCPI) with a copy of the Disclosure Statement, the Plan, and applicable ballots (the

26 "Solicitation Package") for purposes of voting on the Plan. See Kavourias Declaration ¶¶7-11.

27 Notably, the Trustee did not even serve Square Mile, agent for the Third Lien Lenders, with a

28 Solicitation Package by the Mailing Deadline. See id. Neither did the Trustee make any

1    arrangements or seek approval of any procedure for agents of the Lien Lenders to disseminate

2    Solicitation Packages to constituent lenders (nor are such agents required to do so under their

3    respective agreements).  Gramercy alerted the Trustee of this solicitation error by letter dated

4    February 7, 2011, a true and correct copy of which is attached to the Kavourias Declaration as

5    Exhibit 1.  See id.

6         66.    Gramercy further understands that the Trustee, weeks after the Mailing Deadline,

7    made arrangements to serve the Solicitation Packages on each of the Junior Lien Lenders once

8    Gramercy had alerted Trustee of this error.  This late delivery, however, probably did not provide

9    recipients with sufficient time to evaluate the Solicitation Package and determine their vote.  As

10   such, the Trustee's improper solicitation constitutes grounds for denying confirmation of the Plan

11   on the basis that the "proponents of the plan" failed to comply with the applicable provisions of the

12   Code.  See 11 U.S.C. § 1129(a)(2).

13   **V.    The Plan was Proposed in Bad Faith in Violation of Section 1129(a)(3) of the
         Bankruptcy Code**

14

15        67.    The Plan is not confirmable because it was essentially proposed in bad faith since

16   the primary beneficiaries of the Plan are (i) insiders of the Debtors; (ii) the Trustee; and (iii)

17   professionals.  Under section 1129(a)(3) of the Bankruptcy Code, a condition to confirmation is

18   that  a plan must have been "proposed in good faith and by not any means forbidden by law."  11

19   U.S.C. § 1129(a)(3).  What constitutes bad faith is not specifically delineated in the Bankruptcy

20   Code, but the courts have provided some guidance.  See In re Griswold Bldg., LLC, 420 B.R. 666,

21   708 (Bankr. E.D. Mich. 2009) ("'Because the totality of the circumstances must be considered, no

22   single test for good faith can be recited . . . .'") (citation omitted); Platinum Capital, Inc. v. Sylmar

23   Plaza, L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002) (noting that in

24   determining good faith, courts must consider "'the plan itself and whether such plan will fairly

25   achieve a result consistent with the objectives and purposes of the Bankruptcy Code'") (citation

26   omitted); Storlow v. Storlow's, Inc. (In re Storlow's Inc.), 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988)

27   (good faith under section 1129(a)(3) requires *fundamental fairness* in dealing with one's

28   creditors.").

68.     Furthermore, courts have noted that the allowance and treatment of insider claims raises issues of conflict of interest and a valid need for independent analysis of insider claims.  See In re Future Energy Corp., 83 B.R. 470, 487 & n. 29 (Bankr. S.D. Ohio 1988).

69.     Here, the Plan is based on a settlement between the Trustee and an insider of the Debtors (LCPI), who brokered a sizable fraudulent transfer in 2006. Under the Plan, such insider is allowed to participate in the recovery from the proceeds of the Dividend Action, even thought its misconduct formed the basis for such action. In addition to participating in the Dividend Action, such insider is permitted  to share in recovery from all of the Debtors' Properties.  Meanwhile other Lien Lenders (which did not participate in the fraudulent transfer) will receive little to no recovery. Such insider preference clearly raise red flags.

70.     Similarly, the Trustee and all its professionals (including Orrick which will receive a sizable portion of the Dividend Action), will similar enjoy significant fees at the conclusion of these Case.  Meanwhile, the unsecured creditors (Lien Lenders and Trade Creditors) alike are left to recover potential distributions from New Other Recoveries.

71.      The Plan is not a good faith attempt at liquidation and, therefore, should not be confirmed according to section 1129(a)(3) of the Bankruptcy Code.

## VI.     The Plan Lacks Sufficient Information Regarding Successors to the Debtors.

72.     Finally, the Plan is not confirmable because it lacks sufficient information regarding the management of the Debtors' estates post-confirmation. Specifically, it lacks details about the selection and compensation of officers and directors which will serve LCPI, the successor to the Debtors' properties. This is a violation of Bankruptcy Code section 1129(a)(4) and section 1129(a)(5).

73.     Bankruptcy Code section 1129(a)(5)(A) states that the following is a requirement of confirmation:

> "The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and … the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and public policy…

11 U.S.C. §1129(a)(5)(A).

74.    The Trustee has not disclosed information about which entities will be succeeding the Debtors with respect to the Properties if LCPI is successful in its credit bid. Under section §1129(a)(5)(A), however, specific information regarding successors (including the identity of their directors and officers) is required for plan confirmation. Here, there is no such information. As such, this is a violation of Bankruptcy Code section §1129(a)(5)(A), making the Plan unconfirmable.

75.    Furthermore, section 1129(a)(4) states that:

> "Any payment made or to be made by the proponent … or by a person … acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."

11 U.S.C. §1129(a)(4).

76.    In this case, the Plan has no information about the compensation which will eventually be offered to the directors and officers of the entity acquiring the Debtors' Properties. Under Bankruptcy Code section 1129(a)(4), payments for such services must be disclosed (and ultimately approved by the court). Failure to include this information is yet another basis for denying confirmation.

**<u>CONCLUSION</u>**

77.     Wherefore, Gramercy respectively requests that this Court deny confirmation of the Plan and grant such other and further relief as the Court deems appropriate.


Dated: Los Angeles, California

February 18, 2011

                                    Gramercy Warehouse Funding I, LLC

                                    By:    _/s/ Ramon M. Naguiat_

                                    Van C. Durrer II
                                    Ramon M. Naguiat
                                    Kimberly D. Jaimez
                                    Skadden, Arps, Slate, Meagher & Flom LLP
                                    300 South Grand Ave., Suite 3400
                                    Los Angeles, CA  90071
                                    Tel:  (213) 687-5000

620067.10-Los Angeles Server 1A - MSW