1   **WEILAND, GOLDEN,**
    **SMILEY, WANG EKVALL & STROK, LLP**
2   Evan D. Smiley, State Bar No. 161812
    esmiley@wgllp.com
3   Hutchison B. Meltzer, State Bar No. 217166
    hmeltzer@wgllp.com
4   Robert S. Marticello, State Bar No. 244256
    rmarticello@wgllp.com
5   650 Town Center Drive, Suite 950
    Costa Mesa, CA 92626
6   Telephone: 714-966-1000
    Facsimile: 714-966-1002
7
    Attorneys for Alfred H. Siegel,
8   Chapter 11 Trustee

9                 **UNITED STATES BANKRUPTCY COURT**

10                **CENTRAL DISTRICT OF CALIFORNIA**

11                      **SANTA ANA DIVISION**

12  In re                                    Case No. 8:08-BK-15588-ES

13  LBREP/L-Sun Cal Master I, LLC, et al.,   Chapter 11

14                          Debtor.          (Jointly Administered with Case Nos. 8:08-bk-
                                             15637-ES; 8:08-bk-15639-ES; and 8:08-bk-
15                                           15640-ES)
    _____ Affects LBREP/L-SunCal Master I
16  LLC, Only                               **STIPULATION AMONG THE CHAPTER**
                                             **11 TRUSTEE, TERRA VERDE GROUP,**
17  _____ Affects LBREP/L-SunCal McAllister  **LLC AND LEHMAN COMMERCIAL**
    Ranch LLC, Only                          **PAPER, INC., IN ITS CAPACITY AS**
18                                           **ADMINISTRATIVE AGENT FOR THE**
    _____ Affects LBREP/L-SunCal McSweeny     **FIRST LIEN LENDERS, NOMINATING**
19  Farms LLC, Only                          **TERRA VERDE GROUP, LLC, AS THE**
                                             **"STALKING HORSE" BIDDER FOR REAL**
20  _____ Affects LBREP/L-SunCal Summerwind  **PROPERTIES TO BE SOLD PURSUANT**
    Ranch LLC, Only                          **TO THE CHAPTER 11 TRUSTEE'S FIRST**
21                                           **AMENDED CHAPTER 11 PLAN (DATED**
      X   Affects All Debtors.               **JANUARY 7, 2011), MODIFYING AND**
22                                           **SUPPLEMENTING EXISTING OVERBID**
                                             **PROCEDURES THEREFORE AND**
23                                           **ADDRESSING CERTAIN OTHER RIGHTS**
                                             **AND CLAIMS BETWEEN THE CHAPTER**
24                                           **11 TRUSTEE AND LEHMAN**
                                             **COMMERCIAL PAPER, INC.**
25
                                             **Plan Confirmation Hearing**
26                                           DATE:   April 8, 2011, and April 22, 2011
                                             TIME:   10:00 a.m.
27                                           PLACE: Courtroom 5A
                                                    411 W. Fourth St.
28                                                  Santa Ana, CA 92701

    566807.1                                                          STIPULATION

1    Alfred H. Siegel, the chapter 11 trustee ("Trustee") of the jointly administered estates

2   (collectively, the "Estates") of LBREP/L-SunCal Master I, LLC ("Parent Debtor"), and LBREP/L-

3   SunCal McAllister Ranch, LLC ("McAllister Ranch"), LBREP/L-SunCal McSweeny Farms LLC

4   ("McSweeny Farms"), and LBREP/L-SunCal Summerwind Ranch LLC ("Summerwind Ranch")

5   (collectively, the "Subsidiary Debtors" and together with the Parent Debtor, the "Debtors"), Terra

6   Verde Group, LLC ("TVG"), and Lehman Commercial Paper, Inc. ("LCPI"), in its capacity as

7   Administrative Agent for the 1st Lien Lenders (as defined below), by and through the undersigned

8   counsel, enter into this Stipulation Nominating Terra Verde Group, LLC As The "Stalking Horse"

9   Bidder For Real Properties To Be Sold Pursuant To The Chapter 11 Trustee's First Amended

10  Chapter 11 Plan (Dated January 7, 2011), Modifying And Supplementing Existing Overbid

11  Procedures Therefore And Addressing Certain Other Rights And Claims Between The Chapter 11

12  Trustee And Lehman Commercial Paper, Inc. (the "Stipulation").

13                                    **RECITALS**

14       A.      On or about September 10 and 11, 2008, involuntary petitions under chapter 11 of

15  the Bankruptcy Code were filed against the Debtors.  The Debtors' bankruptcy cases are being

16  jointly administered pursuant to the order of this Court entered on November 13, 2008.  On or

17  about October 30, 2008, the Court entered an order approving Alfred H. Siegel's appointment as the

18  chapter 11 trustee, and orders for relief in each of the Debtors' cases.

19       B.      The Parent Debtor is a holding company, established to fund the real estate

20  development projects owned by each of the Subsidiary Debtors, and LBREP/L-SunCal Patterson

21  Ranch LLC.[1]  The Parent Debtor's primary asset, other than cash, is its interests in the Subsidiary

22  Debtors.  The Parent Debtor is the sole equity member of the Subsidiary Debtors, each of which, in

23  turn, owns a real estate development project (as defined below, each a "Property" and collectively,

24  the "Properties").

25

26

---

27  [1] The Parent Debtor's membership interests in LBREP/L-SunCal Patterson Ranch LLC, were abandoned post-
petition by Bankruptcy Court order.

28

1      C.    On October 27, 2010, the Trustee filed his Disclosure Statement Describing Chapter

2 11 Plan [Docket No. 510] ("Original Disclosure Statement") and Chapter 11 Plan [Docket No. 509]

3 ("Original Plan").  The Original Disclosure Statement was subsequently modified by the Proposed

4 First Amended Disclosure Statement, and superseded by the First Amended Disclosure Statement

5 Describing the First Amended Chapter 11 Plan (Dated January 7,2011) [Docket No. 604] filed by

6 the Trustee on January 7, 2011, and is referred to as the "Disclosure Statement."  The Original Plan

7 was subsequently modified and superseded by the First Amended Chapter 11 Plan (Dated January

8 7,2011 [Docket No. 605] filed by the Trustee on January 7, 2011, and is referred to as the "Plan."

9      D.    On January 27, 2011, the Court entered an order approving the Disclosure Statement

10 for dissemination, and, among other things, setting the hearing on the confirmation of the Plan on

11 April 8, 2011, and, also, to the extent necessary, on April 22, 2011.

12      E.    The Plan is a liquidating plan predicated on the terms of a global settlement among

13 the Trustee, the Official Committee of Unsecured Creditors, and the Estates' largest creditors, LCPI

14 and the first-position secured creditors (together, the "1st Lien Lenders"), as set forth in the

15 Amended Term Sheet (as defined in the Plan and Disclosure Statement).

16      F.    Pursuant to the Plan, the Properties will be sold.  To maximize the value of the

17 Properties for the benefit of creditors, the Plan contemplates the sale of the Properties pursuant to

18 the overbid procedures attached as Exhibit "6" to the Disclosure Statement and Exhibit "3" to the

19 Plan (as may have been subsequently modified by the Trustee and together with any other bidding

20 or sale procedures applicable to the sale of the Properties, the "Existing Overbid Procedures").  A

21 copy of the Existing Overbid Procedures are attached hereto as Exhibit "1."

22      G.    Pursuant to the Existing Overbid Procedures, LCPI, in its capacity as the

23 administrative agent for the 1st Lien Lenders, is the initial bidder for each Property.  However, the

24 Existing Overbid Procedures provide that the Trustee may, with LCPI's consent, designate a

25 "Stalking Horse Bidder" and a "Stalking Horse Bid" for each of the Properties, and agree to pay the

26 Stalking Horse Bidder a break-up fee and/or an expense reimbursement in an amount not to exceed

27 the greater, in the aggregate, of (i) $1,000,000.00, and (ii) 2% of the aggregate amount of the

28 Stalking Horse Bids.  (*See* Ex. 1, § II at 3.)  The Existing Overbid Procedures further provide that,

1    prior to the confirmation hearing, the Trustee has the right to modify the terms and conditions

2    contained in the Existing Overbid Procedures or to impose other such terms as he may determine to

3    be in the best interests of the Estates.  (*See* Ex. 1, § XIII at 11.)

4        H.    On March 24, 2011, due to the ongoing negotiations with TVG and questions from

5    other bidders regarding the submission of bids by the Bid Deadline[2] and during the Auction, the

6    Trustee exercised his right under the Existing Overbid Procedures to extend the Bid Deadline and

7    to change the date of the Auction by written notice to all potential bidders.  As a result, the Bid

8    Deadline is currently 5:00 p.m. PDT on April 1, 2011, and the date of the Auction is currently

9    10:00 a.m. PDT on April 5, 2011.  The Trustee notified potential bidders of these changes by

10   written notice posted in the Virtual Data Room accessible by all potential bidders with notification

11   to all potential bidders regarding the posting of the notice, and a further written notice filed with the

12   Bankruptcy Court.

13       I.    On or about March 30, 2011, TVG and the Trustee entered into three asset purchase

14   agreements summarized as follows:[3]

15            (i)    That certain Agreement For Purchase And Sale Of Real Property And

16                   Related Rights And Assets dated as of March 30, 2011, for the sale of the

17                   Property owned by McAllister Ranch and certain related assets as defined

18                   therein (the "McAllister Ranch Real Property") by the Trustee to TVG for

19                   $10,000,000.00, a true and correct copy of which is attached hereto as

20                   Exhibit "2" (the "McAllister Ranch APA");

21            (ii)   That certain Agreement For Purchase And Sale Of Real Property And

22                   Related Rights And Assets dated as of March 30, 2011, for the sale of the

23                   Property owned by McSweeny Farms and certain related assets as defined

24   _____

25   [2] Capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Existing Overbid
     Procedures.

26

27   [3] The following is meant only as a summary of the terms of each asset purchase agreement.  To the extent anything
     in this Stipulation conflicts with the asset purchase agreements, then the asset purchase agreements shall control.

28

1    therein (the "McSweeny Farms Real Property") by the Trustee to TVG for

2    $10,000,000.00, a true and correct copy of which is attached hereto as

3    Exhibit "3" (the "McSweeny Farms APA"); and

4        (iii)    That certain Agreement For Purchase And Sale Of Real Property And

5    Related Rights And Assets dated as of March 30, 2011, for the sale of the

6    Property owned by Summerwind Ranch and certain related assets as defined

7    therein (the "Summerwind Ranch Real Property") by the Trustee to TVG for

8    $30,000,000.00, a true and correct copy of which is attached hereto as

9    Exhibit "4" (the "Summerwind Ranch APA").

10    The McAllister Ranch APA, the McSweeny Farms APA and the Summerwind Ranch APA are

11    collectively and individually referred to herein as TVG's APA or APAs, and the McAllister Ranch

12    Real Property, the McSweeny Farms Real Property and the Summerwind Ranch Real Property are

13    individually and collectively referred to hereinafter as the Property or Properties, as appropriate.

14        J.    Each APA provides for a "Portfolio Premium" (as defined in the APAs) in the

15    collective amount of $10,000,000.00, such that if the sale of each of the Properties to TVG closes

16    as provided in each APA, then the collective purchase price for the Properties will be

17    $60,000,000.00.

18        K.    Each APA obligates the Trustee to, among other things, exercise his rights under the

19    Existing Overbid Procedures, including to modify the Existing Overbid Procedures, by, among

20    other things, nominating TVG as the "Stalking Horse Bidder" for each Property, providing for the

21    break-up fees and other bidder protections set forth in this Stipulation, and supplementing and, to

22    the extent there is a conflict, superseding the Existing Overbid Procedures. By written notice to all

23    potential bidders on March 31, 2011, the Trustee exercised his right to modify the Existing Overbid

24    Procedures and did modify the Existing Overbid Procedures as provided below. The APAs further

25    require that the Trustee immediately seek a Bankruptcy Court order approving this Stipulation.

26        L.    This Stipulation further addresses certain rights and issues that have arisen between

27    the Trustee and LCPI related to the sale of the Properties.

28

1    **NOW, THEREFORE,** based on the above recitals, the Trustee, TVG, and LCPI stipulate

2  as follows:

3  **STIPULATION**

4    1.    With respect to each Property, LCPI is no longer the initial bidder.  Rather, TVG's

5  bid represented by the respective APA shall be deemed the Stalking Horse Bid and TVG shall be

6  deemed the Stalking Horse Bidder.

7    2.    With respect to each Property, any party wishing to participate in the Auction by

8  submitting a Qualified Bid must, in addition to any other requirements set forth in the Existing

9  Overbid Procedures, submit a bid in at least the following amounts:

10    a.    A "bulk" bid for all the Properties must be at least $45,010,000.00;

11    b.    A bid for the McAllister Ranch Real Property only must be at least

12    $10,010,000.00;

13    c.    A bid for the McSweeny Farms Real Property only must be at least

14    $6,760,000.00; and

15    d.    A bid for the Summerwind Ranch Real Property only must be at least

16    $18,460,000.00.

17    3.    With respect to each Property and for all the Properties, TVG's Stalking Horse Bid

18  shall be deemed the Initial Successful Bid for purposes of the Auction.

19    4.    During the Auction, the Initial Overbid must be at least the following amounts:

20    a.    The Initial Overbid for all the Properties must be at least $61,000,000.00;

21    b.    The Initial Overbid for the McAllister Ranch Real Property only must be at

22    least $10,350,000.00;

23    c.    The Initial Overbid for the McSweeny Farms Real Property only must be at

24    least $10,350,000.00; and

25    d.    The Initial Overbid for the Summerwind Ranch Real Property only must be

26    at least $30,350,000.00.

27    5.    For each Property, subsequent overbids must be in minimum increments of at least

28  the following amounts, provided that the Trustee, in his sole discretion during or prior to the

566807.1                                      6                                      STIPULATION

1  Auction, may reduce or increase the minimum bid increment, upon written or oral notice to all

2  Qualified Bidders participating in the Auction:

3            a.       For "bulk" bids for all the Properties, $300,000.00;

4            b.       For the McAllister Ranch Real Property only, $100,000.00;

5            c.       For the McSweeny Farms Real Property only, $100,000.00; and

6            d.       For the Summerwind Ranch Real Property only, $100,000.00.

7        6.     With respect to each Property, in determining the Winning Bid for the Property,

8  among the other considerations listed in Section IX, ¶ 4 of the Existing Overbid Procedures, the

9  Trustee shall take into consideration the amount of the Break-Up Fee to be paid to TVG, and the

10  resulting reduction in the net cash proceeds to be received by the Trustee, if TVG is not determined

11  to be the Winning Bidder. Without limiting the foregoing, during the Auction, TVG shall have the

12  option to match rather than exceed the then highest competing bid for a particular Property or for

13  all the Properties, and the Trustee shall have the option to accept such bid as the highest and best

14  bid after taking into consideration all the facts and circumstances, including, without limitation, the

15  amount of the Break-Up Fee to be paid to TVG, and the resulting reduction in the net cash

16  proceeds to be received by the Trustee, if TVG is not determined to be the Winning Bidder.

17        7.     With respect to each Property, if (a) the Bankruptcy Court authorizes or approves

18  the sale of the Property to a Winning Bidder that is not TVG, and (b) the sale to such Winning

19  Bidder actually closes, then TVG shall have earned and be entitled to receive a Break-Up Fee in the

20  amount of $250,000.00. Such Break-Up Fee shall be paid to TVG from the proceeds of such sale

21  prior to and without regard to any lien or other dispute pertaining to the proceeds of such sale.

22        8.     Without limiting the generality of the preceding Paragraph 7, with respect to any

23  Property, if (a) LCPI is the Winning Bidder for such Property pursuant to a credit bid by the 1st

24  Lien Lenders, and (b) the Bankruptcy Court authorizes or approves the sale of such Property to

25  LCPI pursuant to a credit bid by the 1st Lien Lenders, then LCPI will pay TVG, and TVG shall

26  have earned and be entitled to receive, a Break-Up Fee in the amount of $250,000.00 from LCPI,

27  and, under such circumstances, the Trustee, the Estates, and/or the Debtors shall have no obligation

28  to pay the Break-Up Fee with respect to such Property.

9.     For clarity, unless it exercises a right to credit bid against such Property, LCPI consents to the sale of each of the Properties to TVG pursuant to the APAs, free and clear of its liens, claims and interests pursuant to 11 U.S.C. § 363(f), with such liens to attach to the proceeds of sale of the Properties in their order of existing priority.

10.     If under any of TVG's APAs, the Initial Deposit and/or the Second Deposit is forfeited to the Trustee, then the Trustee shall hold such Deposit(s), subject to further agreement with LCPI and/or order of the Bankruptcy Court, and the Trustee and LCPI fully reserve their respective rights with respect to such Deposit(s).

11.     If the Bankruptcy Court enters an order approving the sale of one or more Properties (as defined in the appropriate APA, the "Approval Order"), then the Termination Deadline under the Amended Term Sheet shall be extended from April 30, 2011, to and including May 20, 2011.

12.     The foregoing provisions of this Stipulation shall be deemed for all purposes to supplement and, to the extent there is a conflict, supersede the Existing Overbid Procedures, and except as provided herein such Existing Overbid Procedures shall be deemed unmodified.

13.     To the extent the modifications to the Existing Overbid Procedures set forth herein are determined by the Bankruptcy Court to constitute a non-material modification to the Plan, then the Trustee shall seek appropriate approval of such non-material modifications.

14.     Notwithstanding anything herein to the contrary, nothing herein shall restrict, limit, or impair the Trustee's right to modify the terms and conditions contained herein or in the Existing Overbid Procedures or impose such other terms and conditions as he may determine to be in the best interests of the bankruptcy estates.

1    **IT IS SO STIPULATED.**

2    DATED: March 30, 2011                    WEILAND, GOLDEN
                                             SMILEY, WANG EKVALL & STROK, LLP
3

4                                            By: _____
5                                               ROBERT S. MARTICELLO
                                                General Bankruptcy Counsel for Chapter
6                                               11 Trustee, Alfred H. Siegel

7

8    DATED:  March 30, 2011                  CADWALADER, WICKERSHAM & TAFT LLP

9                                            By: _____
10                                              ANDREW M. TROOP
                                                Attorneys for Lehman Commercial Paper
11                                              Inc., as First Lien Administrative Agent
                                                for the First Lien Lenders
12

13

14   DATED:  March 30, 2011                  BUCHALTER NEMER
                                             A PROFESSIONAL CORPORATION
15

16                                           By: _____
17                                              BERNARD BOLLINGER
                                                AUSTIN BARRON
18                                              Attorneys for Terra Verde Group, LLC

19

20

21

22

23

24

25

26

27

28

566807.1                                    9                              STIPULATION

1    **IT IS SO STIPULATED.**

2    DATED: March 30, 2011          WEILAND, GOLDEN
                                              SMILEY, WANG EKVALL & STROK, LLP

3

4

5                                      By: _____

                                             ROBERT S. MARTICELLO

6                                              General Bankruptcy Counsel for Chapter
                                             11 Trustee, Alfred H. Siegel

7

8    DATED:  March 30, 2011        CADWALADER, WICKERSHAM & TAFT LLP

9

10                                     By: _____

                                             ANDREW M. TROOP

11                                              Attorneys for Lehman Commercial Paper
                                             Inc., as First Lien Administrative Agent

12                                              for the First Lien Lenders

13

14    DATED:  March 30, 2011        BUCHALTER NEMER
                                             A PROFESSIONAL CORPORATION

15

16                                     By: _____

17                                              BERNARD BOLLINGER
                                             AUSTIN BARRON

18                                              Attorneys for Terra Verde Group, LLC

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1 | **WEILAND, GOLDEN,**
**SMILEY, WANG EKVALL & STROK, LLP**
2 | Evan D. Smiley, State Bar No. 161812
esmiley@wgllp.com
3 | Hutchison B. Meltzer, State Bar No. 217166
hmeltzer@wgllp.com
4 | Robert S. Marticello, State Bar No. 244256
rmarticello@wgllp.com
5 | 650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
6 | Telephone:   (714) 966-1000
Facsimile:   (714) 966-1002
7 |
Attorneys for Alfred H. Siegel
8 | Chapter 11 Trustee

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 | **SANTA ANA DIVISION**

12 | In re | Case No. 8:08-bk-15588-ES

13 | LBREP/L-Sun Cal Master I LLC, et al., | Chapter 11

14 | Debtor. | (Jointly Administered with Case Nos. 8:08-bk-15637-ES; 8:08-bk-15639-ES; and 8:08-bk-15640-ES)

15 |

16 | ___ Affects LBREP/L-SunCal Master I LLC, Only | **OVERBID PROCEDURES**

17 | ___ Affects LBREP/L-SunCal McAllister Ranch LLC, Only

18 |

19 | ___ Affects LBREP/L-SunCal McSweeny Farms LLC, Only

20 | ___ Affects LBREP/L-SunCal Summerwind Ranch LLC, Only

21 |

22 | _X_ Affects All Debtors.

23 |         Set forth below are the overbid procedures (the "Overbid Procedures") to be

24 | employed by Alfred H. Siegel, the chapter 11 trustee (hereinafter "Seller" or "Trustee")

25 | of the jointly adminstered bankruptcy estates of LBREP/L-SunCal McAllister Ranch LLC,

26 | LBREP/L-SunCal McSweeney Farms LLC, and LBREP/L-SunCal Summerwind Ranch

27 | LLC (collectively, the "Subsidiary Debtors"), and by LBREP/L-SunCal Master I LLC,

28 | in the auction sale (the "Auction") of certain real property of the Subsidiary Debtors.

554802.1 | OVERBID PROCEDURES

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

EXHIBIT 1 PAGE 10

## I.    THE PROPERTIES

LBREP/L-SunCal McAllister Ranch LLC ("McAllister Ranch LLC"), is the owner of that certain real property described on the attached Exhibit "A-1" (the "McAllister Ranch Real Property").  LBREP/L-SunCal McSweeney Farms LLC ("McSweeny Farms, LLC"), is the owner of that certain real property described on the attached Exhibit "A-2" (the "McSweeny Farms Real Property"), and LBREP/L-SunCal Summerwind Ranch LLC ("Summerwind Ranch LLC"), is the owner of that certain real property described on the attached Exhibit "A-3" (the "Summerwind Ranch Real Property").

By reason of the filing of the Bankruptcy Cases and the appointment of the Seller as the Chapter 11 trustee in those Cases, all right, title and interest of McAllister Ranch LLC in and to the McAllister Ranch Real Property, all right, title and interest of McSweeny Farms LLC in and to the McSweeny Farms Real Property, and all right, title and interest of Summerwind Ranch LLC in and to the Summerwind Ranch Real Property, became vested in the Seller, as trustee in the Bankruptcy Case of each such Debtor.  Each such property (including various rights associated with and/or appurtenant to the property) is referred to herein as a "Property," and all three Properties are referred to as the "Properties."

Trustee desires to sell each of the Properties in accordance with these Overbid Procedures.

## II.    THE LCPI LIEN AND LCPI CREDIT BID

Lehman Commercial Paper Inc. ("LCPI"), in its capacity as the administrative agent for the first-position secured lenders (the "1st Lien Lenders"), asserts a senior (first priority) lien (the "LCPI Lien") against the Properties.  The Trustee shall consult with LCPI with respect to determinations to be made by the Trustee pursuant to these Overbid Procedures, and LCPI reserves its right to object to the Trustee's determinations.  LCPI, in its capacity as the administrative agent for the 1st Lien Lenders, will be the initial bidder for each of the Properties.  LCPI's initial credit bid will be in the minimum aggregate amount of $45,000,000.00, which amount shall be allocated among the Properties (each, an

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP

EXHIBIT 1 PAGE 11

1    "Initial Credit Bid" and collectively, the "Initial Credit Bids") by the Trustee and LCPI in

2    consultation with their brokers.  LCPI may increase any or all of the Initial Credit Bids,

3    incrementally during the bidding process contemplated by these Overbid Procedures, and

4    in accordance with these Overbid Procedures and the Plan, not to exceed the maximum

5    allocated credit bid amounts established by the Trustee and LCPI (each, a "Maximum

6    Allocated Credit Bid Amount" and collectively, the "Maximum Credit Bid Amounts").  In the

7    event LCPI submits a bid for any Property in excess of the Maximum Allocated Credit Bid

8    Amount for that Property, the amount bid in excess of the Maximum Allocated Credit Bid

9    Amount must be paid in cash.  Notwithstanding the foregoing, the Trustee reserves the

10    right, with LCPI's consent, to designate a "Stalking Horse Bidder" for the Properties and,

11    with respect to each Property, the bid of such Stalking Horse Bidder as the "Stalking

12    Horse Bid."  Any "Potential Bidders" (defined below) may obtain the amount of the Initial

13    Credit Bids or the Stalking Horse Bids, as the case may be, and the Maximum Allocated

14    Credit Bid Amounts by contacting:

15                                Terry V. Ruckle

16                Land Advisors Organization - California Division

17                      8105 Irvine Center Drive, Suite 1460

18                          Irvine, California 92618

19                            (949) 952-8288 x44

20                        truckle@landadvisors.com

21

22    III.    **DETERMINATION OF "QUALIFIED BIDDER" STATUS**

23            Only "Qualified Bidders" may bid on a Property.  LCPI will be deemed to be a

24    Qualified Bidder.  Any other person (a "Potential Bidder") who wishes to participate in the

25    contemplated auction sale ("Auction") of the Properties must deliver to the Trustee's

26    counsel, Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP ("Weiland Golden"), the

27    following qualifying materials (the "Qualifying Materials") on or before the Bid Deadline

28    (defined below):

554802.1                                3                    OVERBID PROCEDURES

EXHIBIT 1 PAGE 12

1.    An executed confidentiality agreement acceptable to the Trustee (the "Confidentiality Agreement");

2.    Written proof satisfactory to the Trustee that the Potential Bidder is financially capable of consummating the proposed transaction (including such financial and other information as may be requested by the Trustee to allow the Trustee to make a reasonable determination, in his sole and absolute discretion), as to the Proposed Bidder's financial and other capabilities to consummate the transaction, including financial statements, copies of recent statements of bank accounts, evidence of certified funds, and/or a commitment for financing;

3.    An executed copy of the asset purchase agreement ("APA") attached hereto as Exhibit "A," as may be modified by the Trustee, with an acknowledgement that the signed APA is binding and enforceable on the Potential Bidder and is subject only to Court approval;

4.    Proof that such Potential Bidder may be entitled to a good faith purchaser finding pursuant to 11 U.S.C. § 363(m); and

5.    Any other documents as the Trustee may reasonably request.

Qualified Bidder status shall be determined by the Trustee in his sole discretion, and no Potential Bidder shall have standing to challenge the Trustee's determination.

## IV.    DUE DILIGENCE

Only Qualified Bidders may obtain Due Diligence material regarding the Properties by contacting:

Terry V. Ruckle

Land Advisors Organization - California Division

8105 Irvine Center Drive, Suite 1460

Irvine, California 92618

(949) 952-8288 x44

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP

554802.1

4

OVERBID PROCEDURES

EXHIBIT 1 PAGE 13

1                                 truckle@landadvisors. com

2        All Due Diligence must be completed by the Bid Deadline (as defined below).

3

4 **V.**    **BID REQUIREMENTS**

5        Only Qualified Bidders may submit bids.  Bids for the purchase of the Properties

6 must meet the following requirements:

7     1.    A bid must be in writing in the form of an executed APA, with all exhibits,

8           including the initialing by the bidder of the Liquidated Damages provision

9           set forth in the APA.  A separate APA is required for each Property bid upon,

10          regardless of whether a Qualified Bidder is submitting a bid for more than

11          one Property.

12     2.    A bid must be irrevocable and unconditional, subject to only Bankruptcy

13          Court approval.

14     3.    A bid must be submitted by the Bid Deadline as specified below.

15     4.    A bid must propose a closing date no later than the "Closing Performance

16          Date" as defined in the APA.

17     5.    A Qualified Bidder may submit a bid for all or any one of the Properties.  In

18          the event the bid provides for the purchase of more than one Property, the

19          bid should specify the price offered for each Property.

20     6.    For each Property bid upon, the amount of the bid must exceed the amount

21          of the Initial Credit Bid or the Stalking Horse Bid , as the case may be, by not

22          less than $10,000.00, plus the amount of the "Break-Up Fee" (defined

23          below), if any; provided, however, that Trustee, in Trustee's sole discretion,

24          may at any time reduce that minimum bid increment to $5,000.00, upon

25          written or oral notice to any Qualified Bidders participating in the Auction.

26     7.    A bid must also be accompanied by the Qualifying Materials and a deposit in

27          the amount of $250,000.00 per Property bid upon (the "Deposit"), made by

28          wire transfer, certified funds, or cashier's check payable to Alfred H. Siegel,

Welland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 / Fax 714-966-1002

554802.1                      5                      OVERBID PROCEDURES

EXHIBIT 1 PAGE 14

1    Chapter 11 Trustee, which Deposit is refundable only if the Potential Bidder

2    is not deemed the Winning Bidder (as defined below) or if the Potential

3    Bidder is deemed the Winning Bidder but the sale could not be

4    consummated because the Trustee could not satisfy one or more conditions

5    to closing as specified in the APA.

6    8.    The bid must not request or entitle the Qualified Bidder to any break-up fee,

7    topping fee, termination fee, broker's fee, expense reimbursement, or similar

8    type of payment.

9    9.    With respect to each Property bid upon, the bid must specify the executory

10    contracts and/or unexpired leases that the Qualified Bidder requests that the

11    Trustee assume and assign.

12    A bid received from a Qualified Bidder that meets all of the above requirements

13 will be deemed a "Qualified Bid."

14

15 **VI.    THE BID DEADLINE**

16    The Bid Deadline is 5:00 p.m. (P.S.T.) on March 25, 2011 (the "Bid Deadline"). A

17 Qualified Bidder that desires to make a bid shall deliver four (4) written copies of the bid

18 (in the form of original executed and APA's as discussed above), with by mail or personal

19 delivery, with original signatures by the Bid Deadline to:

20    Terry V. Ruckle

21    Land Advisors Organization - California Division

22    8105 Irvine Center Drive, Suite 1460

23    Irvine, California 92618

24    (949) 952-8288 x44

25    truckle@landadvisors. com

26    The Trustee in his sole discretion may extend the Bid Deadline once or

27 successively, but is not obligated to do so. If the Trustee extends the Bid Deadline, then

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP

EXHIBIT 1 PAGE 15

1    he will promptly notify all Qualified Bidders of the extension in writing.  No bid will be

2    considered unless it is received on or before the Bid Deadline.

3

4    VII.    **INITIAL SUCCESSFUL BID**

5        After all of the Qualified Bids have been received, the Trustee will, in his sole

6    discretion, determine the highest and best Qualified Bid received by the Bid Deadline for

7    each Property or the Properties, and will select an "Initial Successful Bid."  The Qualified

8    Bidder(s) who submitted the Initial Successful Bid(s) (the "Initial Successful Bidder(s)")

9    shall be promptly notified.  The Initial Successful Bidder(s) will be entitled and required to

10    purchase the Property or Properties successfully bid upon on the terms set forth in the

11    APA, unless the Initial Successful Bid is not the Winning Bid (as defined below).

12

13    VIII.    **AUCTION**

14        If no Qualified Bid is received by the Trustee by the Bid Deadline, then the Trustee

15    will request that the Court approve the sale of the Properties to LCPI, and there will be no

16    Auction.  If a Qualified Bid other than LCPI is timely received by the Trustee, then the

17    Trustee will hold the Auction.  The Auction on the Properties will take place at 10:00 a.m.

18    (P.S.T.) on March 29, 2011, at the offices of Weiland Golden, 650 Town Center Drive,

19    Suite 950, Costa Mesa, California 92626, or such later time or other place as may be

20    determined by the Trustee in his sole discretion.  Any change in the time or place of the

21    Auction shall be promptly provided in writing to all Qualified Bidders who have submitted

22    Qualified Bids.  The Auction shall be governed by the following procedures:

23        1.    Only Qualified Bidders who submitted a Qualified Bid (including LCPI) are

24           eligible to attend and bid at the Auction;

25        2.    Any person attending and wishing to bid at the Auction on behalf of a

26           Qualified Bidder must certify that he or she have the authority to bind the

27           Qualified Bidder by any bid that is submitted and by the outcome of the

28           Auction;

554802.1           7           OVERBID PROCEDURES

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 / Fax 714-966-1002

EXHIBIT 1 PAGE 16

1     3.    Only Qualified Bidders who submitted a Qualified Bid (including LCPI) may

2          submit new bids at the Auction;

3     4.    The Auction will be held in person;

4     5.    The Auction will be conducted openly and with all competing bids submitted

5          in the presence of other bidders; and

6     6.    The bidding shall start at the amount of the Initial Successful Bid(s), which

7          will be announced at or prior to the commencement of the Auction.

8

9  **IX.    OVERBID PROCEDURES**

10      Qualified Bidders present at the Auction will be entitled to overbid the Initial

11  Successful Bid(s).  The Auction shall be governed by the following overbid procedures:

12     1.    A Qualified Bidder may bid for all or any one of the Properties;

13     2.    For each Property, the initial overbid (the "Initial Overbid") must be at least

14          $10,000.00 more than the Initial Successful Bid;

15     3.    For each Property, subsequent overbids must be in minimum increments of

16          $10,000.00, provided that the Trustee, in his sole discretion, may reduce

17          that minimum bid increment to $5,000.00, upon written or oral notice to all

18          Qualified Bidders participating in the Auction;

19     4.    The Auction shall continue until the Trustee determines, in his sole

20          discretion, which bid (or bids) is the highest and best bid for the Properties

21          (the "Winning Bid"), subject to final Bankruptcy Court approval.  In making

22          this decision, the Trustee shall consider, without limitation, the amount of the

23          purchase price, the form of consideration being offered, the net cash

24          proceeds to be received by the Trustee, the likelihood of the bidder's ability

25          to close the transaction and perform thereunder, and the timing thereof.

26          Neither the Initial Successful Bidder nor any Qualified Bidder shall have

27          standing to challenge the Trustee's determination of the Winning Bid.  The

28          Qualified Bidder submitting such Winning Bid shall be the "Winning Bidder,"

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

554802.1               8            OVERBID PROCEDURES

EXHIBIT 1 PAGE 17

1    and shall have such rights and responsibilities of the purchaser, as set forth

2    in the APA;

3    5.    The Trustee may, in his sole discretion and subject to Bankruptcy Court

4    approval, designate one or more bids as a "Back-Up Bid", which shall

5    become the Winning Bid if the Winning Bidder fails to consummate the sale;

6    6.    The Winning Bid(s) and any Back-Up Bid(s) are irrevocable;

7    7.    The Winning Bid(s) and the Back-Up Bid(s) shall be subject to Bankruptcy

8    Court approval;

9    8.    The difference between the Winning Bidder's Deposit of $250,000.00,

10    required as a condition to being considered a "Qualified Bidder," and the

11    $1,000,000.00 "Initial Deposit" required pursuant to the APA, shall be wire

12    transferred to the Trustee within 48 hours of the conclusion of the Auction;

13    and

14    9.    With the exception of the 1st Lien Lenders, no holder of a lien on the

15    Properties shall be permitted to credit bid pursuant to § 363(k) of the

16    Bankruptcy Code.

17

18    X.    **CONFIRMATION HEARING**

19    The results of the Auction will be confirmed and the sale of the Properties to the

20    Winning Bidder(s) will be approved in connection with the hearing on the confirmation of

21    the Trustee's Chapter 11 Plan held before the Bankruptcy Court on April 1, 2011 at 10:00

22    a.m., and, to the extent necessary, on April 8, 2011 (the "Confirmation Hearing"). Prior to

23    the Confirmation Hearing, the Trustee will file a supplemental brief (the "Supplement")

24    identifying the Winning Bid(s) and seeking approval of the sale of the Properties to the

25    Winning Bidder(s). If the Auction is held after the Confirmation Hearing, then the results

26    of the Auction will be confirmed and the sale of the Properties to the Winning Bidder(s) will

27    be approved through a separate duly noticed proceeding. The Trustee's submission of

28    the Winning Bid(s) to the Bankruptcy Court for approval does not contractually bind the

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

EXHIBIT 1 PAGE 18

Smiley, Wang Ekvall & Strok, LLP
Weiland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1 Trustee to consummate the sale of the Properties to the Winning Bidder(s). The Trustee's

2 obligation to consummate a sale of one or more of the Properties to a Winning Bidder

3 shall only arise when the Bankruptcy Court approves the sale at the Confirmation Hearing

4 and the Winning Bidder tenders the full purchase price. If a Winning Bidder fails to

5 consummate the sale, then the Back-Up Bid will be deemed the new Winning Bid and the

6 Trustee will be authorized, but not required, to consummate the sale with the new Winning

7 Bidder without further order of the Bankruptcy Court. In such case, the defaulting Winning

8 Bidder's deposit shall be forfeited to the Trustee, and the Trustee specifically reserves the

9 right to seek all available damages against the defaulting Winning Bidder.

10

11 **XI.   RETURN OF GOOD FAITH DEPOSIT**

12       Except for the Deposit of the Winning Bidder(s) and the Back-Up Bidder(s),

13 the Deposits shall be returned within five (5) business days after the conclusion of the

14 Auction. The Deposit of the Back-Up Bidder(s) shall be returned by the earlier of two (2)

15 business days after the closing of the sale to the applicable Winning Bidder(s) and five (5)

16 business days after entry of a final order approving the sale of the Properties to the

17 Winning Bidder(s), unless such Back-Up Bidder became the Winning Bidder, in which

18 case the procedures regarding the Deposit of the Winning Bidder shall govern. The

19 Deposit of a Winning Bidder is non-refundable if the Bankruptcy Court approves the sale

20 of one or more of the Properties to the Winning Bidder pursuant to the terms of the

21 Winning Bid. In the event the Bankruptcy Court approves the sale but the Winning Bidder

22 fails to close the sale, the Deposit shall be forfeited to the Trustee free and clear of any

23 claims or interests of the Winning Bidder, and the Trustee specifically reserves the right to

24 seek all available damages against the defaulting Winning Bidder.

25

26 **XII.   BREAK-UP FEE AND EXPENSE REIMBURSEMENT**

27       There will be no break-up fees, expense reimbursements, or other fees, costs or

28 expenses paid to any Qualified Bidder or Proposed Bidder in connection with the Auction

654802.1                                  10                        OVERBID PROCEDURES

EXHIBIT 1 PAGE 19

1   or these Overbid Procedures; provided, however, with LCPI's consent, the Trustee may

2   agree to pay the Stalking Horse Bidder a break-up fee and/or an expense reimbursement

3   in an amount not to exceed the greater, in the aggregate, of (i) $1,000,000.00, and (ii) 2%

4   of the aggregate amount of the Stalking Horse Bids (the "Break-Up Fee").

5

6   **XIII.   MODIFICATIONS**

7           The Trustee may determine, in his sole discretion, which Qualified Bid(s), if any,

8   is/are the highest or otherwise best offer and reject at any time before the entry of an

9   order of the Bankruptcy Court approving one or more Winning Bids, any Qualified Bid that,

10  in the Trustee's sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with

11  the requirements of the Bankruptcy Code, the Overbid Procedures or the terms or

12  conditions of sale, or (iii) not within the best interest of the bankruptcy states.  At or before

13  the Confirmation Hearing, the Bankruptcy Court or the Trustee may modify the terms and

14  conditions contained herein or impose such other terms and conditions as they may

15  determine to be in the best interests of the bankruptcy estates.

16          FOR FURTHER INFORMATION concerning the Properties or the Overbid

17  Procedures, contact:

18                          Terry V. Ruckle

19                  Land Advisors Organization - California Division

20                      8105 Irvine Center Drive, Suite 1460

21                          Irvine, California 92618

22                          (949) 952-8288 x44

23                      truckle@landadvisors. com

24

25

26

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

EXHIBIT 1 PAGE 20

# EXHIBIT 2

Execution Copy

## AGREEMENT FOR PURCHASE AND SALE OF
## REAL PROPERTY AND RELATED RIGHTS AND ASSETS

This Agreement for Purchase and Sale of Real Property and Related Rights and Assets ("**Agreement**") is made, executed and entered into on March 30, 2011 ("**Execution Date**") by and between Terra Verde Group, LLC, a Delaware limited liability company ("**Buyer**"), and Alfred H. Siegel ("**Seller**"), acting solely in his capacity as the chapter 11 trustee of the bankruptcy estates (each, an "**Estate**" and collectively, the "**Estates**") of the following chapter 11 debtors (each, a "**Debtor**", and collectively, the "**Debtors**"), in the following administratively consolidated bankruptcy cases, each of which was initiated by the filing of an involuntary petition pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et. seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "**Bankruptcy Court**"):

> LBREP/L-SunCal Master I LLC, a Delaware limited liability company ("**SunCal Master I LLC**" or "**Parent**"), Case No. 8:08-bk-15588-ES;

> LBREP/L-SunCal McAllister Ranch LLC, a Delaware limited liability company ("**McAllister Ranch LLC**" or "**Selling Debtor**"), Case No. 8:08-bk-15637-ES;

> LBREP/L-SunCal McSweeny Farms LLC, a Delaware limited liability company ("**McSweeny Farms LLC**"), Case No. 8:08-bk-15639-ES; and

> LBREP/L-SunCal Summerwind Ranch LLC, a Delaware limited liability company ("**Summerwind Ranch LLC**"), Case No. 8:08-bk-15640-ES;

(Buyer and Seller each, individually, a "**Party**", and both, collectively, the "**Parties**"), with regard to the following facts, circumstances, understandings and beliefs (collectively, the "**Recitals**"):

### RECITALS:

A.    Section 1.1 identifies various words and phrases that have specifically assigned meanings for the purposes of this Agreement, and other terms have been defined throughout the Agreement and shall be used consistently throughout.

B.    At the time their Bankruptcy Cases were filed, McAllister Ranch LLC owned the real property (the "**McAllister Ranch Real Estate**") described on the attached Exhibit A-1 hereto, McSweeny Farms LLC owned the real property (the "**McSweeny Farms Real Estate**") described on the attached Exhibit A-2 hereto, and Summerwind Ranch LLC owned the real property (the "**Summerwind Ranch Real Estate**") described on the attached Exhibit A-3 hereto.

C.    By reason of the filing of the Bankruptcy Cases and the appointment of the Seller as the Chapter 11 trustee in those Cases, all right, title and interest of McAllister Ranch LLC in and to the McAllister Ranch Real Estate, all right, title and interest of McSweeny Farms LLC in and to the McSweeny Farms Real Estate, and all right, title and interest of Summerwind Ranch

BN 8648468v2

EXHIBIT 2 PAGE 21

Execution Copy

LLC in and to the Summerwind Ranch Real Estate, became vested in the Seller, as trustee in the Bankruptcy Case of each such Debtor.

     D.    In addition to certain other property and rights described herein, this Agreement relates to the McAllister Ranch Real Estate (including all improvements thereto and thereon, collectively, the "**Real Property**") and certain other rights and property of Selling Debtor.

     E.    Lehman Commercial Paper Inc. ("**LCPI**"), in its capacity as the administrative agent for the first-position secured lenders, asserts a senior (first priority) lien ("**LCPI Lien**") against the Assets. LCPI is the debtor in chapter 11 bankruptcy Case No. 08-13900-jmp ("**LCPI Bankruptcy Case**") pending in the United States Bankruptcy Court for the Southern District of New York ("**New York Bankruptcy Court**"), which is being jointly administered under the lead bankruptcy case of Lehman Brothers Holdings, Inc., Case No. 08-13555. LCPI and Seller have entered into a binding term sheet (the "**Settlement Agreement**"), which Settlement Agreement was approved by the New York Bankruptcy Court pursuant to an order entered in the LCPI Bankruptcy Case on or around September 29, 2010, and by the Bankruptcy Court on or around January 27, 2011, pursuant to which LCPI has consented to Seller selling the Assets by auction pursuant to certain Overbid Procedures (as defined in the Settlement Agreement).

     F.    On or about January 7, 2011, Seller filed the First Amended Chapter 11 Plan (Dated January 7, 2011) in the Bankruptcy Case (Docket No. 605, as such may be amended from time to time, the "**Plan**"), and the related First Amended Disclosure Statement Describing First Amended Chapter 11 Plan (Dated January 7, 2011) (Docket No. 604, the "**Disclosure Statement**"). The Plan provides for, and the Disclosure Statement describes, the sale of the Assets through the Plan pursuant to an auction to be conducted under certain Overbid Procedures attached as Exhibit 3 to the Plan and Exhibit 6 to the Disclosure Statement (as such may be modified as required by this Agreement, the "**Overbid Procedures**"). The Overbid Procedures also describe the selection, at Seller's option and with the consent of LCPI, of a "**Stalking Horse Bidder**" for the purchase of the Assets. The Disclosure Statement was approved by order of the Bankruptcy Court dated January 27, 2011.

     G.    Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, as a sale free and clear of Interests (as defined below) pursuant to sections 1123(a) and 363(f) of the Bankruptcy Code, and in accordance with the terms and conditions of this Agreement and in connection with the confirmation and consummation of the Plan, the Assets (as defined below), including all right, title and interest of Seller in and to the Real Property. Buyer and Seller further desire that Buyer be designated as the "Stalking Horse Bidder" for the purchase of the Assets under and pursuant to the Overbid Procedures.

     H.    The purchase and sale of the Assets pursuant to this Agreement is subject to approval by the Bankruptcy Court, and to the possibility of overbidding by other prospective purchasers.

     I.    Buyer and Seller desire that this Agreement supersede all prior and contemporaneous discussions, negotiations, understandings and agreements between Buyer and Seller relating to the purchase and sale of the Assets.

EXHIBIT 2 PAGE 22

Execution Copy

PURSUANT TO THE RECITALS, and in consideration of the covenants, agreements, warranties, representations and declarations contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of this Agreement, the Parties, intending to be legally bound by this Agreement, hereby covenant, agree, warrant, represent and declare as follows:

## ARTICLE 1.
## DEFINITIONS, CONVENTIONS AND RULES OF CONSTRUCTION

1.1    <u>Definitions</u>. The following capitalized words and phrases will have the meaning assigned to them in this Agreement when used in this Agreement, unless the context in which such capitalized word or phrase is used reasonably prohibits the application of such meaning:

"Agreement" is defined in the Introductory Paragraph.

"Appeal" means any appeal, motion for reconsideration or for judgment notwithstanding a verdict, or other motion seeking to reverse, vacate, set aside or remand an entered order.

"Approval Order" means an order or orders entered by the Bankruptcy Court on the docket of the Bankruptcy Case, containing a finding that Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and otherwise in form and substance reasonably satisfactory to Buyer (a) approving the Sale free and clear of all Interests pursuant to sections 1123(a) and 363(f) of the Bankruptcy Code and all other transfers and transactions contemplated in this Agreement on the terms and conditions set forth in this Agreement and (b) setting the Cure Costs for the Assigned Contracts. At Buyer's discretion, which discretion shall be exercised reasonably, the Approval Order may be a part of any order confirming the Plan or may be a separate order or orders.

"Assets" is defined in <u>Section 3.1(b)</u>.

"Assigned Contracts" means those contracts, agreements and other documents which are specifically identified on the attached <u>Schedule 1.1A</u>.

"Avoidance Actions" means any and all claims and causes of action of the Trustee on behalf of one or more of the Debtors' Estates, including, without limitation, any and all claims and causes of action (a) under chapter 5 of the Bankruptcy Code, (b) against any current or former holders of equity interests in any Debtor based on fraudulent transfer or similar theories, and/or (c) alleged in the following pending actions: (i) Alfred H. Siegel, Chapter 11 Trustee v. Gramercy Warehouse Funding I, LLC, et al, Case No. 8:10-ap-01518-ES; (ii) Alfred H. Siegel, Chapter 11 Trustee v. LBREP Lakeside SC Master I, LLC, et al., Case No. 8:11-ap-01084; and (iii) Alfred H. Siegel, Chapter 11 Trustee v. SunCal Management LLC, Case Nos. 8:08-ap-15588-ES, 8:08-ap-01516-ES, and 8:08-ap-01515-ES.

"Bankruptcy Case" means the bankruptcy cases of the Debtors as referenced in the Introductory Paragraph, administratively consolidated under Case No. 8:08-bk-15588-ES, and any case under any chapter to which any of the foregoing may be converted.

EXHIBIT 2 PAGE 23

"**Bankruptcy Code**" is defined in the Introductory Paragraph.

"**Bankruptcy Court**" is defined in the Introductory Paragraph, and includes any court with jurisdiction over the Bankruptcy Case.

"**Bankruptcy Court Approval Condition**" means entry of the Approval Order and the Approval Order becoming a Final Order, unless Buyer waives such condition that the Approval Order be a Final Order, in which case "Bankruptcy Court Approval Condition" means entry of the Approval Order and the Approval Order remaining unstayed and unmodified by any court of competent jurisdiction.

"**Base Purchase Price**" means the sum of Ten Million Dollars ($10,000,000.00).

"**Benefits**" means, to the extent not part of the Excluded Assets, all right, title and interest of Selling Debtor, Parent or their respective Estates in, to or under any deposits, prepaid items, pre-paid fees, fee credits and other credits, rights to reimbursements or refunds, prepaid expenses, deferred charges, advance payments, security deposits, utility deposits, escrows, benefits of any cost sharing agreements, Insurance Claims, California Department of Real Estate rights, deposits and reserves (including any homeowner's association reserves), community facilities districts and other assessment and benefit districts, to the extent related to the Real Property, including without limitation the specific items identified on the attached Schedule 1.1B.

"**Brokerage Commission**" is defined in Section 3.9.

"**Business Day**" means any day upon which a majority of federally insured banks within the State of California are open for business.

"**Buyer**" is defined in the Introductory Paragraph.

"**Buyer's Agents**" means Buyer's principals (including shareholders, members, limited partners and general partners), directors, officers, employees, agents, representatives, architects, engineers, accountants, attorneys, brokers, consultants and advisors.

"**Buyer's Cost Deposit**" is defined in Section 3.5.

"**Buyer's Costs**" is defined in Section 3.14.

"**Buyer's Designee**" is defined in Section 3.10.

"**Buyer's Representations**" is defined in Section 4.1.

"**Closing**" is defined in Section 3.23.

"**Closing Failure Default**" is defined in Section 5.6(d).

"**Closing Performance Date**" is defined in Section 3.12.

"**Confirmation Hearing**" is defined in Section 2.3.

EXHIBIT 2 PAGE 24

"**Conveyance Instruments**" is defined in Section 3.13.

"**Cure Costs**" is defined in Section 2.3(b).

"**Debtor**" is, and "**Debtors**" are, defined in the Introductory Paragraph.

"**Default**" is defined in Section 5.1.

"**Deposit**" means any deposit provided for in this Agreement which has been delivered by Buyer, including the Initial Deposit, the Second Deposit, the Final Deposit and Buyer's Cost Deposit.

"**Development Rights**" means, to the extent not part of the Excluded Assets, all development rights, governmental approvals and entitlements, certificates of authority, applications, licenses, franchises, permits, variances, maps, development plans, development agreements, homeowner's association rights and benefits, engineering studies, reports and data, architectural plans, drawings and CAD files, contracts, warranties, guarantees, assurances, entitlement rights, fee credit agreements, and other rights, benefits, agreements, documents and privileges to the extent primarily related to the Real Property or the development thereof or that were used or could be used in the development of the Real Property, including without limitation the specific items identified on the attached <u>Schedule 1.1C</u>.

"**Disclosure Statement**" is defined in Recital F.

"**Dollars**" or "**$**" will mean and refer to United States Dollars.

"**Environmental Law**" means any foreign, federal, state or local statute, regulation, ordinance, or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources, emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, pesticides, or industrial, infectious, toxic or hazardous substances or wastes into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the processing, generation, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, infectious, toxic, or hazardous substances or wastes, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"**Excluded Asset**" means (1) the Yucaipa Proceeds, (2) all Avoidance Actions and proceeds thereof, (3) any cash or funds in accounts in the possession or under the control of the Trustee as of the Execution Date, including any cash or funds held on behalf of LCPI, any affiliate of LCPI, any of the Debtors, or any of the Estates, including, without

5

EXHIBIT 2 PAGE 25

limitation, the "Administrative Funds" (as defined in the Settlement Agreement) and the approximately $2,000,000.00 in "Remaining Development Funds" (as defined in the Settlement Agreement) held by the Trustee on behalf of LCPI to the extent provided and otherwise in accordance with, the Settlement Agreement on the Execution Date, (4) the deposits or cash that are the subject of the adversary proceeding entitled Superior Pipelines, Inc., v. LBREP/L-SunCal McAllister Ranch, LLC, *et al.*, Case No. 8:09-ap-01318-ES, (5) the benefits of this Agreement, including the right to receive the Purchase Price, (6) any contracts, assets or other rights or property, that would otherwise be included in the Assets, that are listed by Buyer on Schedule 1.1D on or before the Closing Performance Date (provided Buyer may not exclude any of the Assigned Contracts after the assumption and assignment of such contracts to Buyer pursuant to this Agreement), (7) the surety bonds identified by Seller on Schedule 1.1E (the "Existing Surety Bonds"), and (8) property identified in the *Notice of Motion and Motion for Relief from the Automatic Stay Under 11 U.S.C. 362* filed by General Electric Capital Corporation [Docket No. 124] and/or the exhibits attached thereto.

"Execution Date" is defined in the Introductory Paragraph.

"Final Deposit" is defined in Section 3.4(c).

"Final Order" means an order or judgment of the Bankruptcy Court entered on the Bankruptcy Court's docket as to which there is no stay pending Appeal or other injunction or court order in place that would stay or otherwise limit the enforceability of such order, and as to which the time to file an Appeal has expired and (i) no timely filed Appeal is pending, or (ii) if such an Appeal has been timely filed, then no request for a stay pending Appeal has been made, or any pending request for a stay pending Appeal has been denied and no further request for stay pending Appeal has been filed with a superior court.

"General Intangibles" means, to the extent not part of the Excluded Assets, all right, title and interest of Selling Debtor or its Estate in, to or under any general intangibles (including payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, patents, trade names, trademarks, service marks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, money, deposit accounts, insurance premium rebates, tax refunds, and tax refund claims) and any and all supporting obligations in respect thereof, any other personal rights and property other than Tangible Property, Benefits and Development Rights, and any right of Parent in, to or under any of the foregoing types of property that relates to the Assets.

"Government Entity" means any federal, state, county, city or other government authority of competent jurisdiction, including any official or body thereof, lawfully entitled to exercise any executive, legislative, judicial, administrative, police, regulatory or taxing authority.

EXHIBIT 2 PAGE 26

"**Inchoate Rights**" means to the extent transferable by applicable law and not part of the Excluded Assets, the right to benefit from and enforce any benefit, contract, document, license, permit, regulation, exception, exemption, covenant or other right or asset, not otherwise included in the definition of Assets, the benefit or enforcement of which would be materially beneficial in the use, ownership, development or other enjoyment of the Assets, including (a) all representations and warranties under any contract, agreement or other document under which any Seller obtained any rights, title or interest in or relating to the Real Property or other Assets, and (b) all rights under any contract under which the counterparty or counterparties agree or have agreed (1) not to compete with the operations or property of any Debtor or (2) to keep confidential information regarding any Debtor.

"**Initial Deposit**" is defined in Section 3.4(a).

"**Insurance Claims**" means insurance benefits and proceeds pertaining to the Real Property that accrue on or after January 27, 2011, or that arise any time prior to Closing and relate to facts and circumstances pertaining to the Real Property that are not part of the Available Information.

"**Intangible Property**" means, to the extent not part of the Excluded Assets, all right, title and interest of Selling Debtor or its Estate in, to or under any intangible assets, including the Assigned Contracts, the Benefits, the General Intangibles and the Inchoate Rights, and any right of Parent in, to or under any of the foregoing types of property that relates to the Assets.

"**Interests**" means all Liens, claims, encumbrances or other interests of any nature whatsoever, whether known or unknown, recorded or unrecorded, arising under contract, statute, law, equity or otherwise, including without limitation in each case all "interests" as such term is defined in section 363(f) of the Bankruptcy Code.

"**Introductory Paragraph**" means the first paragraph of this Agreement.

"**Law**" means any statute, code, ordinance, regulation, rule, principal of common law, order or other law that is binding upon the Assets or any Party, as amended from time to time.

"**LCPI**" is defined in Recital "E".

"**LCPI Bankruptcy Case**" is defined in Recital "E".

"**Lien**" means any mortgage, deed of trust, security interest, pledge, hypothecation, encumbrance, mechanics lien, judgment lien, notice of pending action, right of first negotiation, right of first refusal, right of termination, right of forfeiture, right of reversion or other encumbrance, lien or charge.

"**Liquidated Damages**" means any damages payable to Seller pursuant to Section 5.2.

EXHIBIT 2 PAGE 27

"**Material Assets**" is defined in Section 3.2(b), provided that for clarity the Real Property shall be considered a Material Asset for all purposes herein.

"**McAllister Ranch LLC**" is defined in the Introductory Paragraph.

"**McAllister Ranch Real Estate**" is defined in Recital "B".

"**McSweeny Farms LLC**" is defined in the Introductory Paragraph.

"**McSweeny Farms Real Estate**" is defined in Recital "B".

"**New York Bankruptcy Court**" is defined in Recital "E".

"**Notice**" means any notice, consent, approval, acceptance, disapproval, objection, waiver, or other communication required or intended to be given pursuant to this Agreement.

"**Overbid Procedures**" is defined in Recital F.

"**Parent**" is defined in the Introductory Paragraph.

"**Party**" and "**Parties**" are defined in the Introductory Paragraph.

"**Permitted Title Exceptions**" is defined in Section 3.11(a).

"**Person**" means any human being, trust, estate, corporation, limited liability company, partnership, joint venture, agency, labor union, Government Entity or other entity.

"**Plan**" is defined in Recital F.

"**Portfolio Premium**" means, if and only if the Closing (as defined therein) occurs under each of (a) this Agreement pertaining to the sale of the McAllister Ranch Real Estate and certain related Assets, as defined herein (the "**McAllister Ranch PSA**"), (b) that certain Agreement For Purchase And Sale Of Real Property by and between Buyer and Seller of even date herewith pertaining, inter alia, to the sale of the McSweeny Farms Real Estate and certain related Assets (as defined therein) (the "**McSweeny Farms PSA**"), and (c) that certain Agreement For Purchase And Sale Of Real Property by and between Buyer and Seller of even date herewith pertaining, inter alia, to the sale of the Summerwind Ranch Real Estate and certain related Assets (as defined therein) (the "**Summerwind Ranch PSA**"), an amount equal to one third of the amount by which Sixty Million Dollars ($60,000,000.00) exceeds the sum of the Base Purchase Price under this Agreement, the Base Purchase Price under the McSweeny Farms PSA, and the Base Purchase Price under the Summerwind Ranch PSA (with an identical one third to be paid under each the McSweeny Farms PSA and the Summerwind Ranch PSA). If the Closing does not occur under any of this Agreement, the McSweeny Farms PSA or the Summerwind Ranch PSA, the Portfolio Premium shall be zero dollars ($0.00).

"**Purchase Price**" is defined in Section 3.3.

EXHIBIT 2 PAGE 28

Execution Copy

"Real Property" is defined in Recital "D".

"Records" is defined in Section 3.1(b)(3).

"Recitals" is defined in the Introductory Paragraph.

"Required Endorsements" is defined in Section 3.11(a).

"Sale" is defined in Section 3.1.

"Second Deposit" is defined in Section 3.4(b).

"Seller" is defined in the Introductory Paragraph.

"Seller's Agents" means the principals, employees, agents, representatives, attorneys, accountants, property managers, brokers and other advisors and professionals of Seller.

"Seller's Broker" means the broker identified as Seller's Broker in Section 6.16.

"Seller's Costs" is defined in Section 3.15.

"Seller's Representations" is defined in Section 4.2.

"Selling Debtor" is defined in the Introductory Paragraph.

"Summerwind Ranch LLC" is defined in the Introductory Paragraph.

"Summerwind Ranch Real Estate" is defined in Recital "B".

"SunCal Master I LLC" is defined in the Introductory Paragraph.

"Tangible Property" means, to the extent not part of the Excluded Assets, all right, title and interest of Selling Debtor or its Estate in, to or under any tangible assets, including all furniture, fixtures, equipment and other tangible personal property situated on or appurtenant to the Real Property, or stored offsite but owned or used by any Debtor in developing the Real Property, and intended to be used in connection with the ownership, operation, development or physical maintenance of the Real Property, including without limitation the specific items identified on the attached Schedule 1.1F, and any right of Parent in, to or under any of the foregoing types of property that relates to the Assets.

"Title Company" means First American Title Insurance Corporation, and if First American Title Insurance Corporation refuses to issue the Title Policy required herein, then either Lawyers Title Insurance Company, Fidelity National Title Insurance Company, or Chicago Title Insurance Company, as determined by reasonable agreement between Buyer and Seller.

"Title Policy" is defined in Section 3.11(a).

EXHIBIT 2 PAGE 29

"**Yucaipa Proceeds**" means any funds which Seller, any of the Debtors or any of the Estates may receive or be entitled to pursuant to that certain Order Granting Motion For Order Approving Compromise Of Controversy Between The Chapter 11 Trustee and Oak Valley Partners, L.P. dated as of October 8, 2010 (Docket no. 505 in the Bankruptcy Case).

1.2     **Conventions**. This Agreement incorporates the following conventions:

(a)     The words "include", "includes" and "including" will be deemed and construed to be immediately followed by the words "without limitation".

(b)     The words "will" and "shall" refer to a mandatory act or obligation, unless the context in which the word is used logically prohibits the application of this convention.

(c)     Unless otherwise stated, all references to "days" will mean calendar days, and all references to "years" will mean calendar years.

(d)     Words or phrases denoting the singular will include the plural, words or phrases denoting the plural will include the singular, and words or phrases denoting gender will include all genders including the masculine, feminine and neuter, unless applying this convention would be contrary to the obvious intent of this Agreement.

(e)     A reference to any Party or any party to any other contract or document will include such Person's successors and permitted assigns.

1.3     **Rules of Construction**. The provisions of this Agreement will be liberally construed to effectuate the Sale. Article and Section headings are for convenience only and will not be given undue consideration in resolving questions of construction or interpretation. Each Party is deemed to have had equal bargaining strength in the negotiation of this Agreement and equal responsibility for the preparation of this document, such that neither this document, nor any uncertainty or ambiguity therein, will be arbitrarily construed or resolved against any Party pursuant to any rule of construction or other Law to the effect that ambiguities in documents are to be construed against the drafter of the document.

## ARTICLE 2.
## CONDITIONS TO CLOSING AND REQUIREMENT FOR COURT APPROVAL

2.1     **Buyer's Waiver of Contingencies and Conditions to Close**. Buyer hereby irrevocably waives all contingencies to the Sale and the Closing relating to financing or due diligence. Buyer's obligation to close the Sale shall, however, be subject to satisfaction or waiver of the following conditions precedent:

(a)     issuance of the Title Policy effective upon the Closing;

(b)     satisfaction of the Bankruptcy Court Approval Condition;

EXHIBIT 2 PAGE 30

(c)     accuracy and satisfaction of all Seller's representations, warranties and obligations under this Agreement as required herein; and

(d)     Seller shall not be in Default.

2.2     <u>Requirement for Bankruptcy Court Approval</u>.

(a)     Because of the Bankruptcy Case, Seller cannot sell or commit to sell the Assets to Buyer without the approval of the Bankruptcy Court. For that reason, <u>Article 3</u>, which sets forth the obligation of Seller to sell the Assets to Buyer, and the terms of the Sale, will become binding upon and enforceable only if and when the Bankruptcy Court Approval Condition is satisfied. Subject to the more specific obligations and limitations herein, each Party agrees to perform the actions reasonably required of such Party to cause the Bankruptcy Court Approval Condition to be satisfied, including: (a) promptly executing and delivering any motions, declarations or items of support required in connection therewith; and (b) appearing at the confirmation hearing on the Plan (including any continuances thereof) and any other hearings relating to this Agreement, the Sale, or any Appeal of any action by the Bankruptcy Court relating to this Agreement or the Sale.

(b)     Notwithstanding the foregoing, if for any reason the Bankruptcy Court Approval Condition does not occur within 30 days of the entry of the Approval Order, then Seller shall have no obligation to contest any Appeal, and Seller may instead elect in its sole and absolute discretion to terminate this Agreement as provided in Section 5.3(a) of this Agreement; provided, however, that during such 30-day period Seller shall use reasonable efforts to cause the Approval Order to become a Final Order, including opposing any request for a stay pending Appeal.

2.3     <u>Obligation to Seek Bankruptcy Court Approval; Sale Procedures Order</u>.

(a)     Seller will seek Bankruptcy Court approval of the Sale and the other transfers and transactions contemplated by this Agreement in connection with the confirmation and consummation of the Plan, including authorization to assume and assign the Assigned Contracts by Seller to Buyer, and shall file all motions, commence all actions, and obtain all Bankruptcy Court orders which are reasonably necessary or appropriate thereto or as reasonably requested by Buyer to cause the Bankruptcy Court Approval Condition to occur. All such motions, orders and notices, and the scope thereof, including the terms of any order confirming the Plan as such order relates to this Agreement or the consummation of the Sale through the Plan, shall be reviewed by and be reasonably satisfactory in form and substance to Buyer. Without limiting the generality of the foregoing, Seller shall request that the Bankruptcy Court, in confirming the Plan, order that, pursuant to section 1146(a) of the Bankruptcy Code, the Sale of the Assets shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States.

(b)     Without limiting the generality of the foregoing, Seller shall file such motion or motions as are reasonably necessary to set the amounts (the "Cure Costs"), if any, necessary to cure any defaults and/or to satisfy any actual or pecuniary losses that

EXHIBIT 2 PAGE 31

have resulted from such defaults under the Assigned Contracts, as determined by the Bankruptcy Court or by agreement between Buyer and any non-Debtor party or parties to such Assigned Contracts, and shall reasonably cooperate with Buyer in seeking to set such Cure Costs at the amounts set forth on Schedule 1.1A.

(c)     Seller will seek immediate Bankruptcy Court approval through motion or stipulation, in form and substance reasonably satisfactory to Buyer, of the stipulation attached as Exhibit B hereto, which shall modify the Overbid Procedures by, among other things, nominating Buyer as the "Stalking Horse Bidder" for the Assets, providing for the breakup fees and other bidder protections set forth therein, and supplementing and, to the extent there is a conflict, superseding any prior overbid procedures applicable to the sale of the Assets.

2.4     **Over-Bidding.** Buyer acknowledges that the Sale of the Assets to Buyer is subject to possible over-bidding by other prospective buyers, subject to and as provided in the Overbid Procedures. Seller may solicit, negotiate and accept competing offers for the Assets. If Buyer is not the "Winning Bidder" (as defined in the Overbid Procedures) for all or a portion of the Assets, then Buyer shall have the right, but not the obligation, to keep the offer represented by this Agreement open and available as a "Back-Up Bid" (as defined in the Overbid Procedures) for the Assets. Absent a Default by Buyer, if the Bankruptcy Court authorizes a sale or other transfer of all or any portion of the Assets to any person other than Buyer (including an equity infusion or other strategic transaction), and the sale or other transfer authorized by the Bankruptcy Court closes, then upon the closing of such sale this Agreement shall terminate and Buyer shall be entitled to the $250,000 breakup fee set forth in Exhibit B from the sale proceeds. Seller will not be deemed to have breached this Agreement or to have acted in bad faith by reason of soliciting, negotiating or accepting any competing offer for the Assets. Absent a Default by Buyer, if Buyer is not the Winning Bidder for all or a portion of the Assets, then any Deposits made by Buyer pursuant to this Agreement will be refunded to Buyer within the time period provided in the Overbid Procedures.

2.5     **No Inconsistent Actions.** No Party will take any action inconsistent with this Agreement, pending either the Closing or the termination of this Agreement.

## ARTICLE 3.
## SALE TERMS

3.1     Purchase and Sale of the Assets; Assigned Contracts.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will sell and transfer, to the fullest extent permissible by 11 U.S.C. § 363, the Assets to Buyer, and Buyer will purchase the Assets from Seller, free and clear of all Interests under and pursuant to sections 1123(a) and 363(f) of the Bankruptcy Code (the "Sale").

(b)     As used herein, the "Assets" will be deemed to mean the Real Property, the Assigned Contracts, the Development Rights, the Intangible Property, the Records, and the Tangible Property, including without limitation and for purposes of clarification

EXHIBIT 2 PAGE 32

the following, as the same may exist as of the Closing and otherwise be transferrable by Seller without third party consents or the Estates' payment of additional consideration and, to the extent not part of the Excluded Assets (notwithstanding anything that may be set forth or implied to the contrary elsewhere in this Agreement, in no event are the Excluded Assets or any of them included within the Assets or otherwise being transferred pursuant to the Sale):

(1)    any and all accounts and notes receivable, deposits, prepaid assets and other such claims for money due to the Selling Debtor (the "Accounts Receivable"), and further including any and all litigation claims, rights and causes of action related to the foregoing;

(2)    any and all rights, warranties, guarantees and recourse (other than any Avoidance Actions) to past providers of engineering, architectural and other professional services and materials by third parties contracting with the Selling Debtor in regard to the Assets;

(3)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, property reports, advertising and promotional materials, reports and other records or materials (in whatever form or medium) which relate to the Assets, including the Real Property and the development thereof (collectively, the "Records"); provided, however, that Seller shall not be obligated to deliver possession of the foregoing to the extent they are not in Seller's actual possession; and further, that Seller may retain copies of the foregoing for administrative purposes;

(4)    all insurance and condemnation claims and proceeds in respect of the Assets arising from claims relating to periods after the Execution Date and prior to the Closing;

(5)    any cash, funds in accounts or other rights or property in the possession or under the control of Seller as of the Closing that has been received between the Execution Date and the Closing on account of any Assets;

(6)    any and all litigation claims, rights, causes of action; offsets and other legal rights and actions arising out of or relating to the Assets, including the Real Property and the development thereof, whether arising before or after the commencement of the Bankruptcy Cases, other than any Avoidance Actions;

(7)    all goodwill of or relating to Selling Debtor's businesses and/or the Assets;

(8)    all intellectual property and rights thereto, including without limitation all rights in or relating to the use of the names McAllister, McAllister Ranch, McSweeny, McSweeny Farms, Summerwind and/or Summerwind Ranch, any and all customer lists (including lists of all past, present and

13

EXHIBIT 2 PAGE 33

Execution Copy

prospective customers), sales and marketing materials (including artwork and collateral materials), mailing lists, marketing lists, employee lists, engineering plans, models and projects, and any and all information related to any of the foregoing; and

(9)   to the extent transferable by applicable law, all rights under any contract under which the counterparty or counterparties agree or have agreed not to compete with the operations or property of Selling Debtor or of its Estate or agree or have agreed to keep confidential information regarding the Selling Debtor or its Estate, without regard to whether any such contract is an Excluded Asset.

(c)   As part of the Sale, pursuant to sections 1123(a) and 365 of the Bankruptcy Code, Seller shall obtain a Bankruptcy Court order authorizing the assumption and assignment by Seller to Buyer of the Assigned Contracts subject only to payment by Buyer of the associated Cure Costs at or after Closing. The Approval Order shall provide that Buyer's payment of the Cure Costs at or after Closing shall be a condition precedent to the assumption and assignment of the Assigned Contracts by Seller and that the Assigned Contracts shall be neither assumed nor assigned absent Buyer's payment of the Cure Costs at or after Closing. Buyer acknowledges that Seller shall have no obligation to obtain authorization to assume and assign to Buyer any contracts other than the Assigned Contacts and any contracts that are Material Assets, and the Approval Order shall provide that Seller shall have no obligation to pay any Cure Costs with respect to any contracts.

3.2   **Material Assets**.

(a)   Buyer acknowledges that the Bankruptcy Court may condition or deny the transfer of certain of the Assets (including for these purposes the assumption and/or assignment of the Assigned Contracts), and that such action by the Bankruptcy Court shall not be a Default by Seller under this Agreement. Except with respect to the Material Assets as provided in Section 3.2(b) immediately below, if the Bankruptcy Court denies the transfer of certain of the Assets, or any of them, or otherwise conditions the transfer thereof, (i) Buyer shall not have the right to terminate this Agreement, (ii) Buyer shall be obligated to proceed with the Closing on the terms set forth in this Agreement without adjustment to the Purchase Price, (iii) any such Assets that cannot be so transferred to Buyer shall be excluded from the Sale and shall be deemed not to be material to this transaction or a material portion of the consideration that Buyer is receiving pursuant to this Agreement, (iv) Seller shall have no obligation to incur any expense, liability or obligation in order to satisfy any conditions upon transfer imposed by the Bankruptcy Court, and (v) without limiting the foregoing, and for avoidance of doubt, any of the Assets identified on any of the Schedules or Exhibits attached to this Agreement which are not Material Assets shall be subject to the foregoing provisions.

(b)   Notwithstanding the foregoing, Buyer may terminate this Agreement as provided below if the Bankruptcy Court either (i) denies the transfer of any of the Assets on the attached Schedule 3.2(b) (collectively, the "Material Assets") or (ii) conditions

EXHIBIT 2 PAGE 34

the transfer of any of the Material Assets to Buyer in such a manner that would materially impair the transfer thereof (including a condition requiring procurement of third party consent to such transfer) or impose a material expense or liability upon Buyer in order to satisfy such transfer condition which exceeds the obligations of Buyer expressly set forth in this Agreement (for clarity, a requirement that Buyer pay a Cure Cost as a condition to assumption and assignment of an Assigned Contract or any contract that is a Material Asset shall not trigger this Section 3.2(b)(ii)). Buyer will have until the date which is three (3) Business Days prior to the Closing Performance Date in which to terminate this Agreement as provided in this Section 3.2(b) by providing written notice to Seller. Buyer's failure to elect to terminate this Agreement in writing by said date shall constitute Buyer's election to proceed with the Closing on the terms set forth in this Agreement without adjustment to the Purchase Price. To the extent the Bankruptcy Court conditions the transfer of any of the Assets listed on Schedule 3.2(b) upon the consent of parties other than Seller, and provided the Agreement has not been terminated by Buyer as provided herein, Seller shall provide reasonable cooperation to Buyer in seeking to obtain any such consents; provided, however, Seller shall have no obligation to take any actions that would cause or require the Seller, the Liquidating Trust (as defined in the Plan), or the Debtors' bankruptcy estates to incur material cost or liability or to become party to any lawsuit, action or other dispute. If this Agreement is terminated pursuant to this Section 3.2(b), then (1) any Deposits made by Buyer will be promptly returned to Buyer as Buyer's sole and exclusive remedy, (2) each Party will promptly return to the other Party any documents or property of the other Party within its possession or control received pursuant to this Agreement; (3) neither Party will have any further obligations to the other Party with regard to this Agreement except for Buyer's obligations under Section 3.18, and (4) Buyer shall not be entitled to a breakup fee.

3.3 **Purchase Price.** The price ("**Purchase Price**") for the Assets will be the Base Purchase Price of Ten Million Dollars ($10,000,000.00), or any other higher price that results from any competitive bidding process undertaken in accordance with the Sale Procedures Order, plus the Portfolio Premium, if any, determined in accordance with this Agreement.

3.4 **Payment of Purchase Price.** Buyer will deposit and pay the Purchase Price as follows:

(a) Initial Deposit. On the Execution Date, Buyer will deposit with Seller an initial deposit ("**Initial Deposit**") in the sum of one hundred fifty thousand dollars ($150,000.00).

(b) Second Deposit. On the Qualified Bid Deadline (as defined in the Sale Procedures Order), Buyer will deposit with Seller an additional deposit ("**Second Deposit**") in the sum of one hundred thousand dollars ($100,000.00).

(c) Final Deposit. On or before the Closing Performance Date, Buyer will deposit with Seller the balance of the Purchase Price (inclusive of the Portfolio Premium, if and as applicable), less the Initial Deposit and the Second Deposit ("**Final Deposit**").

EXHIBIT 2 PAGE 35

Execution Copy

3.5    <u>Buyer's Cost Deposit</u>.  On or before the Closing Performance Date, Buyer will deposit with Seller a cash deposit ("**Buyer's Cost Deposit**") in an amount equal to Buyer's Costs as reasonably estimated by Buyer and Seller in consultation.

3.6    <u>Form of Payment</u>.  All Deposits and other payments required pursuant to this Agreement will be deposited or paid in cash, by certified cashier's check or federal wire transfer of funds, provided that the Final Deposit must be delivered by federal wire transfer of funds.

3.7    <u>Maintenance of Deposits</u>.  Seller will promptly deposit any Deposits received pursuant to this Agreement into an account in the Estate's name at a federally insured bank, maintain the Deposits and all interest earned thereon in that account until disbursed, and disburse such funds in accordance with the terms of this Agreement.  If Seller will be holding any Deposits made pursuant to this Agreement that exceed $25,000.00, in the aggregate, for a period of more than 10 days, then said account shall be an interest bearing account.

3.8    <u>Benefit of Interest</u>.  Unless Seller is entitled to retain any Deposits as Liquidated Damages as provided herein, all interest earned on any Deposits held by Seller will accrue to the benefit of Buyer.

3.9    <u>Brokerage Commission</u>.  Upon the Closing and from the Purchase Price due to Seller, Seller will pay a fee ("**Brokerage Commission**") in accordance with the Bankruptcy Court's *Order Approving Application of Chapter 11 Trustee for Authorization to: (1) Employ Real Estate Co-Brokers (Park Place Partners, Inc., DBA Land Advisors Organization, and Madison Partners); and (2) Enter Into Listing Agreement for Sale of Real Property* [Docket No. 637] .

3.10    <u>Designation of Alternate Vestee</u>.  At or prior to the Closing Performance Date, Buyer may designate one or more other duly formed Persons in good standing (each a "**Buyer's Designee**") to accept title to any portion or all of the Assets upon the Closing, including through division of the Real Property, by providing written notice of such designation to Seller not less than three (3) Business Days prior to the Closing, provided that: (a) such action will not release Buyer from any obligation or liability under this Agreement, (b) Buyer's Designee is not an affiliate of Selling Debtor, any other Debtor or Parent (unless disclosed to and expressly approved by the Bankruptcy Court), (c) Buyer provides Seller and Title Company with all information regarding Buyer's Designee required to obtain the Title Policy and lawfully transact the Sale, and (d) Buyer's Designee acknowledges in writing in a form reasonably acceptable to Seller that it is acquiring the Assets on and subject to the terms and conditions of the Agreement.  If Title Company is unwilling to insure this transaction in the name of Buyer's Designee, then such designation shall not be permitted to occur and any attempted designation by Buyer shall be null and void.

3.11    <u>Title Insurance</u>.

(a)    <u>Title Policy</u>. As a condition of the Closing and for Buyer's benefit, Seller will cause Title Company to issue and deliver to Buyer or Buyer's Designee at Closing, or be irrevocably committed to issue to Buyer or Buyer's Designee as of the Closing, a 1990 CLTA Owner's Policy of Title Insurance for the Real Property with coverage equal

EXHIBIT 2 PAGE 36

Execution Copy

to the amount of the Purchase Price (the "Title Policy"). The Title Policy must include standard forms of: (i) Mechanics' Lien Endorsement (CLTA Form 101); and (ii) Subdivision Map Act Compliance Endorsement (CLTA Form 116.7) (the "**Required Endorsements**"). The Title Policy must be subject only to the following exceptions ("**Permitted Title Exceptions**"):

(1)    exceptions 1-29, 31-33, 36, 37, 39, 47-51, 53 and 74 reflected on Schedule B-1 to the title report prepared by First American Title Insurance Company dated March 2, 2011 and referenced as Commitment number 474805C as included in the VDR, and any other non-monetary matters, which are non-material to the value or development of the Real Property as reasonably determined by Buyer;

(2)    The lien and encumbrance of non-delinquent real property taxes and assessments, and non-delinquent owners association assessments, prorated as of the Closing, provided that all taxes, assessments, special taxes and special assessments shown as exceptions on the Title Policy shall be paid current at the time of Closing;

(3)    Any title exceptions arising in connection with any financing obtained by Buyer in connection with the Sale;

(4)    The standard pre-printed exclusions and exceptions contained in the Title Policy form; and

(5)    any other title exceptions approved by Buyer in writing or caused by Buyer.

Procurement of additional or extended title coverage, or any particular title endorsements, shall not be a requirement of the Title Policy or a condition precedent to Buyer's obligation to complete the Sale in accordance with the terms of this Agreement; provided, however, that Buyer is not prohibited from negotiating with the Title Company for such additional or extended title insurance coverage or any particular title endorsements (at Buyer's sole cost and expense). Notwithstanding anything to the contrary contained elsewhere in this Agreement, if for any reason the Title Company is unwilling or unable to issue the Title Policy with the Required Endorsements and Permitted Title Exceptions, Seller shall not be in breach of this Agreement and Buyer's sole recourse and remedy shall be to either (i) waive the condition that the Title Policy be issued in the form prescribed above and proceed with the Sale and the Closing on the terms set forth herein, or (ii) terminate this Agreement and obtain a return of the Deposits previously made by Buyer (and Buyer shall not be entitled to a break up fee).

(b)    **Buyer's Title Insurance Obligations.** Buyer will promptly complete, execute and deliver to Seller and Title Company any statements of identity, information reports, affidavits and other documents or information reasonably required by the Title Company to issue any Title Policy.

EXHIBIT 2 PAGE 37

3.12  **Closing Performance Date.**  Each Party will perform all acts required of it to enable the Closing to be transacted on or before the first Business Day following the later of (a) 14 days after the date the Bankruptcy Court Approval Condition is satisfied and (b) the date on which Buyer's termination rights, if any, under any of Sections 3.24(a), 3.24(b) or 4.3(c) expire or are waived by Buyer ("Closing Performance Date").

3.13  **Conveyance Instruments.**  On or before the Closing Performance Date, the Parties will cause to be prepared, and the appropriate Party will execute, before a notary public as required, any deeds, bills of sale, assignments and instruments (collectively, "Conveyance Instruments") required to assign and convey the Assets to Buyer upon the Closing on the terms set forth in this Agreement.

3.14  **Buyer's Costs.**  On or before the Closing Performance Date, Buyer and Seller shall consult and will reasonably estimate the following costs ("Buyer's Costs"), which costs will be collected from Buyer and paid and charged to Buyer's account upon Closing,

(a)  All applicable documentary transfer taxes;

(b)  All applicable recording fees and filing fees, including for the deed(s) to the Real Property, and any mortgages, deeds of trust or financing statements associated with any financing obtained by Buyer;

(c)  The additional title insurance premium, if any, in excess of the premium payable by Seller pursuant to Section 3.15(b), for any additional or extended title coverage or any endorsements issued at the request of Buyer or Buyer's lender;

(d)  Any prorations, transfers, credits, debits, adjustments or other payments required of Buyer pursuant to Section 3.16; and

(e)  Any other closing costs not allocated in this Agreement which are customarily paid by the purchaser of real property in the county in which the Real Property is located.

3.15  **Seller's Costs.**  On or before the Closing Performance Date, Buyer and Seller shall consult and will reasonably estimate the following costs ("Seller's Costs"), which costs will be treated as a credit against the Purchase Price at Closing:

(a)  The Brokerage Commission;

(b)  The premium for a standard CLTA owner's title policy;

(c)  Any prorations, transfers, credits, debits, adjustments or other payments required of Seller or constituting credits against the Purchase Price hereunder and ascertainable as of Closing; and

(d)  Any other closing costs not allocated in this Agreement which are customarily paid by the seller of real property in the county in which the Real Property is located.

EXHIBIT 2 PAGE 38

3.16   **Prorations**.

(a)      Except as otherwise set forth in this Agreement, Seller will receive the benefit of all income from and the burden of all expenses of the Assets prior to the Closing, and Buyer will receive the benefit of all income from and the burden of all expenses of the Assets following the Closing. In furtherance of the forgoing intent, the income and expense items listed on the attached Schedule 3.16 will be prorated as of 12:00 midnight the morning of the Closing Performance Date, based on the total number of days in the month and year in which the Closing occurs and the actual number of days elapsed in the month and year in which the Closing occurs, and the Purchase Price shall be adjusted accordingly, at Closing.

(b)      If at any time before or after the Closing Seller receives any payments, refunds, credits or other funds or property relating to periods following the Closing, Seller shall hold such property in trust for the benefit of Buyer and shall deliver such property to Buyer forthwith. If at any time before or after the Closing Buyer receives any payments, refunds, credits or other funds or property relating to periods preceding the Closing, Buyer shall hold such property in trust for the benefit of Seller and shall deliver such property to Seller forthwith.

3.17   **Excluded Liabilities**.  Buyer shall not assume, and shall have no liability or obligation for any liabilities of Seller, Debtors or their Estates, as a successor in interest or otherwise, including, without limitation, any liability arising out of, or related to, any of the following ((a)-(l) below, collectively, the "**Excluded Liabilities**"):

(a)      all liabilities and obligations arising under any and all Excluded Assets or under any and all contracts, agreements, leases and commitments not included in the Assets;

(b)      except as set forth in clause (a) above, all liabilities and obligations under portions of Debtors' business not arising in connection with the conduct or operation of, or the use or ownership of, the Assets by the Buyer;

(c)      any liabilities to employees or consultants of Seller, any Debtor or their Estates, including any liability with respect to any key employee retention plans, any liability with respect to or arising from any "employee benefit plan" (as defined in section 3(3) of ERISA), any liability with respect to the Worker Adjustment and Retraining Notification (WARN) Act and any liability with respect to COBRA coverage for employees or consultants of Seller, any Debtor or their Estates terminated prior to or as part of the consummation of the transactions set forth in this Agreement;

(d)      any severance payable to any employee or consultant of Seller, any Debtor or their Estates;

(e)      any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases;

EXHIBIT 2 PAGE 39

(f)     liabilities under any warranty, guaranty or similar obligation of Seller, any Debtor or their Estates arising from or relating to any acts or transactions prior to the Closing;

(g)     any liabilities or obligations with respect to any litigation or threatened litigation, claim, obligation, damages, costs and expenses relating to or arising out of or relating to any actions or omissions of Seller, any Debtor or their Estates or any use of any of the Assets prior to the Closing, whether arising under contract, tort, civil or criminal law or otherwise;

(h)     any liabilities for environmental claims, whether arising under contract or statute, including without limitation any and all laws relating to pollution or the environment, including all Environmental Laws;

(i)     all obligations of Seller, any Debtor or their Estates relating to taxes assessed or due prior to the Closing;

(j)     all liabilities in respect of all indebtedness of Seller, any Debtor or their Estates; and/or

(k)     any accounts payable of Seller, any Debtor or their Estates.

3.18    **Buyer Indemnity.**    Buyer hereby agrees to indemnify, defend (with counsel acceptable to Seller) and hold free and harmless Seller, Selling Debtor and the Estate of Selling Debtor from and against any and all claims, causes of action, liens, liabilities, obligations, damages, awards, fines, penalties, losses, costs and expenses (including, without limitation attorneys' fees and costs of litigation) resulting from any entry or activities of or by Buyer or its employees, contractors, consultants, agents or designees, on or about the Real Property or any portion thereof prior to the Closing. This indemnity obligation shall survive the Closing or the termination of this Agreement, as applicable.

3.19    **No Post-Closing Obligations of Seller.**    Buyer expressly acknowledges and agrees that except to the extent expressly required by the terms of this Agreement, from and after the Closing, Seller shall have no further obligation to undertake any actions or efforts of any kind with respect to the Assets, the Sale or the transactions contemplated by this Agreement; provided that, for a period of time not to exceed the later of (i) 1 year after the Closing, and (ii) the closing of the Bankruptcy Case, Seller shall provide commercially reasonable cooperation to Buyer, at Buyer's sole cost and expense and on such terms as shall ensure that neither Seller (personally or in his capacity as Trustee) nor the Debtors' estates shall incur any liability in connection therewith, in taking, prosecuting or pursuing or any legal rights, remedies or actions that are part of the Assets or that are reasonably necessary to the benefit and enjoyment of the Assets, including any legal rights or actions that are required for purposes of standing or otherwise to be pursued in the name of Seller or any Debtor.

3.20    **Insurance.**    Seller shall maintain the existing insurance policies on the Assets, including the policies identified on Schedule 3.20, or substantially comparable coverages issued by the same or other insurance providers, from and after the Execution Date until the earlier of the Closing or the termination of this Agreement.

EXHIBIT 2 PAGE 40

3.21  <u>Buyer's Closing Obligations</u>.  On or before the Closing Performance Date and effective as of the Closing, Buyer will:

(a)     Cause Buyer's Representations to be true and correct in all material respects;

(b)     Deposit the Final Deposit and Buyer's Cost Deposit; and

(c)     Perform or cause to be performed all other acts required of Buyer pursuant to this Agreement to enable the Closing to occur as contemplated by this Agreement.

3.22  <u>Seller's Closing Obligations</u>.  On or before the Closing Performance Date and effective as of the Closing, Seller will:

(a)     Execute and deliver to Buyer the Conveyance Documents and any other documents required of Seller to enable the Closing to occur;

(b)     Perform or cause to be performed all other acts required of Seller pursuant to this Agreement to enable the Closing to occur as contemplated by this Agreement; and

(c)     Perform or provide, or cause to be performed or provided, the list of additional items and deliverables on the attached <u>Schedule 3.22</u>, which shall be limited to keys, security codes and similar items, if any, which are in Seller's possession and are necessary to provide Buyer with physical access to the Real Property.

3.23  <u>Closing</u>.  The "Closing" will consist of all of the following events, which the Parties will cause to occur concurrently in accordance with this Agreement:

(a)     Delivery of the Purchase Price to Seller, subject to adjustments and prorations as set forth in this Agreement;

(b)     Delivery of the executed Conveyance Documents to Buyer, including causing the deed to the Real Property to be recorded with the County Recorder for the county in which the Real Property is located; and

(c)     Issuance of the Title Policy.

3.24  <u>Condemnation and Damage</u>.

(a)     If, prior to the Closing, Seller receives Notice or otherwise obtains actual knowledge of any proposed condemnation or other taking through eminent domain of all or any part of the Real Property, then Seller will give prompt Notice thereof to Buyer, and Buyer will have 7 days following the date of such Notice in which to terminate this Agreement without any liability to Seller for money damages or otherwise, and without receipt of a break up fee.  Buyer's failure to elect to terminate this Agreement in writing within said 7 day period shall constitute Buyer's election to proceed with the Closing on the terms set forth in this Agreement notwithstanding such proposed condemnation or taking.

EXHIBIT 2 PAGE 41

(b)    If, prior to the Closing, Seller receives Notice or otherwise obtains actual knowledge of any material damage to the Assets or any portion thereof, then Seller will give prompt Notice thereof to Buyer.  If the damage or cost to repair the damage is reasonably estimated by Buyer to equal or exceed two percent (2.00%) of the Purchase Price, then Buyer will have 7 days following the date of such Notice in which to terminate this Agreement without any liability to Seller for money damages or otherwise, and without receipt of a break up fee.  Buyer's failure to elect to terminate this Agreement in writing within said 7 day period shall constitute Buyer's election to proceed with the Closing on the terms set forth in this Agreement notwithstanding such damages.

(c)    If Buyer terminates this Agreement pursuant to the preceding subsections (a) or (b), then the Initial Deposit and any other Deposits by Buyer will be promptly returned to Buyer.

3.25    **Surety Bonds.**  Buyer and Seller hereby acknowledge and agree that the Existing Surety Bonds will not be transferred by Seller to Buyer, and, if Buyer (or its successor) determines to develop the Real Property, the Existing Surety Bonds will not apply to the Buyer's (or its successor's) bonding requirements with respect to such development.  If Buyer (or its successor) determines to develop all or a portion of the Real Property, it will be required at that time to obtain and to provide new subdivision improvement bonds or other surety bonds or other security to the extent surety bonds or other security are required by applicable federal, state and local development requirements.

## ARTICLE 4.
## WARRANTIES, REPRESENTATIONS AND WAIVERS

4.1    **Representations and Warranties by Buyer.**  Buyer hereby makes the following representations and warranties ("**Buyer's Representations**") to Seller:

(a)    (1) Buyer has the requisite power, authority and legal capacity to make, execute, enter into and deliver this Agreement and to perform its obligations under this Agreement, (2) any Person executing and delivering this Agreement on behalf of Buyer is duly authorized to do so; (3) neither this Agreement nor the performance by Buyer of any obligation of Buyer under this Agreement will violate any provision of any article, by-law, operating agreement or partnership agreement of Buyer or any contract, covenant, agreement, condition, restriction, injunction or order by which Buyer is bound; and (4) no consent, waiver, approval, order or authorization of, or declaration or filing with, or notification to, any Person or governmental body is required on the part of Seller in connection with the execution and delivery of this Agreement or the Conveyance Instruments, the consummation of the transactions contemplated hereby or thereby or the taking by Buyer of any other action contemplated hereby or thereby, other than the Bankruptcy Court.

(b)    Buyer entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances, and that no representations, warranties or promises other than those set forth in this Agreement were

EXHIBIT 2 PAGE 42

made by Seller or any agent, employee or counsel of Seller to induce Buyer to execute or enter into this Agreement.

(c)     Buyer acted pursuant to the advice of legal counsel of its own independent choosing in connection with the negotiation, preparation and execution of this Agreement, or was advised to obtain the advice of such legal counsel, had fair and ample opportunity to obtain the advice of such legal counsel and willfully declined to obtain the advice of such legal counsel.

(d)     Buyer has not engaged or utilized the services of any broker, sales agent or finder in connection with the Sale.  No broker's commission, sales agent's commission, finder's fee or other consideration or compensation is or will be due or owing in connection with the Sale by reason of any conduct by Buyer.

4.2     <u>Representations and Warranties by Seller</u>.  As of the date of this Agreement (and again as of the Closing, subject to the provisions of Section 4.3 below), Seller hereby makes the following covenants, representations and warranties ("**Seller's Representations**"), which representations and warranties shall survive the Closing:

(a)     Subject to the provisions of this Agreement relating to the entry of the Approval Order: (1) Seller has the requisite power, authority and legal capacity to make, execute, enter into and deliver this Agreement and to perform its obligations under this Agreement, (2) any Person executing and delivering this Agreement on behalf of Seller is duly authorized to do so; and (3) neither this Agreement nor the performance by Seller of any obligation of Seller under this Agreement will result in a material violation of any provision of any contract, covenant, agreement, condition, restriction, injunction or order by which Seller is bound.

(b)     Seller entered into this Agreement in reliance solely upon its own independent investigation and analysis of the facts and circumstances, and that no representations, warranties or promises other than those set forth in this Agreement were made by Buyer or any agent, employee or counsel of Buyer to induce Seller to execute and enter into this Agreement.

(c)     Seller acted pursuant to the advice of legal counsel of its own independent choosing in connection with the negotiation, preparation and execution of this Agreement, or was advised to obtain the advice of such legal counsel, had fair and ample opportunity to obtain the advice of such legal counsel and willfully declined to obtain the advice of such legal counsel.

(d)     Except as disclosed in the Available Information or as previously disclosed to or known by Buyer as of the date of this Agreement, to Seller's actual knowledge there exist no written contracts or other commitments (executed or unexecuted) for the sale, exchange, lease or transfer of all or any part of the Assets which have not been terminated (except for this Agreement).

(e)     Except as disclosed in the Available Information or as previously disclosed to or known by Buyer as of the date of this Agreement, to Seller's actual

23

EXHIBIT 2 PAGE 43

knowledge Seller has provided Buyer with access to or otherwise identified for Buyer all documents or other written materials in the possession of Seller, the existence or identity of which is actually known by Seller, that pertain to the Assets or any right, title or interest therein, that Seller believes would be material to Buyer's evaluation of the benefits of use, ownership, development or other enjoyment of the Assets.

(f)     To Seller's actual knowledge, subject only to satisfaction of the Bankruptcy Court Approval Condition, Seller has the power to sell the Assets to Buyer free and clear of any Interests.

(g)     To Seller's actual knowledge, except as disclosed in the Available Information or as previously disclosed to or known by Buyer as of the date of this Agreement, neither Seller nor any of its agents or representatives has intentionally misrepresented any material facts or intentionally omitted to disclose any material facts in connection with the Assets, this Agreement and/or the transactions contemplated hereby.

(h)     To Sellers' actual knowledge, except as previously disclosed to or known by Buyer as of the date of this Agreement or as otherwise disclosed in the Available Information (i) the Assets are not in material violation of applicable law, and (ii) Seller has not received any written notice from any governmental entity alleging any existing material non-compliance with any laws.

(i)     To Seller's actual knowledge, except as previously disclosed to or known by Buyer as of the date of this Agreement or as otherwise disclosed in the Available Information, no tenant or other person has an option to purchase the Real Property or any right of first refusal or right of first offer with respect to the Real Property or any portion thereof, and there are no unrecorded leases, easements or other contracts or grants affecting title to the Real Property or any estate therein.

(j)     To Seller's actual knowledge, except as previously disclosed to or known by Buyer as of the date of this Agreement or as otherwise disclosed in the Available Information, (1) Seller has not received any written notice from any governmental agency alleging an outstanding material violation of any law, rule, regulation or order that has not been cured prior to the date hereof, relating to environmental conditions by reason of the presence of hazardous substances or materials (as such terms are presently used under applicable environmental laws, rules and regulations) at any of the Real Property; and (2) Seller has included within the Available Information all environmental audits and reports and other material environmental documents in the possession of Seller relating to the Assets. The representations and warranties contained in this Section 4.2(j) are the sole and exclusive representations and warranties of Seller pertaining or relating to any environmental, health or safety matters, including any arising under any Environmental Law. Seller shall not be deemed to have made, and Buyer acknowledges it has not relied upon, any other representations, warranties, or statements of fact relating to environmental, health or safety matters.

(k)     To Seller's actual knowledge, except as previously disclosed to or known by Buyer as of the date of this Agreement or as otherwise disclosed in the Available

EXHIBIT 2 PAGE 44

Information, there are no legal proceedings pending against Seller, the Selling Debtor, its Estate or the Assets, or to which Seller is otherwise a party before any governmental body, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or to consummate the transactions hereby, including the transfer of the Assets to Buyer free and clear of all Interests.

(l)    Except for Seller's Broker, if any, identified as such in Section 6.16 (and the prior engagement of Madison Partners which is now acting pursuant to a broker cooperation agreement with Seller's Broker), Seller has not engaged or utilized the services of any broker, sales agent or finder in connection with the Sale. Except for the Brokerage Commission, if any, payable pursuant to Section 3.9, no broker's commission, sales agent's commission, finder's fee or other consideration or compensation is or will be due or owing in connection with the Sale by reason of any conduct by Seller. The only fee payable to Seller's Broker, if any, is the Brokerage Commission described in Section 3.9, if any, the distribution of which will be governed by a separate written agreement between Seller and Seller's Broker.

4.3    **Limitation on Representations.**

(a)    As used in the preceding Section 4.2, the term "Available Information" shall mean and refer to the aggregate of (i) all information contained in the ShareFile's Virtual Data Room established and maintained by Land Advisors Organization with respect to the McAllister Ranch Real Estate and related Assets (as defined herein), the McSweeny Farms Real Estate and related Assets (as defined in the McSweeny Farms PSA), and the Summerwind Ranch Real Estate and related Assets (as defined in the Summerwind Ranch PSA), as updated from time-to-time (the "VDR"), (ii) all matters which are recorded in the Official Records of the County in which the Real Property is situated, and (iii) the pleadings, filings and documents on file in the Bankruptcy Case and the information otherwise referred to or disclosed in the pleadings, filings and documents on file in the Bankruptcy Case.

(b)    Without limiting the generality of the foregoing, Buyer understands and agrees that each of the foregoing representations in Section 4.2 is made by Seller with reference to his personal and actual knowledge as of the Execution Date, without any investigation, due diligence or inquiry of any kind, and without any obligation to undertake any such investigation, due diligence or inquiry. Use of the terms "to Seller's actual knowledge" or "to Seller's knowledge" or words of similar import above and elsewhere in this Agreement shall mean and refer to such current actual knowledge of Seller only. Without limiting the foregoing, Seller shall not be charged or imputed with any knowledge or information known to any other Person such as, without limitation, any agents, accountants or attorneys engaged by Seller (including any of the Debtors, Parent, or Suncal Management/Argent Management or any of their respective employees, agents, consultants, officers, directors or principals) but which is not actually known personally by Seller, and Seller shall not be deemed to have constructive knowledge or notice of any information that is not actually known personally by Seller. Buyer understands it is likely that Debtors, Parent, and/or Suncal Management/Argent Management, or certain of

EXHIBIT 2 PAGE 45

them, have material knowledge about certain aspects of the Assets that is not known to Seller. Consistent with Section 4.4 below, in no event whatsoever shall Seller have any liability based upon the inaccuracy of any representation or warranty contained in this Agreement.

(c)    In the event that prior to the Closing a change in circumstances or in Seller's actual knowledge should occur which would cause any of Seller's representations and warranties in Section 4.2 to be inaccurate, then Seller will give Notice thereof to Buyer within three (3) Business Days following the date upon which Seller obtains actual knowledge of same, and in any event prior to the Closing, and Buyer will have 7 days following the date of such Notice in which to elect in writing to terminate this Agreement without any liability to Seller or Selling Debtor or its Estate for money damages or any other remedy, and without receipt of a break up fee. Buyer's failure to elect to terminate this Agreement in writing within said 7 day period shall constitute Buyer's waiver of any and all rights and claims associated with such matter and Buyer's election to proceed with the Closing on the terms of this Agreement, and the information contained in such Notice shall be deemed to be part of the Available Information with the applicable representations and warranties of Seller being deemed modified accordingly so as to be accurate.

(d)    If Buyer terminates this Agreement pursuant to the preceding subsection (c), then the Initial Deposit and any other Deposits made by Buyer will be promptly returned to Buyer as Buyer's sole and exclusive remedy. Notwithstanding Buyer's timely election to terminate this Agreement, Seller shall have the right, but not the obligation, to correct or cure such change in circumstance or inaccuracy in the representations and warranties so as to cause the applicable representation to be materially accurate as of the Closing, and if Seller agrees to do so in its sole and absolute discretion, Buyer's termination notice shall be null and void and this Agreement shall continue in effect, with Buyer's obligation to Close being subject to Seller's cure of such matter prior to the Closing Performance Date. Buyer shall have no termination rights with respect to any inaccuracy of any of the foregoing representations which is not material. In no event shall Seller be liable for, or in breach or in Default of this Agreement as a result of, any such change in circumstance or change in Seller's actual knowledge or resulting inaccuracy in any representation, it being agreed that Buyer's sole remedy shall be to terminate this Agreement on the terms expressly set forth in this Section 4.3.

4.4    Trustee's Liability.    Buyer understands and agrees that (i) Seller is executing this Agreement solely in his capacity as the Chapter 11 Trustee in the Bankruptcy Case, (ii) Seller is not in the business of developing real property, (iii) Seller has not developed and was not involved with any development of the Real Property, or any portion thereof, or the construction of any improvements thereon, (iv) Seller has limited information regarding the Assets, the condition thereof and matters pertaining thereto, (v) Seller does not have access to all information of the Debtors and Parent pertaining to the Assets, and (vi) the knowledge of Debtors or any other Person shall not be imputed to Seller, and Seller shall not be charged with

EXHIBIT 2 PAGE 46

any knowledge of the Debtors, or any of them, or their respective employees, principals and agents or any other Person. Trustee's duties as to the Assets shall be limited to the selling of the Assets pursuant to terms approved by the Bankruptcy Court. Buyer acknowledges and agrees that Seller is not and shall not be personally liable or responsible for any damages or losses that Buyer may suffer or incur as the result of this transaction or any acts, omissions, breaches or defaults of or by Seller in connection therewith or in connection with the Assets (including any breach of, or inaccuracy in, any representation or warranty contained in this Agreement), whether occurring prior to, upon or following the Execution Date. Buyer further acknowledges that Seller acts subject to the approval of the Bankruptcy Court, that the Bankruptcy Court shall have jurisdiction over any dispute relating to the Assets or to this Agreement, and that Seller shall have no liability whatsoever if the Bankruptcy Court does not approve this transaction or the Sale Procedures Order. Without limiting any other release provisions of this Agreement in favor of Seller or others, and notwithstanding anything contained elsewhere in this Agreement to the contrary, Buyer hereby fully and forever releases and holds harmless Seller and its agents, attorneys, affiliates, successors and assigns, from and against any claims, causes of action, damages, losses, liabilities, costs and expenses arising out of or in any way relating to the Assets, the development or construction of any improvements thereon, the condition thereof, or any acts, omissions or other matters or circumstances occurring or arising on, under, about or with respect to the Assets prior to or following the Execution Date. Such release applies to all claims, whether such claims, damages, or losses are known or unknown, foreseen or unforeseen, patent or latent, that Buyer may have against Seller. Buyer waives application of California Civil Code Section 1542, which states:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Buyer further understands and agrees that even if Buyer incurs damages as a result of a breach of this Agreement by Seller (including any breach of, or inaccuracy in, any representation or warranty contained in this Agreement), or otherwise arising from the purchase of the Assets, whether such breach occurs or is discovered prior to or following Closing, Buyer will not be able to make any claim for those damages against Seller personally, and that Buyer's sole recourse, if any, shall be to assert a claim against the Estate of the Selling Debtor in accordance with, and, subject to the terms and limitations set forth in Section 5.6 below. Further, Buyer acknowledges that Buyer understands these consequences even as to claims for damages that may exist as of the date of this release but which Buyer does not know exist, and which, if known, would materially affect Buyer's decision to execute this release, regardless of whether Buyer's lack of knowledge is the result of ignorance, oversight, error, negligence, or any other cause.

The provisions of this Section shall survive the Closing or termination of this Agreement, as applicable.

Buyer's Initials: _____

4.5     **WAIVER OF IMPLIED WARRANTIES AND REPRESENTATIONS, AND "AS IS" SALE.**     EXCEPT    WITH    RESPECT    TO    THE    WARRANTIES    AND

EXHIBIT 2 PAGE 47

REPRESENTATIONS SET FORTH IN THE PRECEDING SECTION 4.2, BUYER IS PURCHASING THE ASSETS "AS IS", "WHERE IS", "WITH ALL FAULTS", AND IN THEIR PRESENT CONDITION. EXCEPT WITH RESPECT TO THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THE PRECEDING SECTION 4.2, SELLER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, REGARDING THE ASSETS, INCLUDING WITH RESPECT TO: (A) LOCATION, QUALITY, CONDITION, STATE OF REPAIR, FITNESS, HABITABILITY, OR SUITABILITY FOR INTENDED USE; (B) OWNERSHIP, POSSESSION OR STATUS OF TITLE; (C) COMPLIANCE WITH LAWS OR INSURANCE REQUIREMENTS; (D) REQUIREMENTS FOR, VALIDITY OF, OR COMPLIANCE WITH, GOVERNMENT PERMITS; OR (E) WATER, ELECTRICITY, GAS, SEWER, TELEPHONE, DATA COMMUNICATION CONNECTIONS OR CONDUITS, OR OTHER UTILITIES. AS A MATERIAL INDUCEMENT TO SELLER TO ENTER INTO THIS AGREEMENT, BUYER (I) NOW AND FOREVER WAIVES ANY AND ALL IMPLIED WARRANTIES AND REPRESENTATIONS REGARDING THE ASSETS, INCLUDING WITH RESPECT TO THE FORGOING MATTERS, (II) NOW AND FOREVER WAIVES, ANY AND ALL CLAIMS AGAINST SELLER AND SELLER'S AGENTS, REPRESENTATIVES AND LEGAL COUNSEL, REGARDING ANY SUCH MATTERS, AND, (III) WITHOUT LIMITING THE RELEASES SET FORTH IN FAVOR OF SELLER SET FORTH IN SECTION 4.4 ABOVE, BUT SUBJECT TO BUYER'S LIMITED REMEDIES AGAINST THE ESTATE OF SELLING DEBTOR IN ACCORDANCE WITH, AND SUBJECT TO, THE TERMS AND LIMITATIONS SET FORTH IN SECTION 5.6 BELOW, FOREVER RELEASES, ACQUITS AND DISCHARGES SELLER AND SELLER'S AGENTS, REPRESENTATIVES AND LEGAL COUNSEL AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS FROM ANY AND ALL LIABILITY, DAMAGES, LOSSES, ACTIONS, CAUSES OF ACTION, CLAIMS, OBLIGATIONS, LIABILITIES, COSTS AND EXPENSES RELATED TO THE ASSETS, THE DEVELOPMENT OR CONSTRUCTION OF ANY IMPROVEMENTS THEREON, THE CONDITION THEREOF, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, OR ANY ACTS, OMISSIONS OR OTHER MATTERS OR CIRCUMSTANCES OCCURRING OR ARISING ON, UNDER ABOUT OR WITH RESPECT TO THE ASSETS OR THIS TRANSACTION PRIOR TO OR FOLLOWING THE EXECUTION DATE. WITHOUT LIMITING THE FORGOING, EXCEPT WITH RESPECT TO THE WARRANTIES AND REPRESENTATIONS SET FORTH IN THE PRECEDING SECTION 4.2, BUYER WILL RELY SOLELY ON THE APPROVAL ORDER AND THE OWNER'S TITLE POLICY WITH RESPECT TO ALL MATTERS RELATING TO TITLE, AND UPON BUYER'S OWN INSPECTIONS, ANALYSIS AND DUE DILIGENCE WITH RESPECT TO ALL OTHER MATTERS RELATING TO THE ASSETS. SUCH RELASES APPLY TO ALL CLAIMS WHETHER SUCH CLAIMS, DAMAGES OR LOSES ARE KNOWN OR UNKNOWN, FORESEEN OR UNFORSEEN, OR PATENT OR LATENT, THAT BUYER MAY HAVE AGAINST SUCH RELEASED PARTIES. BUYER HEREBY WAIVES THE PROTECTION OF CALIFORNIA CIVIL CODE SECTION 1542 WHICH STATES:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

EXHIBIT 2 PAGE 48

For clarity, nothing contained in Section 4.4 above or in this Section 4.5 shall limit Buyer's right to pursue its remedies against Seller, solely in his capacity as trustee of the Estate of the Selling Debtor (but not Seller personally), as set forth in, and as limited by, Section 5.6 below, in the event of a Seller Default. The provisions of this Section shall survive the Closing or termination of this Agreement, as applicable.

Buyer's Initials: _____

4.6    **Waiver of Representations or Warranties**. The Buyer's Representations set forth in Section 4.1 are for the sole and exclusive benefit of Seller and may be waived only by Seller, and only in an express written waiver executed by Seller. The Seller's Representations set forth in Section 4.2 are for the sole and exclusive benefit of Buyer and may be waived only by Buyer, and only in an express written waiver executed by Buyer.

4.7    **Truth, Accuracy and Survival**. Each representation, warranty, covenant, indemnity, disclaimer, waiver and release contained in this Agreement will survive termination of this Agreement or the Closing, as applicable, provided that the representations of Seller as expressly set forth in Section 4.2 above shall terminate and be become null and void of no further force or effect on the date that is one (1) year following the Closing unless Buyer has prior to such date provided Seller with written notice detailing with reasonable specificity an alleged breach thereof by Seller (and in such event only the representations which have been timely identified by Buyer in writing as being allegedly breached by Seller shall continue in effect after said one (1) year period as necessary to allow Buyer to pursue the remedies specified in Section 5.6(e) below, with all other representations and warranties being of no further force or effect).

## ARTICLE 5.
## DEFAULTS, REMEDIES AND RIGHTS OF TERMINATION

5.1    **Default**. A Party will be in default ("**Default**") of this Agreement if such Party: (a) fails to make any payment or deposit when due; (b) fails to perform any act required of such Party to enable the Closing to occur on the Closing Performance Date; (c) breaches a representation or warranty set forth in this Agreement, or (d) is otherwise in material breach of this Agreement if such breach continues uncured for a period of more than 3 Business Days following the date of Notice of such breach by the other Party, provided, however, that if the breach is not of a type that can be cured by the payment of money and more than 3 Business Days are reasonably required to cure the breach, then there will be no Default by reason of the breach if the breach does not delay the Closing and the Party in breach: (1) commences a cure within 3 Business Days of the date of the Notice of the breach, (2) promptly, diligently and in good faith prosecutes the cure to completion, and (3) completes the cure by no later than 3 Business Days prior to the Closing Performance Date.

5.2    **LIQUIDATED DAMAGES - SELLER'S REMEDY**. IF THE SALE FAILS TO OCCUR BY REASON OF A BUYER DEFAULT, OR IF BUYER FAILS, WITHOUT LEGAL EXCUSE, TO COMPLETE THE SALE IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, THEN SELLER WILL SUFFER REAL AND SIGNIFICANT DAMAGES AS A RESULT, INCLUDING LOST OPPORTUNITY COSTS, INTEREST COSTS, TRANSACTIONAL COSTS, LEGAL COSTS, AND OTHER REAL AND

EXHIBIT 2 PAGE 49

SIGNIFICANT DAMAGES, THE PRECISE AMOUNT WHICH WOULD BE DIFFICULT TO ASCERTAIN. THE PARTIES THEREFORE DESIRE TO LIQUIDATE SUCH DAMAGES AS OF THE EXECUTION DATE. ACCORDINGLY, BUYER AND SELLER HEREBY COVENANT AND AGREE THAT IF THE SALE FAILS TO OCCUR BY REASON OF A BUYER DEFAULT, OR IF BUYER FAILS, WITHOUT LEGAL EXCUSE, TO COMPLETE THE SALE IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, THEN SELLER WILL KEEP AS REASONABLE AGREED UPON LIQUIDATED DAMAGES FOR SUCH DEFAULT OR FAILURE, AND NOT AS A PENALTY, THE ENTIRE INITIAL DEPOSIT IN THE AMOUNT OF $150,000.00 AND, IF AND ONLY IF SUCH SECOND DEPOSIT HAS BEEN MADE, THE ENTIRE SECOND DEPOSIT IN THE ADDITIONAL AMOUNT OF $100,000.00. THE FOREGOING SHALL NOT LIMIT OR IMPAIR SELLER'S RIGHTS TO RECOVER PURSUANT TO ANY INDEMNITY OBLIGATION UNDER SECTION 3.18 OR TO RECOVER ATTORNEYS FEES AND COSTS AS OTHERWISE PERMITTED BY THIS AGREEMENT.

INITIALED ON BEHALF OF SELLER: _____    INITIALED ON BEHALF OF BUYER: _____

    5.3    **Termination.**  In addition to any other termination provision of herein, this Agreement may be terminated prior to the Closing as follows:

      (a)    Commencing on the 30th day after the entry of the Approval Order, Buyer, or Seller may terminate this Agreement for any reason or no reason if the Bankruptcy Court Approval Condition remains unsatisfied, provided the terminating party is not then in Default, and provided further that if the failure to obtain the Bankruptcy Court Approval by such time is proximately caused by Seller's Default, then Buyer may seek money damages from Seller in accordance with Section 5.6(c).

      (b)    Commencing on the 180 day anniversary of the Execution Date, Buyer, or Seller may terminate this Agreement for any reason or no reason if the Closing has not occurred by such date, provided the terminating party is not then in Default, and provided further that if the failure to effect the Closing by such time is proximately caused by Seller's Default, then Buyer may seek money damages from Seller in accordance with Section 5.6(c) as Buyer's sole and exclusive remedy, or pursuant to Section 5.6(d) if such Default is a Closing Failure Default as defined in Section 5.6(d) below, as Buyer's sole and exclusive remedy.

      (c)    Seller, if not in Default, may terminate the Sale if Buyer is in Default and recover liquidated damages in accordance with Section 5.3 above.

      (d)    Buyer, if not in Default, may terminate the Sale if Seller is in Default, and seek money damages on account of such Default in accordance with Section 5.6(c) as Buyer's sole and exclusive remedy (provided that if the Default by Seller is a Closing Failure Default, then Buyer shall be entitled to recover liquidated monetary damages on account of such Closing Failure Default in accordance with Section 5.6(d) as Buyer's sole and exclusive remedy).

EXHIBIT 2 PAGE 50

Execution Copy

5.4    No Obligation to Terminate.  No Party having the right to terminate the Sale will be required to exercise such right of termination, or otherwise be prohibited from enforcing this Agreement by reason of having any such unexercised right to terminate the Sale.

5.5    Notice of Termination.  Any Party who terminates the Sale will give immediate Notice of such termination to the other Party, specifying in the Notice the specific reason for such termination and the provision of this Agreement pursuant to which the termination is made.

5.6    Effect of Termination or Seller Default; Post-Closing Remedies.

(a)    If this Agreement is terminated pursuant to any of Sections 3.24, 5.3(a) or 5.3(b), then (1) any Deposits made by Buyer will be promptly returned, (2) each Party will promptly return to the other Party any documents or property of the other Party within its possession or control received pursuant to this Agreement; and (3) subject to Buyer's right to seek damages under Section 5.6(c) or Section 5.6(d), as applicable and as set forth in such Sections, neither Party will have any further obligations to the other Party with regard to this Agreement.

(b)    If this Agreement is terminated pursuant to Section 5.3(c), then (1) the entire Initial Deposit (and, if made, Second Deposit) will be immediately forfeited to Seller as Liquidated Damages pursuant to Section 5.2, (2) except for such Liquidated Damages, each Party will promptly return to the other Party any documents or property of the other Party within its possession or control received pursuant to this Agreement, and (3) neither Party will have any further obligations to the other Party with regard to this Agreement except for the indemnity obligations of Buyer pursuant to Section 3.18.

(c)    If this Agreement is terminated pursuant to Section 5.3(d) (or pursuant to Sections 5.3(a) or 5.3(b) in the circumstances which reference this Section 5.6(c)), then (1) any Deposits made by Buyer will be promptly returned, and (2) except to the extent liquidated damages are available to Buyer in the case of a Closing Failure Default as provided in Section 5.6(d) below, Buyer may seek money damages on account of any actual damages suffered by Buyer on account of such Default by Seller, not to exceed the sum of $150,000.00 if only the Initial Deposit has been made or $250,000.00 if the Second Deposit has also been made, with any such damages payable solely by the Estate of the Selling Debtor and not by the Seller personally.  Buyer's right to terminate this Agreement and to seek monetary damages from the Estate of the Selling Debtor in the amount and subject to the limitations set forth above shall be Buyer's sole and exclusive remedy in the event of a Default by Seller, except as expressly provided in Section 5.6(d) below.  In no event whatsoever (including a Closing Failure Default) shall Buyer have the right to specifically enforce Seller's obligation to sell the Assets to Buyer or to record a lis pendens upon the Real Property or to file any other lien or encumbrance upon any of the other Assets, and Buyer expressly waives any and all rights of specific performance.

(d)    LIQUIDATED DAMAGES – BUYER'S REMEDY FOR SELLER'S CLOSING FAILURE DEFAULT.  ABSENT A DEFAULT BY BUYER, IF BUYER IS THE WINNING BIDDER FOR THE REAL PROPERTY, THE BANKRUPTCY COURT APPROVES OR AUTHORIZES THE SALE TO BUYER,  AND THE SALE

EXHIBIT 2 PAGE 51

FAILS TO OCCUR DUE SOLELY AND EXCLUSIVELY TO SELLER'S INTENTIONAL REFUSAL TO EXECUTE AND TO DELIVER THE CONVEYANCE INSTRUMENTS AND TO PROCEED WITH THE SALE FOLLOWING SATISFACTION OF THE BANKRUPTCY COURT APPROVAL CONDITION (A "CLOSING FAILURE DEFAULT"), THEN BUYER WILL SUFFER REAL AND SIGNIFICANT DAMAGES AS A RESULT, INCLUDING LOST OPPORTUNITY COSTS, INTEREST COSTS, TRANSACTIONAL COSTS, LEGAL COSTS, AND OTHER REAL AND SIGNIFICANT DAMAGES, THE PRECISE AMOUNT WHICH WOULD BE DIFFICULT TO ASCERTAIN. THE PARTIES THEREFORE DESIRE TO LIQUIDATE SUCH DAMAGES IN THE EVENT OF A CLOSING FAILURE DEFAULT BY SELLER AS OF THE EXECUTION DATE. ACCORDINGLY, BUYER AND SELLER HEREBY COVENANT AND AGREE THAT IF THE SALE FAILS TO OCCUR BY REASON OF A CLOSING FAILURE DEFAULT BY SELLER, THEN BUYER WILL BE ENTITLED, AS REASONABLE AGREED UPON LIQUIDATED DAMAGES FOR SUCH CLOSING FAILURE DEFAULT, AND NOT AS A PENALTY, TO THE SUM OF $250,000.00. WITH THE EXCEPTION OF THE RETURN OF ANY DEPOSITS MADE BY BUYER, SUCH SUM SHALL BE BUYER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF A CLOSING FAILURE DEFAULT, AND SHALL BE IN LIEU OF AND NOT IN ADDITION TO ANY BREAKUP FEE. WITH RESPECT TO ANY OTHER DEFAULT BY SELLER WHICH IS NOT A CLOSING FAILURE DEFAULT, BUYER'S REMEDIES SHALL BE AS SET FORTH IN, AND AS LIMITED BY, SECTION 5.6(c) ABOVE. THE LIQUIDATED DAMAGES TO WHICH BUYER IS ENTITLED HEREUNDER SHALL BE DUE EXCLUSIVELY FROM, AND PAYABLE SOLELY BY, THE ESTATE OF THE SELLING DEBTOR AND NOT BY SELLER PERSONALLY.

Buyer's Initials:                                    Seller's Initials:

(e)    If, after the Closing, Buyer asserts a breach by Seller of this Agreement, including, without limitation, a breach of any representation or warranty set forth in this Agreement, or asserts any other claim, demand or cause of action against Seller of any kind as a result of or pertaining to the Assets, this Agreement or the transactions contemplated herein, Buyer's sole recourse and remedy shall be to pursue an action against the Estate of the Selling Debtor for the amount of any actual damages suffered by Buyer as a result thereof, provided that the maximum damages that Buyer shall be entitled to recover for and as a result of any and all such claims shall, in the aggregate, in no event exceed $250,000.00, with any such damages being payable solely by the Estate of the Selling Debtor and not by the Seller personally. In no event following the Closing shall Buyer shall have the right to rescind or unwind the transactions contemplated herein, or any portion or aspect thereof.

(f)    BY ITS INITIALS BELOW, BUYER HEREBY CONFIRMS ITS UNDERSTANDING OF, AND AGREEMENT TO, THE LIMITATION UPON ITS REMEDIES AS SET FORTH ABOVE IN THIS SECTION 5.6 IN THE EVENT BUYER ASSERTS A BREACH OR DEFAULT BY SELLER OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, A BREACH OF ANY REPRESENTATION OR WARRANTY AS SET FORTH IN THIS AGREEMENT, OR

BN 8648468v2                                    32

EXHIBIT 2 PAGE 52

ASSERTS ANY OTHER CLAIM, DEMAND OR CAUSE OF ACTION AGAINST
SELLER OF ANY KIND AS A RESULT OF OR PERTAINING TO THE ASSETS,
THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN, AND
BUYER ACKNOWLEDGES AND CONFIRMS THAT SUCH REMEDIES HAVE
BEEN FREELY BARGAINED FOR AND ARE FAIR AND REASONABLE IN ALL
RESPECTS.

**Buyer's Initials:** _____

## ARTICLE 6.
## GENERAL PROVISIONS:

6.1    <u>Integration</u>.  This Agreement sets forth the sole and entire agreement between
the Parties regarding the Sale.  All prior and contemporaneous discussions, negotiations
understandings and agreements between the Parties, oral or written, regarding the Sale, are
hereby superseded.  No Person has the authority to orally modify this Agreement, or to make any
oral representation regarding this Agreement or the Sale.

6.2    <u>Amendment</u>.  No modification of, deletion from, or addition to this Agreement
will be effective unless made in writing and executed by each Party.

6.3    <u>No Obligations to Third Parties</u>.  This Agreement will not confer any rights
upon any Person not a Party, nor will it obligate any Party to any Person not a Party.  However,
nothing in this <u>Section 6.3</u> or elsewhere in this Agreement will limit or restrict the binding effect
of the Approval Order on Persons not a Party to this Agreement.

6.4    <u>Expenses of Negotiation, Documentation and Performance</u>.  Each Party will
bear all costs and expenses incurred by such Party in connection with the negotiation and
documentation of this Agreement and in the performance of its obligations under this
Agreement.

6.5    <u>Further Assurances</u>.  Each Party will promptly execute and deliver all
documents and take all actions, including the payment of money, reasonably required to
effectuate the Sale and perform its duties pursuant to this Agreement.

6.6    <u>Time is of the Essence</u>.  With respect to all dates and time periods set forth or
referred to in this Agreement, time is of the essence, such that each Party will perform all acts
required of such Party pursuant to this Agreement by the date or within the time period required
pursuant to this Agreement.

6.7    <u>Performance Dates</u>.  If the date by which or upon which any obligation
otherwise must be performed pursuant to this Agreement, or any Notice otherwise must be given
pursuant to this Agreement, occurs on a day other than a Business Day, then the date by which or
upon which such obligation must be performed or such Notice must be given will be deemed
automatically extended until the next Business Day.

6.8    <u>Governing Law, Jurisdiction and Venue</u>.  This Agreement is made under and
will be construed in accordance with and governed by the Bankruptcy Code and the substantive

EXHIBIT 2 PAGE 53

laws of the State of California, without giving effect to the principles of conflicts of law. The Parties consent to the exclusive jurisdiction of the Bankruptcy Court and to venue in Orange County, California, for the purpose of resolving any claim, controversy or disagreement which may arise among the Parties with respect to this Agreement, the Sale or the Assets. It will be a material breach of this Agreement to seek to resolve any such claim, controversy or disagreement in any other court or forum. However, nothing in this Section 6.8 will constitute a waiver by any Party of the right to appeal any decision or action of the Bankruptcy Court.

6.9    Enforcement. Subject to the provisions of this Agreement including those which relate to venue, jurisdiction and the limitation of remedies or damages, each Party will have the right to enforce by proceedings at law or in equity all of the provisions of this Agreement, including the right to prosecute proceedings at law or in equity against any Person who violates or attempts to violate any of such provisions, to enjoin any such Person from doing so, to cause such violation to be remedied, and to recover damages for such violation.

6.10    Waiver. The failure by any Party to enforce any provision of this Agreement will not constitute a waiver of the right to enforce the same provision, or any other provision of this Agreement, thereafter. No waiver by any Party of any provision of this Agreement will be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor will any such waiver constitute a continuing waiver unless otherwise expressly provided in writing.

6.11    Severability. If any provision of this Agreement is held by any court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, then the remaining portions of this Agreement will nonetheless remain in force and effect, unless the portion of this Agreement found to be illegal, invalid or unenforceable is so material and significant that its deletion would violate the obvious primary purpose and intent of the Parties.

6.12    Litigation Costs and Attorneys' Fees. Notwithstanding any other provision herein that would limit Seller's or Buyer's liability hereunder, if any Party commences legal proceedings against any other Party to enforce this Agreement or to declare any rights or obligations under this Agreement, then the prevailing Party will recover from the losing Party its costs of suit, including reasonable attorneys' fees, as will be determined by the court in such proceeding, in addition to any damages or other relief awarded.

6.13    Inurement. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors, assigns, grantees, administrators and trustees, including any successor trustee appointed in the Bankruptcy Case.

6.14    Execution. This Agreement may be executed in any number of identical counterparts, each of which is an original, and all of which together will constitute one and the same agreement. The delivery of an executed counterpart of a signature page to this Agreement and an initialed counterpart of any "Liquidated Damages" clause contained in this Agreement by electronic mail (email), electronic facsimile transmittal (fax), telecopy or other electronic means will be as effective as the physical delivery of an executed counterpart of this Agreement.

34

EXHIBIT 2 PAGE 54

6.15   **Schedules and Exhibits**.  The following Schedules and Exhibits are attached to this Agreement and incorporated into and made a part of this Agreement as though fully set forth herein:

| | |
|---|---|
| Schedule 1.1A | Specified Assigned Contracts |
| Schedule 1.1B | Specified Benefits |
| Schedule 1.1C | Specified Development Rights |
| Schedule 1.1D | Buyer-Specified Excluded Assets |
| Schedule 1.1E | Existing Surety Bonds |
| Schedule 1.1F | Specified Tangible Property |
| Schedule 3.2(b) | Material Assets |
| Schedule 3.16 | Prorations |
| Schedule 3.20 | Existing Insurance |
| Schedule 3.22 | Closing Deliverables |
| Exhibit A1 | Legal Description of the McAllister Ranch Real Estate |
| Exhibit A2 | Legal Description of the McSweeny Farms Real Estate |
| Exhibit A3 | Legal Description of the Summerwind Ranch Real Estate |
| Exhibit B | Sale Procedures Stipulation |

Buyer and Seller acknowledge and agree that Schedule 1.1A (Specified Assigned Contracts) has not been prepared as of the Execution Date and that Buyer will prepare such Schedule for attachment to this Agreement by April 1, 2011.  Buyer and Seller further acknowledge and agree that Schedule 1.1B (Specified Benefits), Schedule 1.1C (Specified Development Rights), Schedule 1.1D (Buyer-Specified Excluded Assets), Schedule 1.1F (Specified Tangible Property), and Schedule 3.22 (Closing Deliverables) have not been prepared as of the Execution Date and that Buyer will prepare such Schedules and Exhibits for attachment to this Agreement, if at all, no later than three (3) business days prior to the Closing Performance Date.  Buyer and Seller understand and agree that with respect to Schedules 1.1B, 1.1C, 1.1F, and 3.22 , (1) the items to be included within such Schedules and Exhibits shall be for informational and descriptive purposes only, and (2) such Schedules and Exhibits shall not in any way serve as a basis upon which Seller shall be in breach or Default of this Agreement, upon which Buyer shall have a right to terminate this Agreement, or upon which there shall be any adjustment to the Purchase Price or other change in the terms of the Sale.  Buyer and Seller understand and agree that with respect to Schedule 1.1D, such Schedule shall not in any way serve as a basis upon which Seller shall be in breach or Default of this Agreement, upon which Buyer shall have a right to terminate

EXHIBIT 2 PAGE 55

this Agreement, or upon which there shall be any adjustment to the Purchase Price or other change in the terms of the Sale.

6.16   Notices.  Any Notice by any Party to any other Party pursuant to this Agreement must be made in writing and delivered to the other Party at the address below, until written notice of a different address is given by the other Party pursuant to this Section 6.16.  Payments to be made pursuant to this Agreement will be deemed made only upon actual receipt.  Notices given by personal service will be deemed received upon delivery.  Notices given by first class mail, postage prepaid, addressed to the address required by this Section 6.16, will be deemed received 3 Business Days following the deposit thereof with the United States Post Office.  Notices given by overnight courier service will be deemed received on the date of delivery confirmed by the courier service.  Notices given by electronic facsimile transmission will be deemed received on the date upon which the recipient's facsimile machine confirms electronically the receipt of the Notice, provided that a copy of any Notice given by facsimile transmission must also be sent to the recipient by first class mail, postage prepaid, addressed to the address required by this Section 6.16.  The rejection by a Party of a Notice, refusal by a Party to accept a Notice, or inability of another Party to deliver a Notice because of either a change of address of a Party for which no Notice of change of address is given pursuant to this Agreement, or a failure by a Party to ensure that its correct name, address, telephone number, facsimile number and email address are set forth below prior to the execution of this Agreement by the Party will constitute delivery of the Notice; provided, however, that telephone numbers and e-mail addresses, if listed below, have been listed solely for convenience purposes, and not for the purpose of giving any Notice pursuant to this Agreement.  If any of the contact information provided for below is missing as of the time of the execution of this Agreement, then the absence of such information will not invalidate this Agreement, but rather, will constitute a continuing obligation of the Parties to cause such information to be correctly inserted into this Agreement as promptly as reasonably possible following the execution of this Agreement.

| | |
|---|---|
| Seller: | Alfred H. Siegel, Trustee<br>Crowe Horwath LLP<br>15233 Ventura Boulevard, Ninth Floor<br>Sherman Oaks, California 91403<br>Telephone: (818) 501-5200<br>Facsimile: (818) 501-7040<br>E-Mail: al.siegel@crowehorwath.com |
| Any Notice to Seller must also be sent to Seller's Counsel at: | Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP<br>Attention: Robert S Marticello<br>650 Town Center Drive - Suite 950<br>Costa Mesa, California 92660<br>Telephone: (714) 966-1000<br>Facsimile: (714) 966-1002<br>E-Mail: rmarticello@wgllp.com |

BN 8648468v2

36

EXHIBIT 2 PAGE 56

Execution Copy

| | |
|---|---|
| Any Notice to Seller must also be sent to LCPI's Counsel at: | Cadwalader, Wickersham & Taft LLP<br>Attention: Andrew M. Troop<br>One World Financial Center<br>New York, New York 10281<br>Telephone: (212) 504-6000<br>Facsimile: (212) 504-6666<br>E-Mail: Andrew.Troop@cwt.com |
| Buyer: | Terra Verde Group, LLC<br>Attention: Craig Martin<br>2241 E. Continental Blvd., Suite 140<br>Southlake, Texas 76092<br>Telephone: (469) 855-8300<br>E-Mail: cmartin@tvgllc.com |
| Any Notice to Buyer must also be sent to Buyer's Counsel at: | Buchalter Nemer, A Professional Corporation<br>Attention: Bernard Bollinger<br>Telephone: (213) 891-0700<br>Facsimile: (213) 896-0400<br>E-Mail: bbollinger@buchalter.com and abarron@buchalter.com |
| Title Company: | [TBD] |
| Seller's Broker: | Land Advisors Organization – California Division<br>Attention: Terry V. Ruckle<br>201 South Lake Avenue, Suite 500<br>Pasadena, California 91101<br>Telephone: (626) 376-9840<br>Facsimile: (949) 852-8108<br>E-Mail: TRuckle@landadvisors.com |

EXHIBIT 2 PAGE 57

Execution Copy

**THE UNDERSIGNED PARTIES** made, executed, entered into and delivered this Agreement on the Execution Date.

Buyer:

Terra Verde Group, LLC,
a Delaware LLC.

By: _____
        Craig Martin
Its:    Manager

Seller:

_____
Alfred H. Siegel, acting solely in his
capacity as the duly appointed trustee
in the above-referenced Bankruptcy Cases.

EXHIBIT 2 PAGE 58

Execution Copy

Schedule 1.1A

Specified Assigned Contracts

[To be prepared by Buyer and attached no later than April 1, 2011]

BN 8648468v2

EXHIBIT 2 PAGE 59

Execution Copy

## Schedule 1.1B

### Specified Benefits

[To be prepared by Buyer and attached no later than 3 Business Days prior to the Closing]

Execution Copy

## Schedule 1.1C

**Specified Development Rights**

[To be prepared by Buyer and attached no later than 3 Business Days prior to the Closing]

EXHIBIT 2 PAGE 61

Execution Copy

## Schedule 1.1D

**Buyer-Specified Excluded Assets**

[To be prepared by Buyer and attached no later than 3 Business Days prior to the Closing]

EXHIBIT 2 PAGE 62

Execution Copy

### Schedule 1.1E

### Existing Surety Bonds

(a)    Any and all surety bonds issued by Bond Safegaurd Insurance Co.;

(b)    Any and all surety bonds issued by Lexon Insurance Co.; and

(c)    Any and all surety bonds issued by Arch Insurance Company.

BN 8648468v2                                    43

EXHIBIT 2 PAGE 63

Execution Copy

Schedule 1.1F

Specified Tangible Property

[To be prepared by Buyer and attached no later than 3 Business Days prior to the Closing]

EXHIBIT 2 PAGE 64

Execution Copy

Schedule 3.2(b)

Material Assets

- All real estate as described in the offering brochure
- Water and Sewer service agreements
- Pre-annexation Agreement with City of Bakersfield
- All easements acquired for construction including any off-site easements for utility construction or roadway improvement
- Sales and Marketing office, improvements, and furnishings
- Approved Tentative Tract Maps
- Improvements in ground including water lines, sewer lines, fire hydrants, dry utility conduits, block walls, landscaping irrigation materials and all controllers
- All golf course improvements including irrigation system and all controllers
- Any residual water rights not previously exchanged for service
- Development Agreement with Kern County

BN 8648468v2                                    45

EXHIBIT 2 PAGE 65

Execution Copy

## Schedule 3.16

### Prorations

(a)    Rents and other income from the Real Property, if any, whenever received, based upon when such rents accrued;

(b)    Real property taxes, assessments and refunds, and personal property taxes, assessments and refunds, based upon the periods to which they apply; and

(c)    Owners association dues and assessments, if any.

EXHIBIT 2 PAGE 66

## Schedule 3.20

## Existing Insurance

(a)  General liability insurance with Aspen Specialty Insurance, Policy No. CRA6NTH10;

(b)  Excess liability insurance with Everest National Insurance, Policy No. 71C2000342101; and

(c)  Property/Inland Marine insurance with Hartford Insurance, Policy No. 72UMMIV6895.

EXHIBIT 2 PAGE 67

Execution Copy

### Schedule 3.22

### Closing Deliverables

[To be prepared by Buyer and attached no later than 3 Business Days prior to the Closing]

EXHIBIT 2 PAGE 68

Execution Copy

Exhibit A1

Legal Description of the McAllister Ranch Real Estate

EXHIBIT 2 PAGE 69

Execution Copy

Exhibit A2

**Legal Description of the McSweeny Farms Real Estate**

EXHIBIT 2 PAGE 70

Execution Copy

### Exhibit A3

### Legal Description of the Summerwind Ranch Real Estate

BN 8648468v2

51

EXHIBIT 2 PAGE 71

Execution Copy

Exhibit B

Sale Procedures Stipulation

EXHIBIT 2 PAGE 72

# EXHIBIT 3

Execution Copy

## AGREEMENT FOR PURCHASE AND SALE OF
## REAL PROPERTY AND RELATED RIGHTS AND ASSETS

This Agreement for Purchase and Sale of Real Property and Related Rights and Assets ("Agreement") is made, executed and entered into on March 30, 2011 ("Execution Date") by and between Terra Verde Group, LLC, a Delaware limited liability company ("Buyer"), and Alfred H. Siegel ("Seller"), acting solely in his capacity as the chapter 11 trustee of the bankruptcy estates (each, an "Estate" and collectively, the "Estates") of the following chapter 11 debtors (each, a "Debtor", and collectively, the "Debtors"), in the following administratively consolidated bankruptcy cases, each of which was initiated by the filing of an involuntary petition pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"):

LBREP/L-SunCal Master I LLC, a Delaware limited liability company ("SunCal Master I LLC" or "Parent"), Case No. 8:08-bk-15588-ES;

LBREP/L-SunCal McAllister Ranch LLC, a Delaware limited liability company ("McAllister Ranch LLC"), Case No. 8:08-bk-15637-ES;

LBREP/L-SunCal McSweeny Farms LLC, a Delaware limited liability company ("McSweeny Farms LLC" or "Selling Debtor"), Case No. 8:08-bk-15639-ES; and

LBREP/L-SunCal Summerwind Ranch LLC, a Delaware limited liability company ("Summerwind Ranch LLC"), Case No. 8:08-bk-15640-ES;

(Buyer and Seller each, individually, a "Party", and both, collectively, the "Parties"), with regard to the following facts, circumstances, understandings and beliefs (collectively, the "Recitals"):

### RECITALS:

A.    Section 1.1 identifies various words and phrases that have specifically assigned meanings for the purposes of this Agreement, and other terms have been defined throughout the Agreement and shall be used consistently throughout.

B.    At the time their Bankruptcy Cases were filed, McAllister Ranch LLC owned the real property (the "McAllister Ranch Real Estate") described on the attached Exhibit A-1 hereto, McSweeny Farms LLC owned the real property (the "McSweeny Farms Real Estate") described on the attached Exhibit A-2 hereto, and Summerwind Ranch LLC owned the real property (the "Summerwind Ranch Real Estate") described on the attached Exhibit A-3 hereto.

C.    By reason of the filing of the Bankruptcy Cases and the appointment of the Seller as the Chapter 11 trustee in those Cases, all right, title and interest of McAllister Ranch LLC in and to the McAllister Ranch Real Estate, all right, title and interest of McSweeny Farms LLC in and to the McSweeny Farms Real Estate, and all right, title and interest of Summerwind Ranch

EXHIBIT 3 PAGE 73

LLC in and to the Summerwind Ranch Real Estate, became vested in the Seller, as trustee in the Bankruptcy Case of each such Debtor.

D.    In addition to certain other property and rights described herein, this Agreement relates to the McSweeny Farms Real Estate (including all improvements thereto and thereon, collectively, the "**Real Property**") and certain other rights and property of Selling Debtor.

E.    Lehman Commercial Paper Inc. ("**LCPI**"), in its capacity as the administrative agent for the first-position secured lenders, asserts a senior (first priority) lien ("**LCPI Lien**") against the Assets. LCPI is the debtor in chapter 11 bankruptcy Case No. 08-13900-jmp ("**LCPI Bankruptcy Case**") pending in the United States Bankruptcy Court for the Southern District of New York ("**New York Bankruptcy Court**"), which is being jointly administered under the lead bankruptcy case of Lehman Brothers Holdings, Inc., Case No. 08-13555. LCPI and Seller have entered into a binding term sheet (the "**Settlement Agreement**"), which Settlement Agreement was approved by the New York Bankruptcy Court pursuant to an order entered in the LCPI Bankruptcy Case on or around September 29, 2010, and by the Bankruptcy Court on or around January 27, 2011, pursuant to which LCPI has consented to Seller selling the Assets by auction pursuant to certain Overbid Procedures (as defined in the Settlement Agreement).

F.    On or about January 7, 2011, Seller filed the First Amended Chapter 11 Plan (Dated January 7, 2011) in the Bankruptcy Case (Docket No. 605, as such may be amended from time to time, the "**Plan**"), and the related First Amended Disclosure Statement Describing First Amended Chapter 11 Plan (Dated January 7, 2011) (Docket No. 604, the "**Disclosure Statement**"). The Plan provides for, and the Disclosure Statement describes, the sale of the Assets through the Plan pursuant to an auction to be conducted under certain Overbid Procedures attached as Exhibit 3 to the Plan and Exhibit 6 to the Disclosure Statement (as such may be modified as required by this Agreement, the "**Overbid Procedures**"). The Overbid Procedures also describe the selection, at Seller's option and with the consent of LCPI, of a "**Stalking Horse Bidder**" for the purchase of the Assets. The Disclosure Statement was approved by order of the Bankruptcy Court dated January 27, 2011.

G.    Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, as a sale free and clear of Interests (as defined below) pursuant to sections 1123(a) and 363(f) of the Bankruptcy Code, and in accordance with the terms and conditions of this Agreement and in connection with the confirmation and consummation of the Plan, the Assets (as defined below), including all right, title and interest of Seller in and to the Real Property. Buyer and Seller further desire that Buyer be designated as the "**Stalking Horse Bidder**" for the purchase of the Assets under and pursuant to the Overbid Procedures.

H.    The purchase and sale of the Assets pursuant to this Agreement is subject to approval by the Bankruptcy Court, and to the possibility of overbidding by other prospective purchasers.

I.    Buyer and Seller desire that this Agreement supersede all prior and contemporaneous discussions, negotiations, understandings and agreements between Buyer and Seller relating to the purchase and sale of the Assets.

2

EXHIBIT 3 PAGE 74

PURSUANT TO THE RECITALS, and in consideration of the covenants, agreements, warranties, representations and declarations contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of this Agreement, the Parties, intending to be legally bound by this Agreement, hereby covenant, agree, warrant, represent and declare as follows:

## ARTICLE 1.
## DEFINITIONS, CONVENTIONS AND RULES OF CONSTRUCTION

1.1    **Definitions**. The following capitalized words and phrases will have the meaning assigned to them in this Agreement when used in this Agreement, unless the context in which such capitalized word or phrase is used reasonably prohibits the application of such meaning:

"**Agreement**" is defined in the Introductory Paragraph.

"**Appeal**" means any appeal, motion for reconsideration or for judgment notwithstanding a verdict, or other motion seeking to reverse, vacate, set aside or remand an entered order.

"**Approval Order**" means an order or orders entered by the Bankruptcy Court on the docket of the Bankruptcy Case, containing a finding that Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and otherwise in form and substance reasonably satisfactory to Buyer (a) approving the Sale free and clear of all Interests pursuant to sections 1123(a) and 363(f) of the Bankruptcy Code and all other transfers and transactions contemplated in this Agreement on the terms and conditions set forth in this Agreement and (b) setting the Cure Costs for the Assigned Contracts. At Buyer's discretion, which discretion shall be exercised reasonably, the Approval Order may be a part of any order confirming the Plan or may be a separate order or orders.

"**Assets**" is defined in Section 3.1(b).

"**Assigned Contracts**" means those contracts, agreements and other documents which are specifically identified on the attached Schedule 1.1A.

"**Avoidance Actions**" means any and all claims and causes of action of the Trustee on behalf of one or more of the Debtors' Estates, including, without limitation, any and all claims and causes of action (a) under chapter 5 of the Bankruptcy Code, (b) against any current or former holders of equity interests in any Debtor based on fraudulent transfer or similar theories, and/or (c) alleged in the following pending actions: (i) Alfred H. Siegel, Chapter 11 Trustee v.  Gramercy Warehouse Funding I, LLC, et al, Case No. 8:10-ap-01518-ES; (ii) Alfred H. Siegel, Chapter 11 Trustee v. LBREP Lakeside SC Master I, LLC, et al., Case No. 8:11-ap-01084; and (iii) Alfred H. Siegel, Chapter 11 Trustee v. SunCal Management LLC, Case Nos. 8:08-ap-15588-ES, 8:08-ap-01516-ES, and 8:08-ap-01515-ES.

"**Bankruptcy Case**" means the bankruptcy cases of the Debtors as referenced in the Introductory Paragraph, administratively consolidated under Case No. 8:08-bk-15588-ES, and any case under any chapter to which any of the foregoing may be converted.

EXHIBIT 3 PAGE 75

"**Bankruptcy Code**" is defined in the Introductory Paragraph.

"**Bankruptcy Court**" is defined in the Introductory Paragraph, and includes any court with jurisdiction over the Bankruptcy Case.

"**Bankruptcy Court Approval Condition**" means entry of the Approval Order and the Approval Order becoming a Final Order, unless Buyer waives such condition that the Approval Order be a Final Order, in which case "Bankruptcy Court Approval Condition" means entry of the Approval Order and the Approval Order remaining unstayed and unmodified by any court of competent jurisdiction.

"**Base Purchase Price**" means the sum of Ten Million Dollars ($10,000,000.00).

"**Benefits**" means, to the extent not part of the Excluded Assets, all right, title and interest of Selling Debtor, Parent or their respective Estates in, to or under any deposits, prepaid items, pre-paid fees, fee credits and other credits, rights to reimbursements or refunds, prepaid expenses, deferred charges, advance payments, security deposits, utility deposits, escrows, benefits of any cost sharing agreements, Insurance Claims, California Department of Real Estate rights, deposits and reserves (including any homeowner's association reserves), community facilities districts and other assessment and benefit districts, to the extent related to the Real Property, including without limitation the specific items identified on the attached Schedule 1.1B.

"**Brokerage Commission**" is defined in Section 3.9.

"**Business Day**" means any day upon which a majority of federally insured banks within the State of California are open for business.

"**Buyer**" is defined in the Introductory Paragraph.

"**Buyer's Agents**" means Buyer's principals (including shareholders, members, limited partners and general partners), directors, officers, employees, agents, representatives, architects, engineers, accountants, attorneys, brokers, consultants and advisors.

"**Buyer's Cost Deposit**" is defined in Section 3.5.

"**Buyer's Costs**" is defined in Section 3.14.

"**Buyer's Designee**" is defined in Section 3.10.

"**Buyer's Representations**" is defined in Section 4.1.

"**Closing**" is defined in Section 3.23.

"**Closing Failure Default**" is defined in Section 5.6(d).

"**Closing Performance Date**" is defined in Section 3.12.

"**Confirmation Hearing**" is defined in Section 2.3.

EXHIBIT 3 PAGE 76

"**Conveyance Instruments**" is defined in Section 3.13.

"**Cure Costs**" is defined in Section 2.3(b).

"**Debtor**" is, and "**Debtors**" are, defined in the Introductory Paragraph.

"**Default**" is defined in Section 5.1.

"**Deposit**" means any deposit provided for in this Agreement which has been delivered by Buyer, including the Initial Deposit, the Second Deposit, the Final Deposit and Buyer's Cost Deposit.

"**Development Rights**" means, to the extent not part of the Excluded Assets, all development rights, governmental approvals and entitlements, certificates of authority, applications, licenses, franchises, permits, variances, maps, development plans, development agreements, homeowner's association rights and benefits, engineering studies, reports and data, architectural plans, drawings and CAD files, contracts, warranties, guarantees, assurances, entitlement rights, fee credit agreements, and other rights, benefits, agreements, documents and privileges to the extent primarily related to the Real Property or the development thereof or that were used or could be used in the development of the Real Property, including without limitation the specific items identified on the attached Schedule 1.1C.

"**Disclosure Statement**" is defined in Recital F.

"**Dollars**" or "**$**" will mean and refer to United States Dollars.

"**Environmental Law**" means any foreign, federal, state or local statute, regulation, ordinance, or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources, emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, pesticides, or industrial, infectious, toxic or hazardous substances or wastes into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the processing, generation, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, infectious, toxic, or hazardous substances or wastes, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"**Excluded Asset**" means (1) the Yucaipa Proceeds, (2) all Avoidance Actions and proceeds thereof, (3) any cash or funds in accounts in the possession or under the control of the Trustee as of the Execution Date, including any cash or funds held on behalf of LCPI, any affiliate of LCPI, any of the Debtors, or any of the Estates, including, without

EXHIBIT 3 PAGE 77

limitation, the "Administrative Funds" (as defined in the Settlement Agreement) and the approximately $2,000,000.00 in "Remaining Development Funds" (as defined in the Settlement Agreement) held by the Trustee on behalf of LCPI to the extent provided and otherwise in accordance with, the Settlement Agreement on the Execution Date, (4) the deposits or cash that are the subject of the adversary proceeding entitled Superior Pipelines, Inc., v. LBREP/L-SunCal McAllister Ranch, LLC, et al., Case No. 8:09-ap-01318-ES, (5) the benefits of this Agreement, including the right to receive the Purchase Price, (6) any contracts, assets or other rights or property, that would otherwise be included in the Assets, that are listed by Buyer on Schedule 1.1D on or before the Closing Performance Date (provided Buyer may not exclude any of the Assigned Contracts after the assumption and assignment of such contracts to Buyer pursuant to this Agreement), (7) the surety bonds identified by Seller on Schedule 1.1E (the "Existing Surety Bonds"), and (8) property identified in the *Notice of Motion and Motion for Relief from the Automatic Stay Under 11 U.S.C. 362* filed by General Electric Capital Corporation [Docket No. 124] and/or the exhibits attached thereto.

"Execution Date" is defined in the Introductory Paragraph.

"Final Deposit" is defined in Section 3.4(c).

"Final Order" means an order or judgment of the Bankruptcy Court entered on the Bankruptcy Court's docket as to which there is no stay pending Appeal or other injunction or court order in place that would stay or otherwise limit the enforceability of such order, and as to which the time to file an Appeal has expired and (i) no timely filed Appeal is pending, or (ii) if such an Appeal has been timely filed, then no request for a stay pending Appeal has been made, or any pending request for a stay pending Appeal has been denied and no further request for stay pending Appeal has been filed with a superior court.

"General Intangibles" means, to the extent not part of the Excluded Assets, all right, title and interest of Selling Debtor or its Estate in, to or under any general intangibles (including payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, patents, trade names, trademarks, service marks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, money, deposit accounts, insurance premium rebates, tax refunds, and tax refund claims) and any and all supporting obligations in respect thereof, any other personal rights and property other than Tangible Property, Benefits and Development Rights, and any right of Parent in, to or under any of the foregoing types of property that relates to the Assets.

"Government Entity" means any federal, state, county, city or other government authority of competent jurisdiction, including any official or body thereof, lawfully entitled to exercise any executive, legislative, judicial, administrative, police, regulatory or taxing authority.

EXHIBIT 3 PAGE 78

"**Inchoate Rights**" means to the extent transferable by applicable law and not part of the Excluded Assets, the right to benefit from and enforce any benefit, contract, document, license, permit, regulation, exception, exemption, covenant or other right or asset, not otherwise included in the definition of Assets, the benefit or enforcement of which would be materially beneficial in the use, ownership, development or other enjoyment of the Assets, including (a) all representations and warranties under any contract, agreement or other document under which any Seller obtained any rights, title or interest in or relating to the Real Property or other Assets, and (b) all rights under any contract under which the counterparty or counterparties agree or have agreed (1) not to compete with the operations or property of any Debtor or (2) to keep confidential information regarding any Debtor.

"**Initial Deposit**" is defined in Section 3.4(a).

"**Insurance Claims**" means insurance benefits and proceeds pertaining to the Real Property that accrue on or after January 27, 2011, or that arise any time prior to Closing and relate to facts and circumstances pertaining to the Real Property that are not part of the Available Information.

"**Intangible Property**" means, to the extent not part of the Excluded Assets, all right, title and interest of Selling Debtor or its Estate in, to or under any intangible assets, including the Assigned Contracts, the Benefits, the General Intangibles and the Inchoate Rights, and any right of Parent in, to or under any of the foregoing types of property that relates to the Assets.

"**Interests**" means all Liens, claims, encumbrances or other interests of any nature whatsoever, whether known or unknown, recorded or unrecorded, arising under contract, statute, law, equity or otherwise, including without limitation in each case all "interests" as such term is defined in section 363(f) of the Bankruptcy Code.

"**Introductory Paragraph**" means the first paragraph of this Agreement.

"**Law**" means any statute, code, ordinance, regulation, rule, principal of common law, order or other law that is binding upon the Assets or any Party, as amended from time to time.

"**LCPI**" is defined in Recital "E".

"**LCPI Bankruptcy Case**" is defined in Recital "E".

"**Lien**" means any mortgage, deed of trust, security interest, pledge, hypothecation, encumbrance, mechanics lien, judgment lien, notice of pending action, right of first negotiation, right of first refusal, right of termination, right of forfeiture, right of reversion or other encumbrance, lien or charge.

"**Liquidated Damages**" means any damages payable to Seller pursuant to Section 5.2.

EXHIBIT 3 PAGE 79

"**Material Assets**" is defined in Section 3.2(b), provided that for clarity the Real Property shall be considered a Material Asset for all purposes herein.

"**McAllister Ranch LLC**" is defined in the Introductory Paragraph.

"**McAllister Ranch Real Estate**" is defined in Recital "B".

"**McSweeny Farms LLC**" is defined in the Introductory Paragraph.

"**McSweeny Farms Real Estate**" is defined in Recital "B".

"**New York Bankruptcy Court**" is defined in Recital "E".

"**Notice**" means any notice, consent, approval, acceptance, disapproval, objection, waiver, or other communication required or intended to be given pursuant to this Agreement.

"**Overbid Procedures**" is defined in Recital F.

"**Parent**" is defined in the Introductory Paragraph.

"**Party**" and "**Parties**" are defined in the Introductory Paragraph.

"**Permitted Title Exceptions**" is defined in Section 3.11(a).

"**Person**" means any human being, trust, estate, corporation, limited liability company, partnership, joint venture, agency, labor union, Government Entity or other entity.

"**Plan**" is defined in Recital F.

"**Portfolio Premium**" means, if and only if the Closing (as defined therein) occurs under each of (a) this Agreement pertaining to the sale of the McSweeny Farms Real Estate and certain related Assets, as defined herein (the "**McSweeny Farms PSA**"), (b) that certain Agreement For Purchase And Sale Of Real Property by and between Buyer and Seller of even date herewith pertaining, inter alia, to the sale of the McAllister Ranch Real Estate and certain related Assets (as defined therein) (the "**McAllister Ranch PSA**"), and (c) that certain Agreement For Purchase And Sale Of Real Property by and between Buyer and Seller of even date herewith pertaining, inter alia, to the sale of the Summerwind Ranch Real Estate and certain related Assets (as defined therein) (the "**Summerwind Ranch PSA**"), an amount equal to one third of the amount by which Sixty Million Dollars ($60,000,000.00) exceeds the sum of the Base Purchase Price under this Agreement, the Base Purchase Price under the McAllister Ranch PSA, and the Base Purchase Price under the Summerwind Ranch PSA (with an identical one third to be paid under each the McAllister Ranch PSA and the Summerwind Ranch PSA). If the Closing does not occur under any of this Agreement, the McAllister Ranch PSA or the Summerwind Ranch PSA, the Portfolio Premium shall be zero dollars ($0.00).

"**Purchase Price**" is defined in Section 3.3.

8

EXHIBIT 3 PAGE 80

Execution Copy

"**Real Property**" is defined in Recital "D".

"**Records**" is defined in Section 3.1(b)(3).

"**Recitals**" is defined in the Introductory Paragraph.

"**Required Endorsements**" is defined in Section 3.11(a).

"**Sale**" is defined in Section 3.1.

"**Second Deposit**" is defined in Section 3.4(b).

"**Seller**" is defined in the Introductory Paragraph.

"**Seller's Agents**" means the principals, employees, agents, representatives, attorneys, accountants, property managers, brokers and other advisors and professionals of Seller.

"**Seller's Broker**" means the broker identified as Seller's Broker in Section 6.16.

"**Seller's Costs**" is defined in Section 3.15.

"**Seller's Representations**" is defined in Section 4.2.

"**Selling Debtor**" is defined in the Introductory Paragraph.

"**Summerwind Ranch LLC**" is defined in the Introductory Paragraph.

"**Summerwind Ranch Real Estate**" is defined in Recital "B".

"**SunCal Master I LLC**" is defined in the Introductory Paragraph.

"**Tangible Property**" means, to the extent not part of the Excluded Assets, all right, title and interest of Selling Debtor or its Estate in, to or under any tangible assets, including all furniture, fixtures, equipment and other tangible personal property situated on or appurtenant to the Real Property, or stored offsite but owned or used by any Debtor in developing the Real Property, and intended to be used in connection with the ownership, operation, development or physical maintenance of the Real Property, including without limitation the specific items identified on the attached Schedule 1.1F, and any right of Parent in, to or under any of the foregoing types of property that relates to the Assets.

"**Title Company**" means First American Title Insurance Corporation, and if First American Title Insurance Corporation refuses to issue the Title Policy required herein, then either Lawyers Title Insurance Company, Fidelity National Title Insurance Company, or Chicago Title Insurance Company, as determined by reasonable agreement between Buyer and Seller.

"**Title Policy**" is defined in Section 3.11(a).

EXHIBIT 3 PAGE 81

"**Yucaipa Proceeds**" means any funds which Seller, any of the Debtors or any of the Estates may receive or be entitled to pursuant to that certain Order Granting Motion For Order Approving Compromise Of Controversy Between The Chapter 11 Trustee and Oak Valley Partners, L.P. dated as of October 8, 2010 (Docket no. 505 in the Bankruptcy Case).

1.2    **Conventions**. This Agreement incorporates the following conventions:

(a)    The words "include", "includes" and "including" will be deemed and construed to be immediately followed by the words "without limitation".

(b)    The words "will" and "shall" refer to a mandatory act or obligation, unless the context in which the word is used logically prohibits the application of this convention.

(c)    Unless otherwise stated, all references to "days" will mean calendar days, and all references to "years" will mean calendar years.

(d)    Words or phrases denoting the singular will include the plural, words or phrases denoting the plural will include the singular, and words or phrases denoting gender will include all genders including the masculine, feminine and neuter, unless applying this convention would be contrary to the obvious intent of this Agreement.

(e)    A reference to any Party or any party to any other contract or document will include such Person's successors and permitted assigns.

1.3    **Rules of Construction**. The provisions of this Agreement will be liberally construed to effectuate the Sale. Article and Section headings are for convenience only and will not be given undue consideration in resolving questions of construction or interpretation. Each Party is deemed to have had equal bargaining strength in the negotiation of this Agreement and equal responsibility for the preparation of this document, such that neither this document, nor any uncertainty or ambiguity therein, will be arbitrarily construed or resolved against any Party pursuant to any rule of construction or other Law to the effect that ambiguities in documents are to be construed against the drafter of the document.

### ARTICLE 2.
### CONDITIONS TO CLOSING AND REQUIREMENT FOR COURT APPROVAL

2.1    **Buyer's Waiver of Contingencies and Conditions to Close**. Buyer hereby irrevocably waives all contingencies to the Sale and the Closing relating to financing or due diligence. Buyer's obligation to close the Sale shall, however, be subject to satisfaction or waiver of the following conditions precedent:

(a)    issuance of the Title Policy effective upon the Closing;

(b)    satisfaction of the Bankruptcy Court Approval Condition;

BN 8648996v2                                       10

EXHIBIT 3 PAGE 82

Execution Copy

(c)    accuracy and satisfaction of all Seller's representations, warranties and obligations under this Agreement as required herein; and

(d)    Seller shall not be in Default.

## 2.2    Requirement for Bankruptcy Court Approval.

(a)    Because of the Bankruptcy Case, Seller cannot sell or commit to sell the Assets to Buyer without the approval of the Bankruptcy Court. For that reason, Article 3, which sets forth the obligation of Seller to sell the Assets to Buyer, and the terms of the Sale, will become binding upon and enforceable only if and when the Bankruptcy Court Approval Condition is satisfied. Subject to the more specific obligations and limitations herein, each Party agrees to perform the actions reasonably required of such Party to cause the Bankruptcy Court Approval Condition to be satisfied, including: (a) promptly executing and delivering any motions, declarations or items of support required in connection therewith; and (b) appearing at the confirmation hearing on the Plan (including any continuances thereof) and any other hearings relating to this Agreement, the Sale, or any Appeal of any action by the Bankruptcy Court relating to this Agreement or the Sale.

(b)    Notwithstanding the foregoing, if for any reason the Bankruptcy Court Approval Condition does not occur within 30 days of the entry of the Approval Order, then Seller shall have no obligation to contest any Appeal, and Seller may instead elect in its sole and absolute discretion to terminate this Agreement as provided in Section 5.3(a) of this Agreement; provided, however, that during such 30-day period Seller shall use reasonable efforts to cause the Approval Order to become a Final Order, including opposing any request for a stay pending Appeal.

## 2.3    Obligation to Seek Bankruptcy Court Approval; Sale Procedures Order.

(a)    Seller will seek Bankruptcy Court approval of the Sale and the other transfers and transactions contemplated by this Agreement in connection with the confirmation and consummation of the Plan, including authorization to assume and assign the Assigned Contracts by Seller to Buyer, and shall file all motions, commence all actions, and obtain all Bankruptcy Court orders which are reasonably necessary or appropriate thereto or as reasonably requested by Buyer to cause the Bankruptcy Court Approval Condition to occur. All such motions, orders and notices, and the scope thereof, including the terms of any order confirming the Plan as such order relates to this Agreement or the consummation of the Sale through the Plan, shall be reviewed by and be reasonably satisfactory in form and substance to Buyer. Without limiting the generality of the foregoing, Seller shall request that the Bankruptcy Court, in confirming the Plan, order that, pursuant to section 1146(a) of the Bankruptcy Code, the Sale of the Assets shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States.

(b)    Without limiting the generality of the foregoing, Seller shall file such motion or motions as are reasonably necessary to set the amounts (the "Cure Costs"), if any, necessary to cure any defaults and/or to satisfy any actual or pecuniary losses that

EXHIBIT 3 PAGE 83

have resulted from such defaults under the Assigned Contracts, as determined by the Bankruptcy Court or by agreement between Buyer and any non-Debtor party or parties to such Assigned Contracts, and shall reasonably cooperate with Buyer in seeking to set such Cure Costs at the amounts set forth on Schedule 1.1A.

(c)    Seller will seek immediate Bankruptcy Court approval through motion or stipulation, in form and substance reasonably satisfactory to Buyer, of the stipulation attached as Exhibit B hereto, which shall modify the Overbid Procedures by, among other things, nominating Buyer as the "Stalking Horse Bidder" for the Assets, providing for the breakup fees and other bidder protections set forth therein, and supplementing and, to the extent there is a conflict, superseding any prior overbid procedures applicable to the sale of the Assets.

2.4    **Over-Bidding.**    Buyer acknowledges that the Sale of the Assets to Buyer is subject to possible over-bidding by other prospective buyers, subject to and as provided in the Overbid Procedures. Seller may solicit, negotiate and accept competing offers for the Assets. If Buyer is not the "Winning Bidder" (as defined in the Overbid Procedures) for all or a portion of the Assets, then Buyer shall have the right, but not the obligation, to keep the offer represented by this Agreement open and available as a "Back-Up Bid" (as defined in the Overbid Procedures) for the Assets. Absent a Default by Buyer, if the Bankruptcy Court authorizes a sale or other transfer of all or any portion of the Assets to any person other than Buyer (including an equity infusion or other strategic transaction), and the sale or other transfer authorized by the Bankruptcy Court closes, then upon the closing of such sale this Agreement shall terminate and Buyer shall be entitled to the $250,000 breakup fee set forth in Exhibit B from the sale proceeds. Seller will not be deemed to have breached this Agreement or to have acted in bad faith by reason of soliciting, negotiating or accepting competing offer for the Assets. Absent a Default by Buyer, if Buyer is not the Winning Bidder for all or a portion of the Assets, then any Deposits made by Buyer pursuant to this Agreement will be refunded to Buyer within the time period provided in the Overbid Procedures.

2.5    **No Inconsistent Actions.**    No Party will take any action inconsistent with this Agreement, pending either the Closing or the termination of this Agreement.

**ARTICLE 3.**
**SALE TERMS**

3.1    **Purchase and Sale of the Assets; Assigned Contracts.**

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller will sell and transfer, to the fullest extent permissible by 11 U.S.C. § 363, the Assets to Buyer, and Buyer will purchase the Assets from Seller, free and clear of all Interests under and pursuant to sections 1123(a) and 363(f) of the Bankruptcy Code (the "Sale").

(b)    As used herein, the "Assets" will be deemed to mean the Real Property, the Assigned Contracts, the Development Rights, the Intangible Property, the Records, and the Tangible Property, including without limitation and for purposes of clarification

EXHIBIT 3 PAGE 84

the following, as the same may exist as of the Closing and otherwise be transferrable by Seller without third party consents or the Estates' payment of additional consideration and, to the extent not part of the Excluded Assets (notwithstanding anything that may be set forth or implied to the contrary elsewhere in this Agreement, in no event are the Excluded Assets or any of them included within the Assets or otherwise being transferred pursuant to the Sale):

(1) any and all accounts and notes receivable, deposits, prepaid assets and other such claims for money due to the Selling Debtor (the "Accounts Receivable"), and further including any and all litigation claims, rights and causes of action related to the foregoing;

(2) any and all rights, warranties, guarantees and recourse (other than any Avoidance Actions) to past providers of engineering, architectural and other professional services and materials by third parties contracting with the Selling Debtor in regard to the Assets;

(3) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, property reports, advertising and promotional materials, reports and other records or materials (in whatever form or medium) which relate to the Assets, including the Real Property and the development thereof (collectively, the "Records"); provided, however, that Seller shall not be obligated to deliver possession of the foregoing to the extent they are not in Seller's actual possession; and further, that Seller may retain copies of the foregoing for administrative purposes;

(4) all insurance and condemnation claims and proceeds in respect of the Assets arising from claims relating to periods after the Execution Date and prior to the Closing;

(5) any cash, funds in accounts or other rights or property in the possession or under the control of Seller as of the Closing that has been received between the Execution Date and the Closing on account of any Assets;

(6) any and all litigation claims, rights, causes of action; offsets and other legal rights and actions arising out of or relating to the Assets, including the Real Property and the development thereof, whether arising before or after the commencement of the Bankruptcy Cases, other than any Avoidance Actions;

(7) all goodwill of or relating to Selling Debtor's businesses and/or the Assets;

(8) all intellectual property and rights thereto, including without limitation all rights in or relating to the use of the names McAllister, McAllister Ranch, McSweeny, McSweeny Farms, Summerwind and/or Summerwind Ranch, any and all customer lists (including lists of all past, present and

EXHIBIT 3 PAGE 85

prospective customers), sales and marketing materials (including artwork and collateral materials), mailing lists, marketing lists, employee lists, engineering plans, models and projects, and any and all information related to any of the foregoing; and

(9)     to the extent transferable by applicable law, all rights under any contract under which the counterparty or counterparties agree or have agreed not to compete with the operations or property of Selling Debtor or of its Estate or agree or have agreed to keep confidential information regarding the Selling Debtor or its Estate, without regard to whether any such contract is an Excluded Asset.

(c)     As part of the Sale, pursuant to sections 1123(a) and 365 of the Bankruptcy Code, Seller shall obtain a Bankruptcy Court order authorizing the assumption and assignment by Seller to Buyer of the Assigned Contracts subject only to payment by Buyer of the associated Cure Costs at or after Closing. The Approval Order shall provide that Buyer's payment of the Cure Costs at or after Closing shall be a condition precedent to the assumption and assignment of the Assigned Contracts by Seller and that the Assigned Contracts shall be neither assumed nor assigned absent Buyer's payment of the Cure Costs at or after Closing. Buyer acknowledges that Seller shall have no obligation to obtain authorization to assume and assign to Buyer any contracts other than the Assigned Contacts and any contracts that are Material Assets, and the Approval Order shall provide that Seller shall have no obligation to pay any Cure Costs with respect to any contracts.

3.2     **Material Assets.**

(a)     Buyer acknowledges that the Bankruptcy Court may condition or deny the transfer of certain of the Assets (including for these purposes the assumption and/or assignment of the Assigned Contracts), and that such action by the Bankruptcy Court shall not be a Default by Seller under this Agreement. Except with respect to the Material Assets as provided in Section 3.2(b) immediately below, if the Bankruptcy Court denies the transfer of certain of the Assets, or any of them, or otherwise conditions the transfer thereof, (i) Buyer shall not have the right to terminate this Agreement, (ii) Buyer shall be obligated to proceed with the Closing on the terms set forth in this Agreement without adjustment to the Purchase Price, (iii) any such Assets that cannot be so transferred to Buyer shall be excluded from the Sale and shall be deemed not to be material to this transaction or a material portion of the consideration that Buyer is receiving pursuant to this Agreement, (iv) Seller shall have no obligation to incur any expense, liability or obligation in order to satisfy any conditions upon transfer imposed by the Bankruptcy Court, and (v) without limiting the foregoing, and for avoidance of doubt, any of the Assets identified on any of the Schedules or Exhibits attached to this Agreement which are not Material Assets shall be subject to the foregoing provisions.

(b)     Notwithstanding the foregoing, Buyer may terminate this Agreement as provided below if the Bankruptcy Court either (i) denies the transfer of any of the Assets on the attached Schedule 3.2(b) (collectively, the "**Material Assets**") or (ii) conditions

EXHIBIT 3 PAGE 86

the transfer of any of the Material Assets to Buyer in such a manner that would materially impair the transfer thereof (including a condition requiring procurement of third party consent to such transfer) or impose a material expense or liability upon Buyer in order to satisfy such transfer condition which exceeds the obligations of Buyer expressly set forth in this Agreement (for clarity, a requirement that Buyer pay a Cure Cost as a condition to assumption and assignment of an Assigned Contract or any contract that is a Material Asset shall not trigger this Section 3.2(b)(ii)). Buyer will have until the date which is three (3) Business Days prior to the Closing Performance Date in which to terminate this Agreement as provided in this Section 3.2(b) by providing written notice to Seller. Buyer's failure to elect to terminate this Agreement in writing by said date shall constitute Buyer's election to proceed with the Closing on the terms set forth in this Agreement without adjustment to the Purchase Price. To the extent the Bankruptcy Court conditions the transfer of any of the Assets listed on Schedule 3.2(b) upon the consent of parties other than Seller, and provided the Agreement has not been terminated by Buyer as provided herein, Seller shall provide reasonable cooperation to Buyer in seeking to obtain any such consents; provided, however, Seller shall have no obligation to take any actions that would cause or require the Seller, the Liquidating Trust (as defined in the Plan), or the Debtors' bankruptcy estates to incur material cost or liability or to become party to any lawsuit, action or other dispute. If this Agreement is terminated pursuant to this Section 3.2(b), then (1) any Deposits made by Buyer will be promptly returned to Buyer as Buyer's sole and exclusive remedy, (2) each Party will promptly return to the other Party any documents or property of the other Party within its possession or control received pursuant to this Agreement; (3) neither Party will have any further obligations to the other Party with regard to this Agreement except for Buyer's obligations under Section 3.18, and (4) Buyer shall not be entitled to a breakup fee.

3.3    **Purchase Price.** The price ("**Purchase Price**") for the Assets will be the Base Purchase Price of Ten Million Dollars ($10,000,000.00), or any other higher price that results from any competitive bidding process undertaken in accordance with the Sale Procedures Order, plus the Portfolio Premium, if any, determined in accordance with this Agreement.

3.4    **Payment of Purchase Price.** Buyer will deposit and pay the Purchase Price as follows:

(a)    Initial Deposit. On the Execution Date, Buyer will deposit with Seller an initial deposit ("**Initial Deposit**") in the sum of one hundred fifty thousand dollars ($150,000.00).

(b)    Second Deposit. On the Qualified Bid Deadline (as defined in the Sale Procedures Order), Buyer will deposit with Seller an additional deposit ("**Second Deposit**") in the sum of one hundred thousand dollars ($100,000.00).

(c)    Final Deposit. On or before the Closing Performance Date, Buyer will deposit with Seller the balance of the Purchase Price (inclusive of the Portfolio Premium, if and as applicable), less the Initial Deposit and the Second Deposit ("**Final Deposit**").

EXHIBIT 3 PAGE 87

3.5    **Buyer's Cost Deposit.** On or before the Closing Performance Date, Buyer will deposit with Seller a cash deposit ("Buyer's Cost Deposit") in an amount equal to Buyer's Costs as reasonably estimated by Buyer and Seller in consultation.

3.6    **Form of Payment.** All Deposits and other payments required pursuant to this Agreement will be deposited or paid in cash, by certified cashier's check or federal wire transfer of funds, provided that the Final Deposit must be delivered by federal wire transfer of funds.

3.7    **Maintenance of Deposits.** Seller will promptly deposit any Deposits received pursuant to this Agreement into an account in the Estate's name at a federally insured bank, maintain the Deposits and all interest earned thereon in that account until disbursed, and disburse such funds in accordance with the terms of this Agreement. If Seller will be holding any Deposits made pursuant to this Agreement that exceed $25,000.00, in the aggregate, for a period of more than 10 days, then said account shall be an interest bearing account.

3.8    **Benefit of Interest.** Unless Seller is entitled to retain any Deposits as Liquidated Damages as provided herein, all interest earned on any Deposits held by Seller will accrue to the benefit of Buyer.

3.9    **Brokerage Commission.** Upon the Closing and from the Purchase Price due to Seller, Seller will pay a fee ("Brokerage Commission") in accordance with the Bankruptcy Court's *Order Approving Application of Chapter 11 Trustee for Authorization to: (1) Employ Real Estate Co-Brokers (Park Place Partners, Inc., DBA Land Advisors Organization, and Madison Partners); and (2) Enter Into Listing Agreement for Sale of Real Property* [Docket No. 637].

3.10    **Designation of Alternate Vestee.** At or prior to the Closing Performance Date, Buyer may designate one or more other duly formed Persons in good standing (each a "**Buyer's Designee**") to accept title to any portion or all of the Assets upon the Closing, including through division of the Real Property, by providing written notice of such designation to Seller not less than three (3) Business Days prior to the Closing, provided that: (a) such action will not release Buyer from any obligation or liability under this Agreement, (b) Buyer's Designee is not an affiliate of Selling Debtor, any other Debtor or Parent (unless disclosed to and expressly approved by the Bankruptcy Court), (c) Buyer provides Seller and Title Company with all information regarding Buyer's Designee required to obtain the Title Policy and lawfully transact the Sale, and (d) Buyer's Designee acknowledges in writing in a form reasonably acceptable to Seller that it is acquiring the Assets on and subject to the terms and conditions of the Agreement. If Title Company is unwilling to insure this transaction in the name of Buyer's Designee, then such designation shall not be permitted to occur and any attempted designation by Buyer shall be null and void.

3.11    **Title Insurance.**

(a)    **Title Policy.** As a condition of the Closing and for Buyer's benefit, Seller will cause Title Company to issue and deliver to Buyer or Buyer's Designee at Closing, or be irrevocably committed to issue to Buyer or Buyer's Designee, as of the Closing, a 1990 CLTA Owner's Policy of Title Insurance for the Real Property with coverage equal

16

EXHIBIT 3 PAGE 88

to the amount of the Purchase Price (the "Title Policy"). The Title Policy must include standard forms of: (i) Mechanics' Lien Endorsement (CLTA Form 101); and (ii) Subdivision Map Act Compliance Endorsement (CLTA Form 116.7) (the "**Required Endorsements**"). The Title Policy must be subject only to the following exceptions ("**Permitted Title Exceptions**"):

(1)    exceptions 1-28, 30, 31, 37-42, 44, 45, 52, 56 and 59 reflected on Schedule B-1 to the title report prepared by First American Title Insurance Company dated March 2, 2011 and referenced as Commitment number 474805A as included in the VDR, and any other non-monetary matters, which are non-material to the value or development of the Real Property as reasonably determined by Buyer;

(2)    The lien and encumbrance of non-delinquent real property taxes and assessments, and non-delinquent owners association assessments, prorated as of the Closing, provided that all taxes, assessments, special taxes and special assessments shown as exceptions on the Title Policy shall be paid current at the time of Closing;

(3)    Any title exceptions arising in connection with any financing obtained by Buyer in connection with the Sale;

(4)    The standard pre-printed exclusions and exceptions contained in the Title Policy form; and

(5)    any other title exceptions approved by Buyer in writing or caused by Buyer.

Procurement of additional or extended title coverage, or any particular title endorsements, shall not be a requirement of the Title Policy or a condition precedent to Buyer's obligation to complete the Sale in accordance with the terms of this Agreement; provided, however, that Buyer is not prohibited from negotiating with the Title Company for such additional or extended title insurance coverage or any particular title endorsements (at Buyer's sole cost and expense). Notwithstanding anything to the contrary contained elsewhere in this Agreement, if for any reason the Title Company is unwilling or unable to issue the Title Policy with the Required Endorsements and Permitted Title Exceptions, Seller shall not be in breach of this Agreement and Buyer's sole recourse and remedy shall be to either (i) waive the condition that the Title Policy be issued in the form prescribed above and proceed with the Sale and the Closing on the terms set forth herein, or (ii) terminate this Agreement and obtain a return of the Deposits previously made by Buyer (and Buyer shall not be entitled to a break up fee).

(b)    <u>Buyer's Title Insurance Obligations</u>.    Buyer will promptly complete, execute and deliver to Seller and Title Company any statements of identity, information reports, affidavits and other documents or information reasonably required by the Title Company to issue any Title Policy.

EXHIBIT 3 PAGE 89

3.12   <u>Closing Performance Date</u>.  Each Party will perform all acts required of it to enable the Closing to be transacted on or before the first Business Day following the later of (a) 14 days after the date the Bankruptcy Court Approval Condition is satisfied and (b) the date on which Buyer's termination rights, if any, under any of <u>Sections 3.24(a)</u>, <u>3.24(b)</u> or <u>4.3(e)</u> expire or are waived by Buyer ("**Closing Performance Date**").

3.13   <u>Conveyance Instruments</u>.  On or before the Closing Performance Date, the Parties will cause to be prepared, and the appropriate Party will execute, before a notary public as required, any deeds, bills of sale, assignments and instruments (collectively, "**Conveyance Instruments**") required to assign and convey the Assets to Buyer upon the Closing on the terms set forth in this Agreement.

3.14   <u>Buyer's Costs</u>.  On or before the Closing Performance Date, Buyer and Seller shall consult and will reasonably estimate the following costs ("**Buyer's Costs**"), which costs will be collected from Buyer and paid and charged to Buyer's account upon Closing,

     (a)   All applicable documentary transfer taxes;

     (b)   All applicable recording fees and filing fees, including for the deed(s) to the Real Property, and any mortgages, deeds of trust or financing statements associated with any financing obtained by Buyer;

     (c)   The additional title insurance premium, if any, in excess of the premium payable by Seller pursuant to <u>Section 3.15(b)</u>, for any additional or extended title coverage or any endorsements issued at the request of Buyer or Buyer's lender;

     (d)   Any prorations, transfers, credits, debits, adjustments or other payments required of Buyer pursuant to <u>Section 3.16</u>; and

     (e)   Any other closing costs not allocated in this Agreement which are customarily paid by the purchaser of real property in the county in which the Real Property is located.

3.15   <u>Seller's Costs</u>.  On or before the Closing Performance Date, Buyer and Seller shall consult and will reasonably estimate the following costs ("**Seller's Costs**"), which costs will be treated as a credit against the Purchase Price at Closing:

     (a)   The Brokerage Commission;

     (b)   The premium for a standard CLTA owner's title policy;

     (c)   Any prorations, transfers, credits, debits, adjustments or other payments required of Seller or constituting credits against the Purchase Price hereunder and ascertainable as of Closing; and

     (d)   Any other closing costs not allocated in this Agreement which are customarily paid by the seller of real property in the county in which the Real Property is located.

EXHIBIT 3 PAGE 90

3.16   <u>Prorations</u>.

(a)     Except as otherwise set forth in this Agreement, Seller will receive the benefit of all income from and the burden of all expenses of the Assets prior to the Closing, and Buyer will receive the benefit of all income from and the burden of all expenses of the Assets following the Closing.  In furtherance of the forgoing intent, the income and expense items listed on the attached <u>Schedule 3.16</u> will be prorated as of 12:00 midnight the morning of the Closing Performance Date, based on the total number of days in the month and year in which the Closing occurs and the actual number of days elapsed in the month and year in which the Closing occurs, and the Purchase Price shall be adjusted accordingly, at Closing.

(b)     If at any time before or after the Closing Seller receives any payments, refunds, credits or other funds or property relating to periods following the Closing, Seller shall hold such property in trust for the benefit of Buyer and shall deliver such property to Buyer forthwith.  If at any time before or after the Closing Buyer receives any payments, refunds, credits or other funds or property relating to periods preceding the Closing, Buyer shall hold such property in trust for the benefit of Seller and shall deliver such property to Seller forthwith.

3.17   <u>Excluded Liabilities</u>.  Buyer shall not assume, and shall have no liability or obligation for any liabilities of Seller, Debtors or their Estates, as a successor in interest or otherwise, including, without limitation, any liability arising out of, or related to, any of the following ((a)-(l) below, collectively, the "**Excluded Liabilities**"):

(a)     all liabilities and obligations arising under any and all Excluded Assets or under any and all contracts, agreements, leases and commitments not included in the Assets;

(b)     except as set forth in clause (a) above, all liabilities and obligations under portions of Debtors' business not arising in connection with the conduct or operation of, or the use or ownership of, the Assets by the Buyer;

(c)     any liabilities to employees or consultants of Seller, any Debtor or their Estates, including any liability with respect to any key employee retention plans, any liability with respect to or arising from any "employee benefit plan" (as defined in section 3(3) of ERISA), any liability with respect to the Worker Adjustment and Retraining Notification (WARN) Act and any liability with respect to COBRA coverage for employees or consultants of Seller, any Debtor or their Estates terminated prior to or as part of the consummation of the transactions set forth in this Agreement;

(d)     any severance payable to any employee or consultant of Seller, any Debtor or their Estates;

(e)     any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases;

EXHIBIT 3 PAGE 91